**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
06/08/2018

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 16-35634-H4-7** |
| **CURTIS G. TEGELER and** | § | |
| **SANDY R. TEGELER,** | § | |
| *also known as* **SANDRA LYNN** | § | |
| **TEGELER** | § | |
| | § | |
| **Debtors.** | § | **Chapter 7** |
| | § | |
| | § | |
| **TRUSTMARK NATIONAL BANK** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Adversary** No. **17-03043** |
| **v.** | § | |
| | § | |
| **CURTIS G. TEGELER and** | § | |
| **SANDY R. TEGELER,** | § | |
| *also known as* **SANDRA LYNN** | § | |
| **TEGELER** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION REGARDING PLAINTIFF'S COMPLAINT
TO DETERMINE DISCHARGEABILITY**
**[This Order Relates to Adv. Doc. No. 1]**

## I.   INTRODUCTION

Sandy Tegeler ("Ms. Tegeler") and Curtis Tegeler ("Mr. Tegeler") filed a Chapter 7

petition on November 7, 2016, thereby becoming the debtors in the main case (hereinafter, they

are sometimes referred to as "the Debtors").  On February 9, 2017, Trustmark National Bank

("Trustmark") initiated the pending adversary proceeding against the Debtors.  Prior to the

Debtors' filing of their Chapter 7 petition, Trustmark had extended a $230,000.00 loan to the

Debtors' 100%-owned company, a debt that the Debtors had personally guaranteed.  Trustmark

requests this Court to enter a judgment for the amount of this unpaid loan, plus attorneys' fees

1

and costs, as a nondischargeable debt for which the Debtors, jointly and severally, are liable under 11 U.S.C. § 523(a)(2)(A) or, alternatively, under § 523(a)(6).[1]

This Court held a multi-day trial in this adversary proceeding that concluded on December 8, 2017. The Court then took the matter under advisement. On March 29, 2018, this Court held a brief hearing to announce orally on the record that it had decided to grant the relief sought by Trustmark. The Court indicated that it would eventually issue written Findings of Fact and Conclusions of Law, together with a judgment, explaining its decision. However, the Court informed the parties that it would refrain from entering its written findings and conclusions, plus the judgment, until after Trustmark had proven up its reasonable attorneys' fees and expenses. The Court instructed Trustmark's counsel to submit his fee bills to counsel for the Debtors by no later than April 6, 2018, and also instructed the Debtors' counsel to file a certificate by no later than April 20, 2018, setting forth whether the Debtors objected to the amount of the fees and expenses requested by Trustmark.

Trustmark's counsel did, in fact, timely submit his fee bills [Adv. Doc. No. 52]; and counsel for the Debtors did, in fact, timely submit a certificate objecting to a portion of the fees and expenses requested by Trustmark. [Adv. Doc. No. 53]. The Court then scheduled a hearing on this discrete dispute for May 15, 2018. However, the parties filed an agreed motion to continue the hearing, which this Court granted. [Adv. Doc. Nos. 55–56]. The hearing was actually held on May 31, 2018, and after receiving the evidence (which consisted of exhibits of Trustmark, namely the fee bills of its counsel) and listening to oral arguments of the attorneys, the Court determined that the amount of Trustmark's reasonable fees and reasonable expenses

---

[1] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted. Further, any reference to a "Rule" is a reference to the Federal Rules of Bankruptcy Procedure.

for which the Debtors are jointly and severally liable (and which amounts are nondischargeable) total $91,728.00 and $6,503.84, respectively, for a total amount of $98,231.84.[2]

In the wake of this Court's holding the hearing to determine Trustmark's reasonable fees and expenses, the Court now issues these written Findings of Fact and Conclusions of Law pursuant to Rule 7052 explaining why it has decided to grant the relief requested by Trustmark and enter a judgment declaring that $371,565.88, the outstanding amount owed under the loan documents (including attorneys' fees and costs) is a nondischargeable obligation owed by the Debtors, jointly and severally.  To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such; and to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such.  The Court reserves the right to make additional findings and conclusions as this Court deems appropriate or as may be requested by either of the parties.

## II.     FINDINGS OF FACT

### A.  Background of the Debtors

1.     Ms. Tegeler met Mr. Tegeler in 1991, and they were married in 1994.  Ms. Tegeler went to Texas A&M University-Kingsville and graduated with a bachelor's degree in human science and nutrition.  She also pursued a master's degree in English, but did not graduate.  [Nov. 7, 2017 Tr. 136:20–138:3].

---

[2] The Court made oral Findings and Fact and Conclusions of Law on the record at the May 31, 2018, hearing, and these findings and conclusions are incorporated herein as if fully set forth.  The Court notes that at this hearing, counsel for the Debtors stipulated that all of the fees and expenses requested by Trustmark are reasonable.  Further, the Court, fulfilling its independent duty to review Trustmark's fee bills, has reviewed these bills and finds that the entries satisfy both applicable law and U.S. Trustee guidelines, including setting forth the date that the services were rendered, the initials of the attorneys or legal assistants rendering the services, a description of the services that were rendered, and the amount of time spent rendering each of these services.  The substantive argument made by counsel for the Debtors at this hearing is that Trustmark is not entitled to recover the attorneys' fees that it incurred prior to the filing of the Debtors' Chapter 7 petition.  Counsel for Trustmark made opposing arguments, and this Court concluded that Trustmark is, in fact, entitled to recover its fees for services rendered both pre-petition and post-petition.  The Court emphasizes that counsel for the Debtors has not only preserved for appeal purposes his right to argue that this Court has erred in awarding Trustmark its pre-petition attorneys' fees, but has also preserved for appeal purposes his right to argue that no fees should be awarded on the grounds that this Court erred in concluding that the underlying obligation owed by the Debtors is a nondischargeable debt.

2.        Mr. Tegeler, at age thirteen, began working in a machine shop in Corpus Christi, Texas.  [Oct. 25, 2017 Tr. 6:4-13].  He graduated from high school.  [Oct. 25, 2017 Tr. 7:10-12]. He also attended Tyler Junior College as well as Texas A&M University-Kingsville, but did not graduate from either school.  [Oct. 25, 2017 Tr. 7:10–8:3].  After college, Mr. Tegeler spent the next sixteen years working for various drill pipe manufacturers in the oil and gas industry.  [Oct. 25, 2017 Tr. 8:15–11:25].  Mr. Tegeler claims he was diagnosed with dyslexia when he was in third grade.  [Nov. 6, 2017 Tr. 80:11-12].  He claims that he still presently suffers from dyslexia. [Nov. 6, 2017 Tr. 84:19-20].  He also claims that he instructs Ms. Tegeler to read his e-mails to him.  [Nov. 6, 2017 Tr. 84:21-25].

3.        Even though he does not have a college degree, Mr. Tegeler is a sophisticated businessman; indeed, he testified that he is sophisticated and experienced.  [Oct. 26, 2017 Tr. 40:11-22].  His significant sophistication and business acumen are underscored by the fact that he borrowed $2.7 million from John Lindley ("Lindley"), his business associate of thirty-five years, without the assistance of counsel.  [Nov. 7, 2017 Tr. 88:8-17].  Mr. Tegeler testified that the purpose of borrowing $2.7 million from Lindley was to "buy the Stuteses out and merge in with FWM."[3]  [Nov. 7, 2017 Tr. 127:7-9].  Additionally, the Asset Purchase Agreement[4] that is the subject of the suit at bar, which Mr. Tegeler signed and is subsequently described in greater detail, describes his level of sophistication as follows:

> [Mr. Tegeler] is an 'accredited investor' within the meaning of Rule 501 of Regulation D [the definition of this term is found in 17 C.F.R. § 230.501] promulgated under the Securities Act, has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of the transactions contemplated by this Agreement.

[Pl.'s Ex. No. 10 at 16, ¶ 4.16].

---

[3] See Finding of Fact Nos. 7–8 for more detail about Mr. and Ms. Stutes and FWM, respectively.

[4] See Finding of Fact No. 27 for a more detailed discussion about the Asset Purchase Agreement.

**B. Background of BC Gulf Coast Machine & Supply, Inc.**

4.      In September 2008, Mr. Tegeler formed BC Gulf Coast Machine & Supply, Inc. ("BCGC").  [Oct. 25, 2017 Tr. 11:22-25].  In the same year, Ms. Tegeler began working for BCGC.  [Nov. 7, 2017 Tr. 138:14-16]. Ms. Tegeler served as the Vice President of BCGC. [November 27, 2017 Tr. 118:24–119:7].  Her duties included:

      a.  Performing data entry [Nov. 7, 2017 Tr. 138:22-24];

      b.  Setting up BCGC's bank accounts [Nov. 7, 2017 Tr. 139:6];

      c.  Managing BCGC's finances and documenting the transactions in QuickBooks [Nov. 7, 2017 Tr. 139:8];

      d.  Managing BCGC's accounts payable and accounts receivable [Nov. 7, 2017 Tr. 141:18-25];

      e.  Sending invoices to BCGC's clients [Nov. 7, 2017 Tr. 139:8-9];

      f.  Paying BCGC's operational expenses [Nov. 7, 2017 Tr. 139:5-9];

      g.  Answering the telephone calls [Nov. 7, 2017 Tr. 139:13-14]; and

      h.  Facilitating various human resource functions, including payroll [Nov. 7, 2017 Tr. 140:24–141:2].

5.      In January of 2009, BCGC began its operations and engaged in the business of manufacturing, selling, and machining of drill pipe, collars, and other tubulars used in the oil and gas industry.  [Oct. 26, 2017 Tr. 20:23–21:7].  BCGC's headquarters and yard were located in Spring, Texas.  [Nov. 7, 2017 Tr. 122:13-17].

6.      Mr. Tegeler served as the President of BCGC.   [Oct. 25, 2017 Tr. 60:12-20].  His duties included:

      a.  Replacing damaged machinery for BCGC [Oct. 25, 2017 Tr. 12:11-13];

    b.   Purchasing new machinery for BCGC [Oct. 25, 2017 Tr. 15:15-20];

    c.   Improving the profitability of BCGC [Oct. 25, 2017 Tr. 12:10-15]; and

    d.   Maintaining the growth of BCGC's facilities and operations [Oct. 25, 2017 Tr. 12:18–13:13].

7.     Initially, BCGC's shareholders included not only the Debtors, but also Brad Stutes ("Mr. Stutes") and Anita Stutes ("Ms. Stutes") (collectively, the "Stuteses"), each of whom owned a 25% interest in the company.  [Nov. 7, 2017 120:14-22].  Eventually, Mr. Tegeler came to mistrust Mr. Stutes, concluding that Mr. Stutes was, among other alleged improper practices, unethically steering business away from BCGC to his own 100%-owned company in Louisiana.  [Nov. 7, 2017 Tr. 121:2-11, 121:19–126:24].  Thus, Mr. Tegeler decided to buy out the 50% interest owned by the Stuteses.  [*Id.*].  In order to effectuate the buyout of the 50% interest owned by Mr. and Ms. Stutes, Ms. Tegeler conveyed all of her interest in BCGC to Mr. Tegeler.  [Nov. 28, 2017 Tr. 27:6-9].  Mr. Tegeler thereafter paid $2.7 million to buy out the interest held by the Stuteses.  [Nov. 7, 2017 Tr. 119:12–120:22].  As a condition of this buyout, the Debtors were required to relocate BCGC's operations to another facility by the end of August 2014, as the Stuteses owned the real property in Spring, Texas, on which BCGC's headquarters and yard were located.  [Nov. 7, 2017 Tr. 100:5-15].  For the Debtors, time was very much of the essence to find a new location to run BCGC's operations.

**C.**    **The Debtors Enter into Negotiations to Physically Move BCGC's Operations and Also Seek to Obtain a Line of Credit for BCGC**

8.     Having obtained 100% ownership of BCGC, and knowing that he had to quickly and physically move BCGC's operations and assets to a different location, Mr. Tegeler began negotiations with David Rayne ("Rayne"), the CFO of FWM Tubular & Equipment Corporation ("FWM"), and William Huebel ("Huebel"), FWM's 100% owner.  [Nov. 7, 2017 Tr. 31:13-15;

Oct. 24. 2017 Tr. 115:8-18].  FWM's business, which was located in Cleveland, Texas, was similar to BCGC's business.  [Oct. 25, 2017 Tr. 14:4-16, 33:4-5].  Mr. Tegeler believed that it was in BCGC's best interest to explore merging with FWM; indeed, FWM had a much larger operational yard—twenty-five acres—in Cleveland, Texas, that could accommodate BCGC's equipment and allow for much greater growth than otherwise would be the case.  [Oct. 25, 2017 Tr. 14:13–15:22].

9.      After holding initial discussions with Huebel in July 2014, Mr. Tegeler concluded that if BCGC was going to merge with FWM, BCGC first needed to obtain a line of credit.  [Oct. 25, 2017 Tr. 18:9-14]; indeed, Huebel emphasized to Mr. Tegeler that as a condition precedent for FWM to enter into any transaction with BCGC, the latter had to first procure a line of credit facility.  [Nov. 7, 2017 Tr. 93:10-12].  Moreover, Mr. Tegeler concluded that he needed to move quickly if any agreement was going to be achieved with FWM.  [Oct. 25, 2017 Tr. 18:24–19:3].  Given these circumstances, and given the fact that the line of credit and the merger itself would require documentation, Mr. Tegeler decided to retain both an attorney and an accountant to help negotiate and document these transactions.  [Oct. 23, 2017 Tr. 19:3-5].

10.     On behalf of BCGC, Mr. Tegeler retained Jared LeBlanc ("LeBlanc") of Welsh LeBlanc LLP to represent the company in negotiating and documenting whatever transaction between BCGC and FWM could best achieve BCGC's objectives.  [Oct. 26, 2017 Tr. 17:20–18:3].

11.     Additionally, on behalf of BCGC, Mr. Tegeler retained Bob Stephens ("Stephens"), a certified public accountant whom he had known for several years.  [Oct. 27, 2017 Tr. 24:6-24].

a.   Stephens is employed by Kimes, Stephens & Co.  [*Id.*].

7

b.  Stephens prepared the Debtors' personal tax returns for several years.  [Nov. 27, 2017 Tr. 57:17-19].

c.  Stephens was also the outside corporate accountant for BCGC for many years.  [Oct. 25, 2017 Tr. 16:18–17:2].  He was responsible for filing the company's tax returns as well as addressing general accounting inquiries.  [Oct. 25, 2017 Tr. 17:6-9].

d.  Stephens played two roles in his representation of the Debtors.  First, with respect to the BCGC-FWM transaction, Stephens stated that his "role was to help facilitate document preparation for the attorneys involved [i.e., LeBlanc (as counsel for BCGC) and Dinerstein (as counsel for FWM)], provide documents as requested, and generally just be available to help facilitate whatever the attorneys needed."  [Oct. 26, 2017 Tr. 88:24–89:4].  Second, he not only introduced the Tegelers to Trustmark, but also assisted the Tegelers in the loan application process for BCGC to obtain financing from Trustmark.  [Oct. 25, 2017 Tr. 18:12-18].  To a large extent, he was the liaison between the Tegelers and Trustmark.  [Oct. 25, 2017 Tr. 22:16–23:1].  Stephens sent two invoices to the Debtors for the services that he rendered on their behalf and on BCGC's behalf.  His invoice of July 29, 2014, was for $21,000.00, and contains the following description of his services: "In connection with meetings, e-mails, correspondence, financials, etc. for negotiation and completion of acquisition.  85 hours@ $300/hr."  [Court Ex. No. 1].  And, his invoice of $8,600.00 to BCGC dated September 4, 2014, contains the following description of his services: "In connection with meetings, calls, correspondence with client and bank, document review, and related matters

regarding negotiation and completion of 2nd transaction.  34.5 hours x $250/hr." [*Id.*].  Thus, the total amount of Stephens' billings was $29,600.00.

e.  Over the course of five years, Stephens has referred three of his clients in need of financing to Trustmark—specifically, to Christy Petrilla ("Petrilla") who is an officer at Trustmark.  [Oct. 23, 2017 Tr. 64:13-18; Oct. 24, 2017 Tr. 28:7-19].

f.  Stephens himself had a business line of credit with Trustmark.  [Oct. 24, 2017 Tr. 27:16–28:3].

g.  Over the course of five years, Trustmark has hired Stephens' 100%-owned company to perform two or three field audits for Trustmark, including collateral field exams.  [Oct. 24, 2017 Tr. 29:4–30:3; Oct. 26, 2017 Tr. 75:13–76:8].  Specifically, his company reviewed accounts receivable and inspected inventory, and then provided Trustmark with a professional report of its findings.  [*Id.*].

12.  BCGC initially applied to Chase Bank for a line of credit.  [Oct. 25, 2017 Tr. 18:19-21].  However, Chase Bank informed Mr. Tegeler that at least four to five weeks would be required for such approval to be given.  [Oct. 25, 2017 Tr. 18:24–19:3].  During Mr. Tegeler's testimony, he indicated that this was too much time and he worried that BCGC would lose whatever opportunity that it had with FWM.  [*Id.*].

13.  The Debtors then met with Trustmark to discuss obtaining a line of credit for BCGC.  [Oct. 24, 2017 Tr. 102:19–103:4].  Specifically, in late July 2014, Mr. and Ms. Tegeler, together with Stephens, met with Petrilla, the loan officer of Trustmark to whom Stephens had previously referred other clients of his who needed financing.  [*Id.*].

a.  From August 2014 to Spring 2015, Petrilla was the VP Commercial Lender at Trustmark.  [Oct. 24, 2017 Tr. 90:6-15].  She has been employed by Trustmark for ten years.  [Oct. 24, 2017 Tr. 90:10–91:12].

b.  As a VP Commercial Lender, Petrilla was responsible for managing two commercial loan officers, Wayne Johnson ("Johnson"), a junior lending officer at Trustmark, and Jonathan Miller ("Miller"), a relationship manager.  [Oct. 24, 2017 Tr. 92:3–93:13].  Petrilla, Johnson, and Miller, as Trustmark's loan officers, were responsible for conducting due diligence and underwriting.  [Oct. 24, 2017 Tr. 96:5-6].  Specifically, this means that these loan officers must gather financial information for all prospective borrowers and guarantors for the loan application because Trustmark relies on this information to evaluate the credit risks and qualify their prospective borrower.  [Oct. 24, 2017 Tr. 96:5-17].  Furthermore, Trustmark requires its prospective borrowers to submit accurate borrowing base certificates to accurately reflect a prospective borrower's accounts receivable and other assets, upon which Trustmark relies to advance funds under any approved credit facility.  [Oct. 24, 2017 Tr. 181:4-14]

c.  Petrilla's duties included assisting Johnson and Miller with writing loan packages and obtaining approvals for commercial loans.  [*Id.*].

d.  At their initial meeting with Petrilla, the Debtors represented to her that the purpose of the line of credit was to help fund BCGC's relocation, restructure of operations, general working capital, and operating expenses.  [Oct. 23, 2017 Tr. 29:6-9; Oct. 24, 2017 Tr. 7:3-13].  The Debtors never told Petrilla that they were presently planning to transfer all of BCGC's assets to Mr. Tegeler or FWM

immediately after the loan closing.  [Oct. 26, 2017 Tr. 33:7-9; Oct. 24, 2017 Tr. 112:17-19].[5]

e.  At this meeting in late July of 2014, after listening to the Debtors, Petrilla, on behalf of Trustmark, decided to explore providing financing to BCGC.  [Oct. 24, 2017 Tr. 93:25–94:19].   In order to extend credit to a prospective borrower, Trustmark required Petrilla to perform the following steps: (1) gather financial information from the prospective borrower and guarantors; (2) subject the requested loan to the underwriting process; (3) obtain approval for the loan; (4) obtain signatures from the borrower and guarantors on the documents memorializing the terms and conditions of the loan; and (5) book the loan in the system.  [Oct. 24, 2017 Tr. 95:6–96:9].  Petrilla explained these steps to Mr. and Ms. Tegeler and Stephens at their initial meeting.

14.  On August 4, 2014, Mr. and Ms. Tegeler, with assistance from Stephens, provided the requisite information about BCGC and themselves (as prospective guarantors of the loan) to Trustmark in support of BCGC's application to procure a line of credit.  [Oct. 25, 2017 Tr. 42:4–45:12].   Among other documents that the Debtors gave to Petrilla was a completed loan application generated by Trustmark's loan application software that she had given to them at the initial meeting.[6]  Petrilla relied upon the information that the Debtors provided to her in order to

---

[5] At trial, the Debtors testified that at this initial meeting, they expressly told Petrilla that BCGC would be merging with FWM [Oct. 25, 2017 Tr. 32:17-25]—apparently wanting this Court to conclude that a merger is the equivalent of one company's sale of all of its assets to another company (the Court makes no such conclusion; indeed, a merger of two companies is an entirely different transaction than one company conveying all of its assets to another company).  Petrilla testified that they made no such "merger" statement to her.  [Oct. 24, 2017 Tr. 104:20-25].  As set forth in the Credibility Section of this Memorandum Opinion, the Court finds Petrilla more credible than the Debtors, and the Court therefore finds that the Debtors made no such statement to Petrilla.

[6] The Debtors completed this loan application and returned it to Petrilla, but they failed to actually sign this application.  Nevertheless, Trustmark relied upon the information and representations contained therein in assessing the loan request for BCGC.  Eventually, after Trustmark approved the loan request and the Debtors signed the

assess the loan request, obtain approval within the bank, and then have the loan documents drafted.  [Oct. 24, 2017 Tr. 96:10-22, 181:9-14].

15.     Meanwhile, the negotiations between BCGC and FWM continued during the first few weeks of August of 2014.  [Oct. 26, 2017 Tr. 23:15-22].  BCGC's representatives in these negotiations were LeBlanc and Stephens.   [Oct. 26, 2017 Tr. 17:22–18:3].   FWM's representatives were its two attorneys, Jeff Dinerstein ("Dinerstein") and Jordan Bethea ("Bethea"), of the law firm of Jones Day.  [Oct. 23, 2017 Tr. 19:2-3].  Both Mr. Tegeler (BCGC's principal) and Huebel (FWM's principal) were kept abreast of the negotiations via e-mail and verbal communications.  [Pl.'s Ex. No. 10 at 36–47].  Ms. Tegeler was also copied on these e-mails and, from time to time, gave input.  [Pl.'s Ex. Nos. 12–13].  No disclosure of these discussions was ever made to Trustmark, which was considering BCGC's request for a line of credit during this time.

16.     The written and oral communications between BCGC and FWM unequivocally reflect that the transaction between these two entities contemplated that FWM would purchase all of BCGC's assets and that Mr. Tegeler would receive 50% of the shares of stock of FWM in exchange for the conveyance of BCGC's assets to FWM, plus $450,000.00 in cash.  [Oct. 25, 2017 Tr. 35:2-8].  There was no discussion at all of a merger of these two companies.  Examples of these communications are as follows:

---

appropriate loan documents, Trustmark discovered that they had never had actually signed the loan application. Trustmark sent the application to them for their signatures, and the Debtors signed this document (without making any changes) and returned it to Trustmark.  [Finding of Fact No. 33].

**E-mail Exchanges on August 1, 2014**

a.   On August 1, 2014, at 5:22 P.M., Rayne sent an e-mail to Mr. Tegeler and
Stephens (and a copy to Huebel) and attached a draft of a document entitled
"Asset Purchase Agreement."[7] [Pl.'s Ex. No. 10 at 36].

b.   On August 1, 2014, at 5:32 P.M., Stephens responded to the e-mail stating, "As
we discussed on the call today, my understanding is that Jeff [Dinerstein] will also
be preparing a Shareholder Agreement and will forward that when it is ready, and
that he will be sending us a copy of the current Operating Agreement/Bylaws
when he is able to retrieve them (from Dallas I believe he mentioned).  Let me
know if there is a change regarding this." [8] [Pl.'s Ex. No. 10 at 36].

c.   On August 1, 2014, at 5:59 P.M., Rayne replied to Stephens stating, "You are
correct.  We are completing the shareholder agreement now."  [Pl.'s Ex. No. 10 at
37].

**E-mail Exchanges on August 2, 2014**

d.   On August 2, 2014, at 10:01 A.M., Rayne sent an e-mail to Mr. Tegeler and
Stephens (and copied Huebel) and attached a draft of the document entitled
"Shareholder Agreement."  [Pl.'s Ex. No. 10 at 40].  Stephens confirmed receipt
of this draft.  [*Id.*].

---

[7] The final version of the Asset Purchase Agreement is described in Finding of Fact No. 27.

[8] The Shareholder Agreement is an agreement between Huebel and Mr. Tegeler concerning their ownership of
FWM.  As discussed in Finding of Fact No. 27, on August 21, 2014, in exchange for Mr. Tegeler conveying all of
BCGC's assets to FWM and contributing $450,000.00 in cash to FWM's coffers, Mr. Tegeler received 50% of the
stock of FWM.  The Shareholder Agreement was drafted and executed to memorialize Mr. Tegeler's ownership
interest in FWM.

**E-mail Exchanges on August 4, 2014**

e.  On August 4, 2014, at 12:20 P.M., Stephens made the following comments and also posed a question: "David [Rayne], regarding our call last week and Jeff Dinerstein's request for a waiver letter on the default provision (on the sale of the business assets) of a debt covenant that BC Gulf Coast will have with Frost Bank and the bank that will be doing the line of credit, can you contact Jeff [Dinerstein] and ask him if he has a template that he would like the bank to use?  Frost has requested something to use, **and I suspect the other bank would like to have something to work from as well**."  [Pl.'s Ex. No. 10 at 41][9] (emphasis added).

f.  On August 4, 2014, at 12:37 P.M., Rayne forwarded a response from Dinerstein to Rayne (and copied Huebel, Stephens, and Bethea) to address Stephens' inquiry. Specifically, Dinerstein said, "We do not have a form of waiver.  We would have to prepare something specific for this deal.  Is this something that you want us to do?"  [Pl.'s Ex. No. 10 at 42–43].

g.  On August 4, 2014, at 12:38 P.M., Dinerstein e-mailed Rayne (and copied Huebel, Stephens, and Mr. Tegeler), stating that he will call Rayne to provide him with his professional opinion concerning the need for a waiver from Trustmark. [Pl.'s Ex. No. 10 at 43].

h.  On August 4, 2014, at 1:00 P.M., Rayne replied to Dinerstein (and copied Huebel, Stephens, Mr. Tegeler, and Bethea) stating, "Bob [Stephens], I think it is typical for the Bank to have a standard covenant waiver form.  Waiving covenant defaults

---

[9] Although Stephens did not expressly state in this e-mail that "the other bank" was Trustmark, there is no question that it was Trustmark, as the Tegelers and Stephens had just recently met with Trustmark, and, in fact, were awaiting Trustmark's decision whether to approve BCGC's request for a line of credit.

is a fairly typical action the banks provide for loan holders when circumstances warrant the waiver."  [Pl.'s Ex. No. 10 at 44].

i.   On August 4, 2014, at 2:25 P.M., Stephens replied to Rayne and Dinerstein (and copied Huebel, Mr. Tegeler, and Bethea) stating, "David, I work with a lot of banks and understand that banks will either offer a forbearance agreement, or offer some form of waiver.  In this case, the bank asked me to ask if your attorney had something specific he would like used.  I will tell them no."[10]  [Pl.'s Ex. No. 10 at 44–45].

j.   On August 4, 2014, at 2:45 P.M., Dinerstein replied to Stephens (and copied Huebel, Mr. Tegeler, Rayne, and Bethea) stating, "Nothing specific.  We just wanted to make sure the facilities allow for this transaction, waive any defaults caused by the closing of the transaction and allow for an orderly assignment of the credit facility, if applicable, to FWM."  [Pl.'s Ex. No. 10 at 45].

**E-mail Exchanges on August 7, 2014**

k.   On August 7, 2014, at 1:28 P.M., Ms. Tegeler e-mailed Stephens stating, "Good afternoon.  Evidently, the attorney for FWM wants us to verify with our other lien holders [sic] that we are merging with another company and to make sure that they are not going to make our loans Due Immediately.  I am wondering if that is not going to just raise red flags.  What are your thoughts?"  [Pl.'s Ex. No. 12 at 8].

---

[10] The Court finds that the reference here to "the bank" is a reference to Trustmark, as it was the only bank at this time with whom the Debtors were communicating about a loan.  The Court also finds that Trustmark never asked Stephens if FWM's attorney had a specific forbearance agreement or form of waiver, as Trustmark was totally unaware of the negotiations between BCGC (and its representatives) and FWM (and its representatives); indeed, Stephens and the Debtors had deliberately kept Trustmark in the dark about these negotiations.  Rather, the Court finds that Stephens was improperly leading FWM's representatives and attorneys to believe that he had conferred with Trustmark when, in fact, he had not.  The Court makes these findings based upon the credible testimony of Petrilla that no one ever asked her for a waiver.

l.  On August 7, 2014, at 3:34 P.M., Stephens replied to Ms. Tegeler stating, "Hi Sandy, just got back to the office and also got a call from Curtis.  We spoke and I agree."  [Pl.'s Ex. No. 12 at 8].

m.  On August 7, 2014, at 3:35 P.M., Ms. Tegeler replied to Stephens stating, "OK. Think there is a way to appease the other side?"  [Pl.'s Ex. No. 12 at 9].

n.  On August 7, 2014, at 3:40 P.M., Stephens replied to Ms. Tegeler stating, "Honestly, it's Jeff [Dinerstein, FWM's attorney], not David [Rayne] and Bill [Huebel] in my opinion.  And no, if it's up to Jeff, all steps and actions would be completed before a deal is done."  [Pl.'s Ex. No. 12 at 11].

**D.  Loan Documents Between BCGC and Trustmark Delivered to the Debtors on August 12, 2014**

17.  While the negotiations between BCGC and FWM continued to proceed during the first few weeks of August 2014, Trustmark internally approved BCGC's request for a line of credit.  [Pl.'s Ex. No. 1 at 7–8].  On August 12, 2014, Trustmark therefore sent the requisite loan documents to Mr. and Ms. Tegeler to review in order to ensure that they understood the terms and conditions of the loan.  [Finding of Fact No. 13(e)].  Although the loan documents were dated August 12, 2014, the Debtors actually signed the documents at Trustmark's office at the loan closing on August 18, 2014.  [Oct. 24, 2017 Tr. 101:24–102:15; Nov. 6, 2017 Tr. 31:23–32:1; Nov. 7, 2017 Tr. 92:20-25].  Accordingly, the Debtors—between the date they received the loan documents on August 12, 2014, and the date of the loan closing held on August 18, 2014—had plenty of time to review the documents.  Meanwhile, during this time period, the Debtors were firming up their transaction with BCGC and FWM.  They did not, however, disclose this transaction—or any communication about this transaction—to Trustmark; nor did Stephens or LeBlanc.

18.     The promissory note (the "Note") that Trustmark delivered to the Debtors on August 12, 2014, reflected that Trustmark had decided to provide BCGC with a line of credit up to the principal amount of $300,000.00.  [Pl.'s Ex. No. 1 at 7].

19.     The revolving loan agreement delivered to the Debtors on August 12, 2014 (the "Revolving Loan Agreement") contains language that is highly relevant to the suit at bar.

    a.  Paragraph 11(b) of the Revolving Loan Agreement contains representations and warranties by BCGC, which provide, "[BCGC] represents and warrants to [Trustmark] that . . . [n]one of the accounts or inventory forming the basis of the collateral securing [BCGC's] indebtedness to [Trustmark] is or will be subject to any other superior liens, security interests or other encumbrance[s]."  [Pl.'s Ex. No. 2 at 11, ¶ 11(b)].

    b.  Paragraph 12(g) of the Revolving Loan Agreement contains an affirmative covenant, which provides, "So long as all or any portion of the indebtedness to [Trustmark] remains unpaid, [BCGC] will . . . [i]nsure no material change in the current ownership of the business, in the personnel controlling operations, and in the active management of the company or its successors or assigns."  [Pl.'s Ex. No. 2 at 11–12, ¶ 12(g)].

    c.  Paragraph 12(i) of the Revolving Loan Agreement contains an affirmative covenant, which provides:

> So long as all or any portion of the indebtedness to [Trustmark] remains unpaid, [BCGC] will . . . [p]romptly notify [Trustmark] of all material adverse changes in [BCGC's] financial condition, and all existing and threatened litigation, claims, investigations, administrative proceedings or similar actions which could materially affect the financial condition of [BCGC] or  Guarantor.

[Pl.'s Ex. No. 2 at 11–12, ¶ 12(i)].

    d.  Paragraph 14 of the Revolving Loan Agreement contains negative covenants, which provide:

> Until the Note and all other obligations and liabilities of [BCGC] to [Trustmark] are fully paid, [BCGC] covenants that it will not, without the prior written consent of [Trustmark]:
>
>     a.  Reorganize, merge or consolidate with, or acquire all or substantially all of the assets of any other company, firm or association, or make any other substantial change in its capitalization or character of its business;
>     b.  Purchase or redeem any of its stock;
>     c.  Sell the majority of its assets used or useful in its business, except in the ordinary course of business.

[Pl.'s Ex. No. 2 at 13, ¶ 14].

    e.  Paragraph 16 of the Revolving Loan Agreement contains an integration clause, which provides:

> **THIS LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES**.

[Pl.'s Ex. No. 2 at 14, ¶ 16].

    20.  In addition to the Note and the Revolving Loan Agreement, Trustmark also delivered to the Debtors a Commercial Security Agreement (the "Security Agreement") on August 12, 2014.

    a.  To secure the Note, BCGC pledged to Trustmark a first priority security interest in all of BCGC's present and future inventory, accounts, chattel paper, contract rights, and general intangibles (the "Collateral"), wherever located, whether

presently owned or thereafter acquired, whether presently existing or thereafter arising.  [Pl.'s Ex. No. 3 at 16].

 b. The Collateral was used to "secure the Indebtedness [i.e., $300,000 principal]." [*Id.*].

 c. BCGC represented and promised that it "shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral" or "pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or other charge, other than the security interest provided for in the Security Agreement."  [Pl.'s Ex. No. 3 at 16–17].

 d. Finally, much like the Revolving Loan Agreement, the Security Agreement also contains an integration clause, which provides:

> This agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alternation or amendment.

[Pl.'s Ex. No. 3 at 18].

21. On August 12, 2014, Trustmark also delivered to the Debtors a commercial guaranty that each of them would have to sign in order for Trustmark to extend financing to BCGC (the "Guaranties").

 a. The Guaranties make it clear that by signing these documents, the Debtors would be "absolutely and unconditionally guarantee[ing] full and punctual payment and satisfaction of the Indebtedness of [BCGC] to [Trustmark], and the performance and discharge of all [BCGC's] obligations under the Note and Related Documents."  [Pl.'s Ex. No. 5 at 23; Pl.'s Ex. No. 6 at 26].

    b.   The Guaranties also contain representations and warranties from the Debtors that they have "established adequate means of obtaining from [BCGC] on a continuing basis information regarding [BCGC's] financial condition."  [Pl.'s Ex. No. 5 at 23; Pl.'s Ex. No. 6 at 26].  The Guaranties expressly require the Debtors to keep Trustmark "adequately informed from such means of any facts, events, or circumstances which might in any way affect [the Debtors'] risks under [these Guaranties]."  [*Id.*].

### E.  Loan Closing at Trustmark's Offices on August 18, 2014

    22.    On August 18, 2014, the formal loan closing took place at Trustmark's offices.  In attendance at this meeting were the following: Mr. Tegeler, Ms. Tegeler, Stephens, and Petrilla.  [Oct. 24, 2017 Tr. 103:13-15; Nov. 6, 2017 Tr. 31:23–32:1].  Mr. Tegeler, in his capacity as BCGC's President, and Ms. Tegeler, in her capacity as BCGC's Vice President, signed the Note, the Revolving Loan Agreement, and the Security Agreement.  [Pl.'s Ex. Nos. 1–3].  Additionally, Mr. Tegeler and Ms. Tegeler, in their individual capacities, also signed the Guaranties at this loan closing (hereinafter, the Note, the Revolving Loan Agreement, the Security Agreement, and the Guaranties are collectively referred to as the "Loan Documents").  [Pl.'s Ex. No. 5 at 23; Pl.'s Ex. No. 6 at 26].  Although this loan closing was held on August 18, 2014, and although Mr. Tegeler and Ms. Tegeler signed the Loan Documents on this date, the Loan Documents were actually dated August 12, 2014 (i.e., the date that Trustmark had first delivered the Loan Documents to the Debtors so that they would have sufficient time to review them).  [Oct. 24, 2017 Tr. 101:24–102:15; Nov. 6, 2017 31:23–32:1; Nov. 7, 2017 Tr. 92:20-25].

    23.    When the loan closing took place at Trustmark's offices, neither Mr. Tegeler nor Ms. Tegeler nor Stephens informed Petrilla about any negotiations that they had recently been

conducting with FWM, including the exchange of drafts of the Asset Purchase Agreement and Shareholder Agreement that would, within a few days, be executed.  Moreover, at this loan closing, Petrilla testified that none of the parties requested a waiver of any provision of the Loan Documents.  [Oct. 24, 2017 Tr. 104:11-19].  Indeed, the Debtors admitted at trial that they did not request a waiver of any provision of the Loan Documents.  [Oct. 26, 2017 Tr. 50:22–51:5; Nov. 6, 2017 Tr. 33:20–35:15].

**F.  Key E-mail Exchanges of August 19, 2014**

24.     On August 19, 2014—the day after the loan closing—the Debtors, Stephens, and LeBlanc (BCGC's attorney) continued to be involved in the negotiations with FWM's principal (Huebel) and FWM's attorneys regarding the material terms of the Asset Purchase Agreement— which was still in draft form, not yet executed.[11]  It was on this day that Mr. Tegeler (on behalf of both BCGC and himself), Stephens, and Huebel (on behalf of FWM) agreed to delete the condition precedent requiring either party to obtain a waiver of events of default relating to the Loan Documents.  [Nov. 6, 2017 Tr. 42:4–46:22; Pl.'s Ex. No. 13 at 1–7].

> i.   At 12:46 P.M., Stephens e-mailed Rayne (and copied Mr. Tegeler and Huebel) stating, in part, that "Both Frost and Trustmark are aware of the transaction and have instructed us that they have no problem rolling these loans to the new entity, without having to execute new note agreements.  They will simply require an amendment to name FWM as the maker.  However, I do not believe we are going to get the banks attorney's [sic] to agree to prepare waivers.  I recommend that

---

[11] The final version of the Asset Purchase Agreement is described in Finding of Fact No. 27.

this be removed from the requirements . . . Alan Stroud is working on the BC Gulf Coast asset distribution docs."[12]  [Pl.'s Ex. No. 13 at 5].

    ii.  The Court finds that Stephens misled Rayne.  His statement that Trustmark is "aware of the transaction" and that it had no problem "rolling these loans to the new entity, without having to execute new note agreements" is a complete fabrication.  In fact, based upon the credible testimony of Petrilla and the other loan officers of Trustmark who testified at trial, Trustmark was not aware of "the transaction."

    iii.  Because Stephens copied Mr. Tegeler on his e-mail to Rayne, Mr. Tegeler knew that Stephens was misleading Rayne because Mr. Tegeler, like Stephens, knew full well that Trustmark was not aware of "the transaction" and had never stated that it had no problem switching out its borrowers so as to replace BCGC with FWM.

25.    At 1:42 P.M., LeBlanc (BCGC's attorney) e-mailed revisions of the Asset Purchase Agreement to Bethea (FWM's attorney), Stephens, Huebel, Rayne, and Jennifer Mailhes[13] (and copied Dinerstein), stating, in part, "6.1(g): Delivery of Frost and Trustmark waivers: It's my understanding that the parties have agreed to waive this particular requirement, so I replaced the language with 'Intentionally Deleted.'"  [Pl.'s Ex. No. 13 at 1–2].

    i.  The deleted text of Section 6.1(g) stated, "Waivers from each of [Frost] and Trustmark with respect to any breach or other default by Seller or BC Gulf Coast under the [Frost line of credit] or the Seller LOC [i.e., the line of credit facility

---

[12] Alan Stroud is another attorney who represented BCGC, and he assisted in working on certain documents associated with the transactions resulting in FWM acquiring title to all of the assets owned by BCGC.  [Oct. 26, 2017 Tr. 162:18–163:7].

[13] Jennifer Mailhes is a certified public accountant who provided services to FWM.  [Nov. 7, 2017 Tr. 56:19–57:4].

provided by Trustmark to BCGC], respectively, that may occur thereunder in connection with or as a result of consummation of the transactions contemplated by this Agreement." Under this deleted text contained the phrase "INTENTIONALLY DELETED."

ii. While BCGC's attorney (i.e. LeBlanc) may have concluded that BCGC and FWM had agreed to waive this requirement FWM's attorney (Dinerstein) had not so concluded. At 7:24 P.M., he sent an e-mail to Rayne (copying Dinerstein, but not Stephens or Mr. Tegeler) stating that with respect to any waivers from Trustmark and Frost, "we understand that the requirement for these has not been waived. Curtis (i.e., Mr. Tegeler) to provide. Frost has agreed to provide written wavier [sic] and Trust Mark [sic] has provided verbal assurances. Curtis is calling Trustmark first thing in the morning and requesting a written document." This Court wants to make it eminently clear that the credible evidence shows that Trustmark was not in any way involved in this decision, as Trustmark had no knowledge whatsoever that BCGC was negotiating with FWM; nor had anyone asked Trustmark for a waiver of any event of defaults concerning the Loan Documents.

iii. At 8:54 P.M., Rayne forwarded LeBlanc's e-mail to Stephens and Mr. Tegeler, so there is no question that these two individuals knew that FWM and its counsel expected Mr. Tegeler to call Trustmark on the morning of August 20, 2014, to obtain a waiver regarding the transfer of BCGC's assets to FWM. The Court finds that Mr. Tegeler never called Trustmark on the morning of August 20, 2014, requesting such a waiver; indeed, at no time did Mr. Tegeler ever request such a

waiver.  Nor did FWM continue to insist that he do so as a condition to going forward with effectuating the transaction that the two entities had been negotiating.  Indeed, the comment made by Stephens to Ms. Tegeler in his August 7, 2014, e-mail—i.e., that it was only FWM's attorney, not FWM's principal (Huebel) or officer (Rayne) who was really focused on BCGC obtaining a waiver from Trustmark [Finding of Fact No. 16(n)]—turned out to be true.  When push came to shove, FWM's attorney (Dinerstein) backed off from this request.

## G.  Conveyance of All of BCGC's Assets to Mr. Tegeler on August 20, 2014

26.    On August 20, 2014—two days after the loan closing—Mr. Tegeler executed a document entitled Blanket Conveyance, Bill of Sale, and Assignment (the "Conveyance") and conveyed, transferred, and sold 100% of BCGC's assets to himself personally.  [Pl.'s Ex. No. 10 at 28].  The Conveyance specifically provided that "the officers of [BCGC] have been directed to distribute all of the assets of [BCGC] to [Mr. Tegeler] in complete liquidation and cancellation of the issued and outstanding stock of [BCGC]."  [*Id.*].  Mr. Tegeler signed and executed the Conveyance in his capacities as the President and sole shareholder of BCGC.  [*Id.*].  The assets that BCGC conveyed to Mr. Tegeler included all of the Collateral.  Mr. Tegeler gave no consideration to BCGC in exchange for BCGC conveying all of its assets to him.  [Nov. 27, 2017 Tr. 131:6–132:8].  Mr. Tegeler **did not** obtain written consent from Trustmark before or after transferring all of BCGC's assets (including the Collateral) to himself personally.  [Oct. 26, 2017 Tr. 42:19–43:4].  Indeed, Mr. Tegeler admitted that he did not contact Trustmark to request the bank's consent in writing, despite an e-mail from Bethea to Rayne dated August 19, 2014, reciting, "Waivers for Frost and Trustmark – we understand the requirement for these has not been waived.  [Mr. Tegeler] to provide.  Frost has agreed to provide written wavier [sic] and

24

Trust Mark [sic] has provided verbal assurances.  [Mr. Tegeler] is calling Trustmark . . . and requesting a written document."  [Pl.'s Ex. No. 13 at 7].  Finally, the Debtors never provided Trustmark with a copy of the Conveyance.

## H.  Conveyance of Assets from Mr. Tegeler to FWM on August 21, 2014

27.     On August 21, 2014—three days after the loan closing and one day after Mr. Tegeler had BCGC convey all of the company's assets to himself—Mr. Tegeler proceeded to sell all of the assets that he had acquired the previous day from BCGC.  [Pl.'s Ex. No. 10 at 13–39]. Specifically, Mr. Tegeler (as the sole shareholder of BCGC), Huebel Ranch & Investments, LLC ("Huebel Ranch"), and Huebel executed a document entitled "Asset Purchase Agreement" to convey, transfer, and sell the Purchased Assets (as that term is defined in the document) to FWM (the "Asset Purchase Agreement").  [Id.].  Paragraph 1.1 of the Asset Purchase Agreement described the Purchased Assets as the

> rights, title and interest in and to substantially all of the assets, properties and rights owned or held by or on behalf of [Mr. Tegeler], of every nature and description, both tangible and intangible, real or personal, wherever such assets are situated, whether or not reflected on the books and records of [Mr. Tegeler] (or on the books and records of [BCGC] prior to the distribution of such assets, properties and rights to [Mr. Tegeler]) . . . .

[Pl.'s Ex. No. 10 at 13, ¶ 1.1].   In addition to transferring title of the Purchased Assets to FWM, Mr. Tegeler also paid cash to FWM in the amount of $450,000.00.  [Oct. 25, 2017 Tr. 35:2-8].

28.     Pursuant to Section 1.6 of the Asset Purchase Agreement, the consideration that Mr. Tegeler received for conveying BCGC's assets, and also paying $450,000.00, to FWM was 500 shares of FWM, which represented a 50% ownership interest in FWM.[14]  [Pl.'s Ex. No. 10 at

---

[14] Indeed, according to the Debtors' Schedules filed in the Main Case, the Debtors have represented that Mr. Tegeler owned a 50% interest in FWM as of the date of the filing of their Chapter 7 petition.  [Main Case Doc. No. 21 at 7].

16, ¶ 1.6].   Meanwhile, BCGC received no consideration.   The Asset Purchase Agreement recites, in part:

> On August 20, 2014, [Mr. Tegeler] caused [BCGC] to distribute substantially all of the assets of [BCGC] to [Mr. Tegeler].   [Mr. Tegeler] desires to sell the Purchased Assets . . . to [FWM].   [Mr. Tegeler] has agreed to sell and assign to [FWM], and [FWM] has agreed to purchase and take, the Purchased Assets from [Mr. Tegeler] free and clear of all Liens, except the Permitted Liens.

[Pl.'s Ex. No. 10 at 13].   According to Schedule 1.1 of the Asset Purchase Agreement, the Permitted Liens include: (1) Liens on the Purchased Assets pursuant to [Mr. Tegeler's] line of credit with Frost Bank; and (2) Liens on the Purchased Assets pursuant to [Mr. Tegeler's] line of credit with Trustmark Bank.   [Pl.'s Ex. No. 10 at 9].

29.     Yet, paragraph 1.3 of the Asset Purchase Agreement recites, "On the terms and subject to the conditions set forth in this Agreement, on the date hereof, [FWM] will assume only those Liabilities of [Mr. Tegeler]."   [Pl.'s Ex. No. 10 at 15, ¶ 1.3(a)].   The Assumed Liabilities include the "Seller LOC," which is described in Section 4.18 as an "unsecured, uncollateralized, non-guaranteed line of credit from Trustmark."   [Pl.'s Ex. No. 10 at 28, ¶ 4.18].   Thus, this particular paragraph of the Asset Purchase Agreement contradicts Schedule 1.1 of this document, as Section 1.3 sets forth that Trustmark's line of credit is an unsecured loan.

30.     Mr. Tegeler testified that he did not read the Asset Purchase Agreement before signing it.   [Nov. 7, 2017 Tr. 86:16–87:9].

31.     Mr. Tegeler admitted that the line of credit provided by Trustmark for BCGC benefitted FWM.   [Nov. 7, 2017 Tr. 93:4-6].   He also admitted that he needed to procure the line of credit for BCGC as a condition for closing the Asset Purchase Agreement with FWM.   [Nov. 7, 2017 Tr. 93:10-12].

32.     On the date that Mr. Tegeler executed the Asset Purchase Agreement, neither Mr. Tegeler, Ms. Tegeler, nor Stephens ever provided Trustmark with a copy of the Asset Purchase Agreement.  [Oct. 26, 2017 Tr. 39:20–40:8, 152:3-18; Nov. 6, 2017 Tr. 71:4-18].[15]  Furthermore, the Debtors and Stephens made no verbal disclosure to Trustmark about the Conveyance or the Asset Purchase Agreement.  [Oct. 24, 2017 Tr. 111:10–113:1].  Thus, Trustmark was not aware of the Asset Purchase Agreement—either by written or verbal communication.   Moreover, Trustmark never granted or provided a written waiver of any of the terms contained in any of the Loan Documents, including the requirement that any sale of BCGC's assets be approved in advance by Trustmark in writing.  [Oct. 26, 2017 Tr. 57:2–58:23; Oct. 23, 2017 Tr. 62:2-10; Nov. 6, 2017 Tr. 34:22–35:15].

**I.  Relevant Events Occurring After August 21, 2014**

33.     At some point after the loan closing of August 18, 2014, occurred, Trustmark discovered that it did not have in its file a *signed* loan application from BCGC.  [Oct. 24, 2017 Tr. 6:4-13, 12:14–15:5].  Therefore, Trustmark sent to the Debtors the completed but unsigned loan application and requested them to sign this document and return it to Trustmark.  [Oct. 24, 2017 Tr. 14:10–15:5].  On August 29, 2014, the Debtors returned to Trustmark the signed loan application on behalf of BCGC.  [Pl.'s Ex. No. 13 at 8–14].  The loan application inquired, "Is the collateral being pledged owned by someone other than the business or the owners of the business?"  [Pl.'s Ex. No. 13 at 9].  In their response to this inquiry, the Debtors stated, "no." [*Id.*].  Yet, by this time—August 29, 2014—FWM owned the Collateral, as BCGC had conveyed the Collateral to Mr. Tegeler on August 20, 2014, and Mr. Tegeler had conveyed the same assets to FWM on August 21, 2014.  [Finding of Fact Nos. 26–27].  And, the entity that now owned the

---

[15] It was not until late November of 2014 that the Debtors finally provided Trustmark with a copy of the Asset Purchase Agreement, and they did so only because Petrilla—at some earlier point in November of 2014—became aware of this transaction.  [Oct. 24, 2014 Tr. 136:2-11].

Collateral (FWM) was owned not only by Mr. Tegeler, but also by Huebel.  Because Huebel had no ownership interest in BCGC (i.e., Trustmark's borrower), the representation made by the Tegelers on the loan application was patently false.

34.     Trustmark perfected its security interest in the Collateral on September 2, 2014, by recording the UCC filing statement with the Texas Secretary of State.  [Pl.'s Ex. No. 4 at 1].

35.     On September 12, 2014, Ms. Tegeler e-mailed Latricia Kuretich ("Kuretich"), Petrilla's loan administrative assistant, requesting Trustmark to make an advance of $300,000.00 to BCGC under the Note.  [Pl.'s Ex. No. 12].  Kuretich responded to Ms. Tegeler's e-mail, advising Ms. Tegeler that a borrowing base certificate would be required before an advance of $300,000.00 could be made under the Note.  [*Id.*].  As of this date, Trustmark still did not know that Mr. Tegeler had executed the Conveyance on August 20, 2014, transferring all of BCGC's assets to himself, and then, the next day, he had sold all of these same assets to FWM pursuant to the Asset Purchase Agreement.  [Oct. 24, 2017 Tr. 181:15–182:15].

36.     On September 17, 2014, Ms. Tegeler, as an "authorized officer" of BCGC, signed and submitted a borrowing base certificate to Trustmark.  The eligible accounts receivable set forth in this borrowing base certificate are shown to be those numbers in effect as of September 17, 2014—i.e., thirty days after Ms. Tegeler's execution of the Loan Documents at the loan closing that established the line of credit facility for BCGC.  The certificate reflects that the total eligible accounts receivable was $389,324.00.  Ms. Tegeler made the following representations in this borrowing base certificate on behalf of both Mr. Tegeler and herself:

> *To the best of our knowledge and belief, there have been no changes in the amounts stated above since the date of calculation which would cause the present balance of accounts and inventory to be less than the amount necessary to comply in all respects with this Certificate.  We hereby affirm, represent and warrant to you the following as of the date hereof:*

*(1) there does not exist an Event of Default of any event or condition which, with notice of lapse of time, or both, would constitute an Event of Default under the terms of any agreement between us, including, without limitation, any loan agreement, security agreement, deed of trust, note and mortgage; (2) that all the representations and warranties previously given to you were correct when made and are reaffirmed as correct now; and (3) that we are in compliance with all terms, covenants and conditions of all agreements between us.*

We hereby confirm to you that all of the above accounts, whether now owned or hereafter arising or acquired including but not limited to each and every account furnished to you under the provision of the Security Agreement, and all proceeds thereof and all liens, and securities, guarantees, remedies, and privileges pertaining hereto are, and heretofore have been assigned to you, and are and have been subject to a security interest in your favor, and have accordingly marked our records to reflect same.

[Pl.'s Ex. No. 13] (emphasis added).

a. The emphasized language in the first paragraph above was a material misrepresentation because as of September 17, 2014, the Debtors knew that BCGC (on August 20, 2014) had conveyed all of its assets to Mr. Tegeler, who almost immediately then conveyed the same assets to FWM. [Finding of Fact Nos. 26–27]. Stated differently, as of September 17, 2014, Ms. Tegeler knew that BCGC was a shell corporation with no assets. Thus, as of September 17, 2014, Ms. Tegeler's representation about BCGC's accounts receivable that "there have been no changes in the amounts stated above since the date of calculation which would cause the present balance of accounts and inventory to be less than the amount necessary to comply in all respects with this Certificate" was patently false.

b. The emphasized language in the second paragraph above was a material misrepresentation because as of September 17, 2014, the Debtors knew that BCGC (on August 20, 2014) had conveyed all of its assets to Mr. Tegeler, who

29

almost immediately then conveyed the same assets to FWM [Finding of Fact Nos. 26–27]—an entity in which her husband owned 50% of the stock and for which she was an officer. Thus, as of September 17, 2014, there did indeed exist Events of Default in the Loan Documents that the Debtors, as officers of BCGC, and in their individual capacities, had signed on August 18, 2014, at the loan closing. Specifically, as of September 17, 2014, the following Events of Default existed:

i. Paragraph 11(b) of the Revolving Loan Agreement contains representations and warranties by BCGC, which provide, "[BCGC] represents and warrants to [Trustmark] that . . . [n]one of the accounts or inventory forming the basis of the collateral securing [BCGC's] indebtedness to [Trustmark] is or will be subject to any other superior liens, security interests or other encumbrance[s]." [Pl.'s Ex. No. 2 at 11, ¶ 11(b)]. In fact, however, as of September 17, 2014, these assets had become encumbered, as FWM's two lenders (i.e., Lone Star Bank and Mainland Bank) had liens on all of FWM's assets, and FWM's assets by this date included the assets of BCGC to which Mr. Tegeler himself took title on August 20, 2014, and then conveyed to FWM on August 21, 2014.

ii. Paragraph 15(c) of the Revolving Loan Agreement defines "default" to include a breach of any covenant in the Note, or other Loan documents, or in this Revolving Loan Agreement." [Pl.'s Ex. No. 2 at 13, ¶ 15(c)]. Paragraph 12(i) of the Revolving Loan Agreement (entitled "Affirmative Covenants") sets forth that BCGC will "[p]romptly notify the Lender of all material adverse changes in [BCGC's] financial condition." [Pl.'s Ex.

No. 2 at 11–12, ¶ 12(i)].  Yet, as of September 17, 2014, BCGC—which was controlled solely by the Debtors—had failed to notify Trustmark that on August 20, 2014, all of BCGC's assets had been conveyed to Mr. Tegeler for no consideration, who then the next day conveyed all of these same assets to FWM—thereby leaving BCGC with no assets.  There is no question that the conveyance of all of BCGC's assets represented a "material adverse change" in BCGC's financial condition.  Thus, BCGC was in default of Paragraph 12(i) as of September 17, 2014, but the Debtors failed to notify Trustmark.

iii.  Paragraph 14(a) of the Revolving Loan Agreement (entitled "Negative Covenants") sets forth that BCGC "covenants that it will not, without the prior written consent of Bank . . . make any other substantial change in its capitalization or character of its business."  [Pl.'s Ex. No. 2 at 13, ¶ 14(a)]. Yet, by September 17, 2014, all of BCGC's assets had been conveyed away through the acts of Mr. Tegeler, and therefore, the character of this business had substantially changed, as it had become a shell corporation.

iv.  Paragraph 14(c) of the Revolving Loan Agreement sets forth that BCGC "covenants that it will not, without the prior written consent of Bank . . . sell the majority of its assets used or useful in its business, except in the ordinary course of business."  [Pl.'s Ex. No. 2 at 13, ¶ 14(c)].  By September 17, 2014, BCGC—solely through the acts of Mr. Tegeler with no consent—had conveyed away all of BCGC's assets for no consideration, and neither the first conveyance of these assets to Mr.

Tegeler nor the second transfer to FWM were in the ordinary course of BCGC's business.

c.  Additionally, the representation made by Ms. Tegeler in the first paragraph of the borrowing base certificate also created a misrepresentation under the Guaranty that she executed at the loan closing.  Her Guaranty expressly sets forth that, "upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently had been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided."  Here, Ms. Tegeler's patently false representation in the borrowing base certificate meant that she was also making a blatantly false representation under her Guaranty.

37.    Thus, on September 17, 2014—i.e., twenty-eight days after BCGC had conveyed all of its assets to Mr. Tegeler and twenty-seven days after Mr. Tegeler had sold these same assets to FWM—Ms. Tegeler submitted to Trustmark a borrowing base certificate falsely representing that BCGC's total eligible accounts receivable were $389,324.00 and that there were no Events of Default under the Loan Documents.  [Pl.'s Ex. No. 7; *see* Adv. Doc. No. 50, p. 4 of 9].  The borrowing base certificate further falsely represented that BCGC's borrowing base was accurate as of September 17, 2014.  [Pl.'s Ex. No. 7; *see* Adv. Doc. No. 50, p. 4 of 9; Oct. 25, 2017 Tr. 49:18–50:7].

38.    On September 18, 2014, Johnson (Trustmark's junior lending officer), relying upon what he believed were true and accurate figures in the borrowing base certificate, adjusted

the figures downward in the borrowing base certificate from $389,324.00 to $230,000.00 because the certificate included ineligible accounts receivable.  [Pl.'s Ex. No. 7 at 34–36; Oct. 23, 2017 Tr. 51:22–53:1].

39.     Based upon his analysis, Johnson approved the loan request; however, he informed Ms. Tegeler that based upon the formula set forth in the Loan Documents, the maximum amount BCGC could draw down under the line of credit was $230,000.00.  [Pl.'s Ex. No. 7 at 34–36; Oct. 23, 2017 Tr. 51:22–52:22].

40.     In response to Johnson's communication, Ms. Tegeler requested an advance of $230,000.00.  [Pl.'s Ex. No. 7 at 34–36].  Specifically, Ms. Tegeler requested Trustmark to wire transfer $230,000.00 to BCGC's bank account at Frost Bank—an account in which Mr. Tegeler and Ms. Tegeler were the only authorized signatories.  [Pl.'s Ex. No. 7 at 99, ¶¶ 29–36; Oct. 24, 2017 Tr. 108:19–109:4].  Trustmark processed this request on September 18, 2014, and the wire transfer was indeed effectuated.  [Pl.'s Ex. No. 8].

41.     After the loan proceeds posted to BCGC's bank account, Ms. Tegeler, as BCGC's Vice President with signature authority on BCGC's account, wrote three checks totaling, in the aggregate, $230,000.00.  [Oct. 25, 2017 Tr. 72:19–73:22].  All three checks were payable to FWM from BCGC.  [*Id.*].  The first check in the amount of $155,000.00 was dated September 19, 2014.  [Oct. 25, 2017 Tr. 72:19–73:2].  The second check in the amount of $35,000.00 was dated on November 5, 2014.  [Oct. 25, 2017 Tr. 73:10-16].  The third check in the amount of $40,000.00 was dated November 20, 2014.  [*Id.*].  The sum of these three checks is $230,000.00.  [Oct. 25, 2017 Tr. 73:17-22].  The Debtors did not inform Trustmark about these three checks.  At trial, Mr. Tegeler admitted to using all of the Note proceeds for FWM's working capital and operating expenses, which usage was directly contrary to the representations made in the loan

application and the Loan Documents that the loan proceeds would only be used for BCGC's operations.  [Nov. 7, 2017 Tr. 101:18-25; Nov. 28, 2017 Tr. 35:12-14].  BCGC's operating account at Frost Bank remained open, and BCGC and FWM did not consolidate their respective books; indeed, BCGC and FWM maintained separate accounting records.  [Nov. 7, 2017 Tr. 178:6–179:6; Oct. 27, 2017 Tr. 122:13-18].  These facts hardly reflect the so-called "merger" that the Debtors have insisted all along took place between BCGC and FWM.

42.     Once Mr. Tegeler became a 50% owner of FWM as a result of the Asset Purchase Agreement, Ms. Tegeler became an officer of FWM.  [Nov. 28, 2017 Tr. 32:19-24].  Specifically, she became FWM's Secretary.  [*Id.*].  She was not a shareholder.  [*Id.*].  At FWM, her duties included: bookkeeping, handling health insurance issues, addressing worker's compensation issues, and managing human resource matters.  [Nov. 28, 2017 Tr. 32:25–33:6].  She did not draw a salary at FWM.  [Nov. 28, 2017 Tr. 33:7-8].  Soon after Mr. Tegeler became a 50% owner of FWM, he and his wife became signatories on FWM's bank account.  [Nov. 28, 2017 Tr. 33:9-12].  Huebel remained a signatory on this account.  [*Id.*].

43.     The Debtors, in their dual capacities as officers of BCGC and in their individual capacities as guarantors of the Note, made no efforts to transfer the Note held at Trustmark from BCGC's name to FWM's name, despite the Debtors' alleged intent to merge and operate as one company—i.e., as FWM.  [Oct. 26, 2017 Tr. 65:1-10].

44.     Pursuant to the Note, BCGC was required to make its first interest payment no later than October 12, 2014.  [Pl.'s Ex. No. 1].  BCGC failed to do so.  [Oct. 24, 2017 Tr. 23:25–24:3].

45.     Furthermore, BCGC was required to submit to Trustmark borrowing base certificates each month.  [Oct. 24, 2017 Tr. 126:20–127:1].  When BCGC failed to submit the

October 2014 borrowing base certificate to Trustmark, Petrilla contacted Ms. Tegeler in early November of 2014 to request the documentation.  [Oct. 24, 2017 Tr. 127:2-13-20].  At that time, Ms. Tegeler agreed to provide the borrowing base certificate to Petrilla and informed her that BCGC had "merged" with FWM.  [Oct. 24, 2017 Tr. 127:14-18].  Subsequently, Petrilla requested FWM's financial information.  [Oct. 24, 2017 Tr. 128:4-9].

46.     On November 21, 2014, Petrilla and Miller (Trustmark's relationship manager) met with the Debtors at FWM's headquarters in Cleveland, Texas.  [Oct. 24, 2017 Tr. 131:20–132:13, 154:1-11].  On November 25, 2014, Petrilla e-mailed Ms. Tegeler the borrowing base certificates dated September 30, 2014, and October 31, 2014, and requested her signature.  [Oct. 24, 2017 Tr. 154:12–155:1; Defs.' Ex. No. 8].  After leaving FWM's facility, Petrilla conducted a UCC search on FWM and discovered that there was already an existing lien on FWM's accounts receivable.  [Oct. 24, 2017 Tr. 136:2-11].  On November 17, 2014, Petrilla requested additional financial information to further investigate the nature of the BCGC-FWM transaction, and the Debtors thereafter sent the Asset Purchase Agreement to her.  [*Id.*; Defs.' Ex. No. 7 at 18].  Further, on November 17, 2014, Petrilla e-mailed Ms. Tegeler, stating, in part: "Good afternoon.  Just wanted to check on the status of the September and October Borrowing Base Certificates and A/R agings.  Also, Bob [Stephens] mentioned that you would have the tax id number for FWM Tubular for the new loan documents.  Can you please [sic] the tax number to me too?"  [Defs.' Ex. No. 7 at 18].  On November 19, 2014, Ms. Tegeler provided FWM's tax identification number to Petrilla.  [*Id.*].  Furthermore, Ms. Tegeler told Petrilla, "We would like to discuss our borrowing base report when you arrive because of the way we are doing it with the merger.  It can be a bit confusing and I want to be sure you can see what the issue is."  [*Id.*].

47.     After determining that BCGC was in default because its assets (i.e., the Collateral) had been transferred to FWM, Petrilla decided to involve Reed Cook ("Cook") in dealing with this problem loan.  [Oct. 24, 2017 Tr. 136:24–137:9].  Cook is the Senior Vice President and Senior Credit Officer at Trustmark.  [Oct. 24, 2017 Tr. 20:25–21:2].  He has been a banker for thirty-five years.  [Oct. 24, 2017 Tr. 73:16-17].  He has been employed by Trustmark for approximately fifteen years.  [Oct. 23, 2017 Tr. 24:24–25:20].  Cook is responsible for overseeing the credit approval and credit policy process for loan transactions in Texas.  [*Id.*].  His duties and responsibilities have been the same since 2014 until the date of the trial.  [*Id.*].  Cook does not become involved in the loan collection process unless, among other reasons, a problem exists with the loan.  [Oct. 24, 2017 Tr. 38:12-16].  Cook was not involved in the origination of the BCGC loan.  [Oct. 23, 2017 Tr. 55:19-21].  However, he became involved in November 2014 when Petrilla notified him about issues concerning the BCGC loan.  [Oct. 23, 2017 Tr. 56:23–57:5].

48.     After speaking with Cook about both the monetary and non-monetary defaults under the Loan Documents, Petrilla—having now reviewed the Asset Purchase Agreement and having gained an appreciation for the transaction that occurred on August 21, 2014—scheduled a meeting with Huebel to discuss the Note.  [Oct. 24, 2017 Tr. 139:8–140:25].  Specifically, Petrilla scheduled this meeting with Huebel to obtain Huebel's personal guaranty on the existing debt—i.e., the Note—by having him execute a guaranty for the benefit of Trustmark.  [Oct. 24, 2017 Tr. 173:8-14].  Although he initially had agreed to meet with Petrilla, Huebel refused to speak with her when she arrived at FWM's office and introduced herself, and he then refused to sign the personal guaranty that Petrilla had brought with her.  [Oct. 24, 2017 Tr. 141:1-18, 173:15-24].

36

49.     After BCGC defaulted on the loan, Cook made efforts to try to remediate the default with the Debtors and collect the balance owed under the Note, but was unsuccessful in these efforts.  [Oct. 23, 2017 Tr. 55:22–57:5].

50.     Trustmark retained legal counsel to collect the balance due and owing under the Note.  [Pl.'s Ex. No. 9].  On April 10, 2015, Trustmark's legal counsel sent the Debtors a Notice of Default and Acceleration and Demand for Payment, declaring that the sale or transfer of the Collateral was a non-curable event of default under the Note and the Revolving Loan Agreement.  [*Id.*].  This notice further stated the following:

> By reason of this non-curable event of default, Trustmark hereby gives notice that Note 72633 is now accelerated.  Demand is hereby made for immediate payment of the unpaid principal balance of Note 72633, plus all accrued and unpaid interest and late charges, which as of April 10, 2015 is $229,983.71.  Pursuant to the terms of Note 72633, Borrower has agreed to pay Trustmark's reasonable attorneys' fees in the event payment is not made in response to this demand.

[*Id.*].

51.     On June 30, 2015, FWM sent a check in the amount of $1,694.33 to Trustmark, despite the fact that the Note was already in default for non-payment.  [Defs.' Ex. No. 12; Oct. 25, 2017 Tr. 9:3-18].  Huebel, as an authorized signatory on FWM's operating account, signed this check.  [Defs.' Ex. No. 12; Oct. 25, 2017 Tr. 9:3-18].  This payment represents two separate payments.  [Defs.' Ex. No. 12; Oct. 25, 2017 Tr. 9:3-18].  The first payment totaled $852.60 for May 1, 2015.  [Defs.' Ex. No. 12; Oct. 25, 2017 Tr. 9:3-18].  The second payment totaled $841.73 for June 1, 2015.  [Defs.' Ex. No. 12; Oct. 25, 2017 Tr. 9:3-18].  Trustmark applied this payment against the balance due under the Note.  [Defs.' Ex. No. 12; Oct. 25, 2017 Tr. 9:3-18].

Although Trustmark accepted the two payments, Trustmark's receipt of the funds did not waive the acceleration of the entire balance under the Note.[16]  [Oct. 25, 2017 Tr. 10:4-16].

52.     Lone Star Bank and Mainland Bank had a lien on FWM's equipment prior to Mr. Tegeler's execution of the Asset Purchase Agreement on August 21, 2014, transferring all of BCGC's assets (including its equipment) to FWM.  Therefore, when FWM took title to these assets, the existing lien held by Lone Star Bank and Mainland Bank attached to all of these assets.  [Oct. 25, 2017 Tr. 50:5-17].  Subsequently, FWM defaulted on its obligations with Lone Star Bank.  [*Id.*].  In an effort to create a suitable repayment plan, FWM executed a forbearance agreement.  [Oct. 25, 2017 Tr. 50:18-24].  Eventually, in 2016, FWM ceased operations when Lone Star Bank and Mainland Bank declared a default on the forbearance agreement, and then repossessed and liquidated FWM's assets, including the assets on which Trustmark had a lien (i.e., the Collateral).[17]  [Oct. 25, 2017 Tr. 50:10–51:14].  Therefore, Trustmark's loan to BCGC became a completely unsecured loan.

53.     BCGC has never made any payments to reduce the balance owed under the Note. BCGC owes Trustmark the principal amount of $230,000.00 under the Note, plus all accrued and unpaid interest and late charges.  [Pl.'s Ex. No. 9].  The Debtors, in their individual capacities, owe this same amount by virtue of the Guaranties.

---

[16] *Hardy v. Wells Fargo Bank, N.A.*, No. 01-12-00945-CV, 2014 WL 7473762, at *12 (Tex. App.—Houston [1st Dist.] Dec. 30, 2014, no pet.) (holding that once a note is accelerated, deacceleration occurs only if a written agreement is executed or the conduct of the parties reflects that acceleration has been abandoned).  Here, there was no written agreement between Trustmark and BCGC, or between Trustmark and the Debtors, or between Trustmark and Huebel (or FWM) to deaccelerate Trustmark's acceleration of the Note.  Moreover, mere acceptance by Trustmark of a one-time payment of $1,694.33 is insufficient conduct to constitute a deacceleration.  *See Callan v. Deutsche Bank Tr. Co. Ams.*, 93 F. Supp. 3d 725, 728 n.3 (S.D. Tex. 2015) ("[M]ere acceptance of a partial payment of the accelerated debt by the previous holder of the subject note was not an affirmative act revoking the acceleration and thereby halting the running of the statute of limitations.") (quoting *Arrowood Indem. Co. v. Gibson & Behman, P.C.*, No. 08 Civ. 6227(JCF), 2011 WL 1796045, at *3 (S.D.N.Y. Apr. 29, 2011)).

[17] According to the Debtors' Schedules filed in the Main Case, Huebel "closed down the business and filed chapter 7 on 7/7/16 in the Eastern District of Texas (16-60429)."  [Main Case Doc. No. 21 at 7].

54.     On November 7, 2016, the Debtors filed a voluntary Chapter 7 petition (the "Petition Date"), and the Clerk of Court assigned case number 16-35634 to this main case. [Main Case No. 16-35634, Doc. No. 1].

55.     On March 21, 2017, Trustmark filed a proof of claim in the main case.  [Pl.'s Ex. No. 14].   The proof of claim sets forth that as of the Petition Date, the amount of unpaid principal, accrued unpaid interest, and accrued unpaid late charges due under the Note were $230,000.00, $14,447.22, and $12,269.32, respectively—for a total amount of $256,716.54.  The proof of claim also sets forth that the per diem interest accrual is $28.75.  Finally, the proof of claim sets forth that Trustmark is an unsecured creditor.

### III.     CREDIBILITY OF THE WITNESSES

**A.  The Debtors' Witnesses**

1.  Mr. Tegeler

The Court finds that Mr. Tegeler is not a credible witness.  During his testimony at trial, he gave answers which directly contradicted answers he had previously given earlier in the trial. For example, some of his contradictory statements relate to whether he read any of the drafts or the final version of the Asset Purchase Agreement.  The following questions and answers from the trial are some examples that illustrate his contradictory statements regarding the Asset Purchase Agreement:

When Mr. Tegeler was first asked whether he read the Asset Purchase Agreement, he was quite clear that he had done so:

| | |
|---|---|
| Plaintiff's Counsel: | Now, do you recall having signed an Asset Purchase Agreement? |
| Mr. Tegeler: | Yes, I did. |
| Plaintiff's Counsel: | And did you read it before you signed it? |

|  |  |
|---|---|
| Mr. Tegeler: | Yes, sir, I read it with people. |

[Oct. 26, 2017 Tr. 15:24–16:3].

Later on, however, he backed off, and his testimony changed a bit:

|  |  |
|---|---|
| Plaintiff's Counsel: | Did you read this Asset Purchase Agreement before you signed it? |
| Mr. Tegeler: | I don't know if I read every bit of it, but I was – 'cept that Bob [Stephens] explained it all to me when I signed it. |

[Oct. 26, 2017 Tr. 18:16-19].

Further on in the trial, however, he was even less certain that he had read this

document:

|  |  |
|---|---|
| Plaintiff's Counsel: | Do you recall the Asset Purchase Agreement initially proposing that you – I mean that BCGC would be the seller instead of you personally? |
| Mr. Tegeler: | Probably somebody else did.  I mean, I'm sure I read it or I saw it.  I don't know.  I don't remember that. |

[Nov. 6, 2017 Tr. 9:24–10:3].

Finally, later on in the trial, Mr. Tegeler, contradicted his prior testimony and

stated that he had not ever read the Asset Purchase Agreement:

|  |  |
|---|---|
| Plaintiff's Counsel: | Did you read any of the drafts of the Asset Purchase Agreement? |
| Mr. Tegeler: | No. |
| Plaintiff's Counsel: | You didn't read any of them? |
| Mr. Tegeler: | Nope. |
| Plaintiff's Counsel: | Did you read it before you signed it? |

40

| | |
|---|---|
| Mr. Tegeler: | No. |
| Plaintiff's Counsel: | You didn't read it before you signed it? |
| Mr. Tegeler: | Well I had Bob [Stephens] and them to make sure everything was right. |
| Plaintiff's Counsel: | Okay, well then – |
| Mr. Tegeler: | If I can address – |
| Plaintiff's Counsel: | No, I'm sorry, sir you can't address anything.  You have to answer my questions, okay.  Now in prior testimony, you said – I asked the question, "And did you read it before you signed it?"  I was talking about the Asset Purchase Agreement.  And your answer was, "Yes, sir I read it with people."  So now you're telling me you didn't read it at all. |
| Mr. Tegeler: | No, I didn't want to feel stupid.  You already made me feel like I was stupid up here.  So I answered so that I didn't look that way. |

[Nov. 7, 2017 Tr. 86:16–87:11].

Mr. Tegeler's contradictory testimony about the Asset Purchase Agreement is not the only document about which he gave conflicting testimony at trial.  With respect to the Loan Documents, Mr. Tegeler's conflicting testimony was as follows:

| | |
|---|---|
| Defendants' Counsel: | Do you remember reviewing Trustmark loan documents when [Plaintiff's Counsel] was asking you questions? |
| Mr. Tegeler: | Yes. |
| Defendants' Counsel: | Do you remember him asking you whether you read all of the Trustmark loan documents before you signed them? |
| Mr. Tegeler: | Yes. |
| Defendants' Counsel: | Okay.  What did you tell him about whether you had read all of the Trustmark loan documents prior to signing? |

| | |
|---|---|
| Mr. Tegeler: | I said yes. |
| Defendants' Counsel: | Had you really gone through all of those Trustmark loan documents paragraph-by-paragraph? |
| Mr. Tegeler: | No. |
| Defendants' Counsel: | Then why did you answer him that way? |
| Mr. Tegeler: | I already felt stupid. |
| Defendants' Counsel: | Okay.  And why is that? |
| Mr. Tegeler: | Because I was just doing stuff, I mean, you know, I run out – it's hard for me to get up here, I – you question me on something and, you know, I didn't do it and that would be, why are you signing something you didn't read. |

[Nov. 7, 2017 Tr. 14:16–15:9].

The record reflects there is still more testimony that underscores Mr. Tegeler's lack of credibility:

| | |
|---|---|
| Defendants' Counsel: | Okay. When you were mentioning or using the word merger with . . . Petrilla at the, let's call it pre-closing meeting at the Trustmark office and the closing at Trustmark's office, had you studied or done anything to learn what the technical legal definition of merger was? |
| Mr. Tegeler: | No. |
| Defendants' Counsel: | Okay. What were you trying to convey? |
| Mr. Tegeler: | The two companies were coming together as one, it'd all be one. |

[Oct. 25, 2017 Tr. 56:6-14].

| | |
|---|---|
| Plaintiff's Counsel: | And two days later, on August 20th, you transferred all of the assets of BCGC to yourself? |
| Mr. Tegeler: | Correct. |
| Plaintiff's Counsel: | And you did not tell Trustmark that? |
| Mr. Tegeler: | I did not, no. I told Trustmark we were merging together, whatever we had before that. The very first meeting with Christy [Petrilla] and Bob [Stephens]. |
| Plaintiff's Counsel: | And it was not a merger, was it?  The documents that we have reviewed for the past hour-and-a-half were Asset Purchase Agreements beginning in early August, August 1st is the first draft we reviewed. Every single one of them say, Asset Purchase Agreement, don't they? |
| Mr. Tegeler: | Correct. |
| Plaintiff's Counsel: | They do not say corporate merger? |
| Mr. Tegeler: | No, they do not. |

[Nov. 6, 2017 Tr. 59:15–60:4].  The significance about this exchange is that Mr. Tegeler alleges that he notified Petrilla at both the initial meeting in July of 2014 and the loan closing held on August 18, 2014, that BCGC planned to merge with FWM.  Stated differently, Mr. Tegeler attempts to convince the Court that he has been very forthcoming with Trustmark and all along disclosed his true intentions to merge with FWM.  Contrary to this representation, Mr. Tegeler did not notify Petrilla that he transferred all of BCGC's assets to himself personally.  [Finding of Fact No. 26].  Above all, Mr. Tegeler testified that he reviewed many drafts of the Asset Purchase Agreement, and none of the drafts described a merger or even contained the word "merger" in the document.  [Nov. 6, 2017 Tr. 6:24–7:5].  Therefore, it remains eminently clear that this testimony undermines his credibility.

43

Additionally, Mr. Tegeler attempts to convince the Court that he was combining two companies: BCGC and FWM. However, his actions illustrate anything but a so-called "combination" of two companies. First, he surreptitiously transferred all of BCGC's assets to himself personally. [Finding of Fact No. 26]. This transaction does not describe a combination of two companies because Mr. Tegeler is an individual, and not an entity. Second, Mr. Tegeler then executed the Asset Purchase Agreement and conveyed all of these same assets to FWM. [Finding of Fact No. 27]. Similarly, this transaction does not describe a combination of two companies because BCGC remained in existence as a shell company. Indeed, as stated herein, this transaction was merely an asset sale. Third, after Ms. Tegeler transferred $230,000.00 of the loan proceeds to FWM, the Debtors kept BCGC's bank account open. [Finding of Fact No. 41]. Stated differently, the Debtors managed BCGC's account as well as FWM's account. [*Id.*; Finding of Fact No. 42]. These circumstances certainly do not describe the combination of two entities. Finally, even after all of these transactions, Mr. Tegeler testified that BCGC and FWM did not consolidate their books; indeed, BCGC and FWM maintained separate accounting records. [*Id.*]. Once again, these circumstances hardly describe the combination of two entities whatsoever.

Thus, Mr. Tegeler's explanation to the Court regarding the alleged merger is unpersuasive for these very critical reasons, which casts a pall on his credibility.

2. Ms. Tegeler

At first blush, Ms. Tegeler appeared to be a credible witness. However, this Court recognizes that many of her statements were—not unsurprisingly—aimed to protect Mr. Tegeler's conduct when these transactions transpired. Specifically, Ms. Tegeler's testimony concerning the false borrowing base certificate illustrates her bias as follows:

| | |
|---|---|
| Plaintiff's Counsel: | Did you hear your husband's testimony regarding the line of credit with Mainland Bank and the gray inventory? |
| Ms. Tegeler: | I did. |
| Plaintiff's Counsel: | And he was upset because he had signed a borrowing base certificate for Mainland Bank for -- on behalf of FWM. |
| Ms. Tegeler: | Yes. |
| Plaintiff's Counsel: | You heard that testimony. |
| Ms. Tegeler: | Yes, he was very upset. |
| Plaintiff's Counsel: | And he was upset because Mr. Huebel had not told him that some of the inventory was, in fact, not owned by FWM, correct? |
| Ms. Tegeler: | That is correct. |
| Plaintiff's Counsel: | Yet, it was included on a borrowing base certificate given to Mainland Bank.  Right. And that bothered him because he's an ethical man. |
| Plaintiff's Counsel: | So what's the difference between the collateral on the Mainland Bank borrowing base certificate that didn't really belong to FWM, and the accounts receivable on the Trustmark borrowing base that didn't belong to BCGC? |
| Ms. Tegeler: | I didn't understand it that way because, like I said, we still have the same customers, we still have the same income coming in, we're still -- BC Gulf Coast's name is still on insurance. We still – |
| | . . . |
| Ms. Tegeler: | Well, what I'm saying is, in my mind, in our intentions was to go forward the way it was all planned, to make this all right, good, do business as usual. We still have our customers that are happy with us, still doing business. We still have receivables, we still have invoices going out. In my – |

45

. . .

Ms. Tegeler:                        In my mind, everything was going on as planned.

[Nov. 27, 2017 Tr. 137:11–139:1].

The significance of this testimony is to show that Ms. Tegeler is a very crafty witness. Here, the Debtors committed the same unscrupulous conduct at two different companies: BCGC and FWM.   Indeed, Ms. Tegeler expressed remorse on behalf of her husband for signing false borrowing base certificates—which reflected inventory that FWM did not own.   However, at trial, she was exposed for the exact same conduct—signing a blatantly false borrowing base certificate on behalf of BCGC, which reflected accounts receivable of $389,324.00 that, as of September 17, 2014, BCGC no longer owned due to her husband's execution of the Conveyance and Asset Purchase Agreement the previous month.   [Finding of Fact Nos. 26–27, 37].   Ms. Tegeler appeared to downplay and justify her actions instead of expressing remorse for her own deceitful conduct.   This behavior tarnishes her credibility.

Furthermore, Ms. Tegeler's testimony is also questionable as it relates to notifying Petrilla about the transaction contemplated between BCGC and FWM at the loan closing. Specifically, Ms. Tegeler vividly recalls that her husband had informed Petrilla about BCGC's transaction with FWM:

Defendants' Counsel:         Is there any doubt in your mind that [Mr. Tegeler], once again, told [Petrilla] that [BCGC] was, quote, "wanting to merge" with FWM?

. . .

Ms. Tegeler:                        I have no doubt in my mind that everything was open, talked about, on the table, however you want to put it. There was -- there's no doubt in my mind.

Defendants' Counsel:         Okay.  No doubt in your mind that what?

46

| Ms. Tegeler: | That [Mr. Tegeler] was open, [Petrilla] knew we were moving forward. |
| Defendants' Counsel: | Okay. Now let me break that down. That [Petrilla] knew -- there was no doubt in your mind that [Petrilla] knew what? |
| Ms. Tegeler: | That we were joining forces with FWM, going over there to go to the bigger facility, get more machines, everything was moving forward. |
| Defendants' Counsel: | Okay. After [Mr. Tegeler] told [Petrilla] that, did you perceive any hesitation, trepidation or concern in [Petrilla]? |
| Ms. Tegeler: | No. |

[Nov. 7, 2017 Tr. 147:13–148:10]. The Court has already made a finding that the Debtors and their representatives (Stephens and LeBlanc) did not disclose the Asset Purchase Agreement or Conveyance to Trustmark. [Finding of Fact Nos. 17, 26, 32]. Therefore, Ms. Tegeler's testimony regarding the certainty of her husband's disclosure of the so-called "merger" undermines her credibility because this information simply is not true.

Other than her failure to truthfully testify regarding these two material points, the Court finds that Ms. Tegeler was credible in her testimony regarding other material issues raised at trial. Specifically, Ms. Tegeler credibly testified about the business divorce between the Debtors and the Stuteses, including the urgency to relocate BCGC's headquarters from Spring, Texas, to Cleveland, Texas. Furthermore, she credibly testified about her employment at FWM. Accordingly, the Court gives some weight to her testimony.

3. Bob Stephens

Stephens was the CPA for the Debtors and BCGC. [Finding of Fact No. 11]. In addition to representing the Debtors and their company, Stephens also had a business relationship with

Trustmark.  [Finding of Fact No. 11(g)].  Specifically, Stephens' company audited Trustmark's accounts receivables and inspected its inventory, and then his company provided Trustmark with a professional report of its findings.  [*Id.*].  He was also a customer of Trustmark; indeed, he has a working capital line of credit with Trustmark.  [Finding of Fact No. 11(f)].  Stephens testified that he was extensively involved with assisting the Debtors consummate their business transactions.  [Oct. 26, 2017 Tr. 143:22–144:13].  Specifically, Stephens testified that he assisted the Debtors, on behalf of BCGC, with the following transactions: (1) obtaining a line of credit for BCGC; and (2) assisting the Debtors with the preparation of the Asset Purchase Agreement.  [*Id.*].  Despite Stephens' active participation in these transactions, he could not recall any basic details regarding the activity during this relevant time period.

The Court is skeptical that a seasoned CPA cannot recall any of the details set forth below.  Below are examples of Stephens' inability to recollect that cast aspersions on his credibility:

**Example #1**

| | |
|---|---|
| Plaintiff's Counsel: | So on August 18th when you're in the bank's offices and they're signing the loan, did you say across the table, [Mr. Tegeler], did you get that waiver from [Petrilla]? |
| Stephens: | I don't remember. |
| Plaintiff's Counsel: | Well, that's – |
| Stephens: | I don't remember that that's when the waiver was requested. |
| Plaintiff's Counsel: | Would you ask for the waiver after the loan closed? |
| Stephens: | I'd have to look at the e-mail. |
| Plaintiff's Counsel: | Let's speak professionally. What point would it be to ask for the waiver after the loan had been closed? |

48

| | |
|---|---|
| Stephens: | I don't know. |

[Oct. 26, 2017 Tr. 160:12-23].

**Example #2**

| | |
|---|---|
| Plaintiff's Counsel: | So are we to believe you, when you say in your e-mail on the day after the closing, August 19, 2014, "Trustmark is aware of the transaction and have instructed us that they have no problem rolling these loans to the new entity without having to execute new loan agreements." Was that a true statement when you made it, sir? |
| Stephens: | I believed it was true when I did. |
| Plaintiff's Counsel: | And from what source did you obtain that information from Trustmark? |
| Stephens: | I do not recall. |
| Plaintiff's Counsel: | Sir, this e-mail is one day after you sat in the bank's offices and witnessed a loan closing. Are we to believe that you went into the loan closing, did not provide the bank with a copy of the Asset Purchase Agreement, in fact, I'll ask the question. Did you ever provide the bank with a copy of the Asset Purchase Agreement? |
| Stephens: | I don't recall. |
| Plaintiff's Counsel: | You go further and say, "They will simply require an amendment to name FWM as the maker." Who told you that at Trustmark? |
| Stephens: | I don't recall and I don't recall that anybody from Trustmark told me that. |
| Plaintiff's Counsel: | Were you lying to these people on August 19, 2014? |
| Stephens: | No, sir. |

| | |
|---|---|
| Plaintiff's Counsel: | Are you lying to us now when you say you don't remember whether you'd said anything at the closing or not? |
| Stephens: | No, sir. |

[Oct. 26, 2017 Tr. 165:15–166:17].

**Example #3**

| | |
|---|---|
| Plaintiff's Counsel: | You have no recollection of having been involved either as a drafter or a reviewer or a consultant or some participation in a plan of complete liquidation of BCGC dated August 20, 2014? |
| Stephens: | No. |
| Plaintiff's Counsel: | Yet your Declaration says you were assisting with the winding up of the business. |
| Stephens: | Correct. |

[Oct. 27, 2017 Tr. 33:4-11].

These are only three snippets from the trial during which Stephens claimed that he could not recall anything. The Court simply does not believe him. It strains credulity, for example, that Stephens—who had extensive dealings with Trustmark [Finding of Fact Nos. 11–16, 22–25, 32, 46]—cannot recall which Trustmark employee told him that "Trustmark is aware of the transaction and have instructed us that they have no problem rolling these loans to the new entity without having to execute new loan agreements." The Court expressly finds that no one at Trustmark ever made such a statement to Stephens; that, in fact, he was lying to FWM in his e-mail of August 19, 2014, in order to maximize the chances of consummating the transaction between BCGC and FWM so that Mr. Tegeler could acquire 50% of FWM's stock; and that his "I do not recall" response at trial was given in order to try to convince this Court that someone at

50

Trustmark did in fact make the statement to him.  The Court finds that Stephens' testimony is disingenuous at best, and downright perjurious at worst.

Moreover, it seriously strains credulity to believe Stephens' testimony that he has no recollection of drafting or reviewing the documents associated with BCGC's transfers of its assets.  Indeed, his invoice of $21,000.00 to BCGC dated July 29, 2014, contains the following description of his services: "In connection with meetings, e-mails, correspondence, financials, etc. for negotiation and completion of acquisition.  85 hours@ $300/hr."  [Finding of Fact No. 11(d)].  And, his invoice of $8,600.00 to BCGC dated September 4, 2014, contains the following description of his services: "In connection with meetings, calls, correspondence with client and bank, document review, and related matters regarding negotiation and completion of 2nd transaction.  34.5 hours x $250/hr."  [*Id.*].  Accordingly, the Court gives no weight to this particular testimony, and very little weight to the remaining testimony that he gave.

## B.  Trustmark's Witnesses

### 1.  Reed Cook

Cook is the Senior Vice President and Senior Credit Officer at Trustmark. The Court finds that his testimony is very credible, and the Court gives substantial weight to this testimony.

### 2.  Christy Petrilla

Petrilla is a VP Commercial Lender at Trustmark.  The Court finds that all of her testimony is very credible, and the Court gives substantial weight to this testimony.  Of particular significance, she testified that neither Mr. Tegeler, Ms. Tegeler, nor Stephens ever told her that they collectively contemplated an asset sale of BCGC's assets to, or a corporate merger with, FWM.  She also testified that she had never even heard of FWM until the telephone conversation with Ms. Tegeler in November 2014 (at which time Ms. Tegeler informed her that BCGC had

"merged" with FWM).  [Oct. 24, 2017 Tr. 104:20-25].  The Court believes that Petrilla told the truth and that Mr. and Ms. Tegeler did not.

3.  Wayne Johnson

The Court finds Johnson to be a credible witness and gives his testimony substantial weight.

4.  Jonathan Miller

The Court finds Miller to be a credible witness and gives his testimony substantial weight.

## IV.    CONCLUSIONS OF LAW

**A.  Jurisdiction**

This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1334(b).  Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Bankruptcy Code], or arising in or related to cases under title 11."  District courts may, in turn, refer these proceedings to the bankruptcy judges for that district.  28 U.S.C. § 157(a).  In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

This suit is a core proceeding because it is a suit to determine the dischargeability of a specific debt pursuant to 28 U.S.C. § 157(b)(2)(I).  This suit is also core under the general "catch-all" language because such a suit is the type of proceeding that can only arise in the context of a bankruptcy case.  *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in

the context of a bankruptcy case.") (quoting *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987)).  Preventing the discharge of a specific debt—here, the amount owed under the Note for which the Debtors are liable under the Guaranties—can only occur in a bankruptcy court. There is no state law equivalent for this action.

## B.  Venue

Venue is proper under 28 U.S.C. § 1409(a).  28 U.S.C. § 1409(a) provides that "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending."  The Debtors' main Chapter 7 case is presently pending in this Court; therefore, venue of this adversary proceeding is proper.

## C.  Constitutional Authority to Enter a Final Judgment in the Adversary Proceeding at Bar

In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 564 U.S. 462 (2011), this Court is required to determine whether it has the constitutional authority to enter a final judgment adjudicating the suit at bar.  In *Stern*, which involved a core proceeding brought by the debtor under 28 § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."  564 U.S. at 503.  As indicated above, the pending dispute before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).  The ruling in *Stern* was only limited to the one specific type of core proceeding involved in that dispute, which is not implicated here.  Accordingly, this Court concludes that the narrow limitation imposed by *Stern* does not prohibit this Court from entering a final judgment here. *See, e.g.*, *Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (B.A.P. 8th Cir. 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy

judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *see also Tanguy v. West (In re Davis)*, No. 00-50129, 538 F. App'x 440, 443 (5th Cir. 2013) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect' . . . . We decline to extend *Stern*'s limited holding herein.") (citing Stern, 564 U.S. at 475, 503).

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under § 157(b)(2), *see First Nat'l Bank v. Crescent Elec. Supply Co. (In re Renaissance Hosp. Grand Prairie Inc.)*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) . . . ."), this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final judgment in the dispute at bar.  In *Stern*, the debtor filed a counterclaim based *solely* on state law; whereas, here, the claims brought by Trustmark are based *primarily* on express provisions of the Bankruptcy Code—§§ 523(a)(2) and (a)(6)—and judicially-created bankruptcy law interpreting these provisions.[18]   This Court is therefore constitutionally authorized to enter a final judgment on the Complaint.

Finally, in the alternative, this Court has the constitutional authority to enter a final judgment on the Complaint because Trustmark and the Debtors have consented, impliedly if not explicitly, to adjudication of this dispute by this Court.  *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed.  We disagree.  Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express.  Nor does

---

[18] The Court notes that there are two Texas statutes involved in one of the claims that Trustmark has brought under § 523(a)(2)(A).  That is why this Court finds that the claims brought by Trustmark are based **primarily**, as opposed to **solely**, on federal law.

the relevant statute, 28 U.S.C. § 157, mandate express consent . . . .").  Here, the parties have never objected to this Court's constitutional authority to enter a final judgment—either in their pleadings or their pre-trial statement.  Moreover, the parties participated in a multi-day trial in this Court, and not once did they ever object to this Court's constitutional authority to enter a final judgment.  If these circumstances do not constitute consent—implied, if not express—then nothing does.

### D.  Dischargeability of Debt Under 11 U.S.C. § 523(a)(2)(A)

In an adversary proceeding to determine the dischargeability of a debt under § 523(a), the plaintiff bears the burden of proving the elements by a preponderance of the evidence.[19]  *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *Tower Credit, Inc. v. Gauthier (In re Gauthier)*, 349 F. App'x 943, 945 (5th Cir. 2009); *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995); Fed. R. Bankr. P. 4005.  "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start."  *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997).  However, the Code affords relief only to the "honest but unfortunate debtor," and an individual may not obtain a discharge of debts incurred through his own wrongful conduct.  *Grogan*, 498 U.S. at 286; *Turbo Aleae Invs., Inc. v. Borschow (In re Borschow)*, 467 B.R. 410, 417 (W.D. Tex. 2012).  As set forth below, Trustmark has met its burden of proving the elements of all of its claims under § 523(a)(2)(A) and § 523(a)(6).

---

[19] "A fact is proven by preponderance of the evidence if the finder of fact, here the court, finds it more likely than not, based on the evidence, that the fact is true."  *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 567 B.R. 715, 736 (Bankr. S.D. Tex. 2017) (quoting *Bale v. Ryan (In re Ryan)*, 443 B.R. 395, 408 (Bankr. N.D. Tex. 2010)).

**E.  Description of the Debt that Trustmark Asserts Should Not to Be Discharged**

At the outset, it is important to define which debt Trustmark seeks to prevent from being discharged.  First, the Debtors executed the Guaranties that guarantee repayment of any amounts owed by BCGC under the Note.  Thus, because the principal balance of the Note that BCGC did not pay is $230,000.00, the Debtors each have individual liability, jointly and severally, for this amount; and Trustmark alleges that neither of the Debtors should be discharged from this liability.  Trustmark's contention is that pursuant to § 523(a)(2)(A), the Debtors incurred this guarantor liability through false representations, false pretenses, and actual fraud associated with the extension of credit that Trustmark provided to BCGC.  *See, e.g.*, *Weiss v. Alicea (In re Alicea)*, 230 B.R. 492, 501 (Bankr. S.D.N.Y. 1999) ("Similarly, it alleges that [the debtor] knew when he personally guaranteed the fees that he had already committed his personal assets to other ventures and could not honor his personal guarantee."); *Buckeye Ret. Co., LLC v. Kakde (In re Kakde)*, 382 B.R. 411, 419 (Bankr. S.D. Ohio 2008) (footnote omitted) ("Buckeye asserts that the debt owed by Mr. Kakde to Buckeye pursuant to Mr. Kakde's personal guaranty is nondischargeable under 11 U.S.C.  § 523(a)(2)(B) because USAT obtained advances under the Loan guaranteed by Mr. Kakde . . . by means of the intentional or reckless submissions to Provident of false Borrowing Base Certificates.").  Further, Trustmark's contention is that pursuant to § 523(a)(6), Mr. Tegeler's and Ms. Tegeler's liability under the Guaranties is nondischargeable due to their willful and malicious injury to Trustmark's property—i.e., its lien on the Collateral—by surreptitiously conveying all of BCGC's assets to FWM, which resulted in FWM's lenders acquiring a lien on these assets and subsequently foreclosing thereon.  The secret transfers include not only the transfer of the assets on August 21, 2014, but also the three checks

written on BCGC's account, transferring the loan proceeds of $230,000.00 in September and November of 2014 from BCGC's account to FWM's account.  [Finding of Fact Nos. 27, 41].

Alternatively, there is a separate and distinct debt that Trustmark seeks to prevent from being discharged.  This is the debt arising from the piercing of BCGC's corporate veil under the "actual fraud" claim brought by Trustmark under § 523(a)(2)(A).  Stated differently, Trustmark's position is that even if the Debtors had not executed the Guaranties creating individual liability for the balance owed under the Note, they each have become individually liable for this balance because Trustmark has satisfied all of the elements required under: (1) applicable Texas law for piercing BCGC's corporate veil to impose individual liability on the Debtors; and (2) § 523(a)(2)(A).  *See, e.g.*, *Husky Int'l Elecs. v. Ritz (In re Ritz)*, 567 B.R. 715, 758–59 (Bankr. S.D. Tex. 2017).

In sum, under one basis (guaranty liability) or another (piercing the corporate veil liability), Trustmark contends that the Debtors owe them a nondischargeable debt as of the Petition Date of $256,716.54 (the "$256,716.54 Debt").[20]   The Court will now address Trustmark's claims in the following order: guarantor liability under § 523(a)(2)(A); piercing the corporate veil liability under § 523(a)(2)(A); and guarantor liability under § 523(a)(6).

---

[20] When Trustmark accelerated the Note on April 10, 2015, the amount of unpaid principal, plus all accrued and unpaid interest and late charges, due under the Note was $229,983.71.  [Finding of Fact No. 50].  However, in the Pre-Trial Statement, the parties used the figure of $230,000.00.  [Adv. Doc. No. 16 at 12, ¶ 51].  Moreover, the proof of claim filed by Trustmark sets forth that the outstanding principal is $230,000.00.  [Finding of Fact No. 55].  Hence, this Court finds that the outstanding principal as of the Petition Date was $230,000.00.  Further, the Court finds that as of the Petition Date the amount of accrued unpaid interest under the Note totaled $14,447.22, and the amount of accrued unpaid late charges totaled $12,269.32.  [Finding of Fact No. 55].  Thus, the total amount of unpaid principal, unpaid interest, and unpaid late charges as of the Petition Date was $256,746.54.  Finally, the Court notes that Trustmark contends that the amount of the nondischargeable obligation owed by the Debtors is not only $256,746.54, but also interest accruing after the Petition Date as well as the attorneys' fees and costs incurred by Trustmark.  As discussed subsequently herein, this Court agrees with Trustmark's position; and, as also discussed herein, this Court makes a determination of the amount of post-petition interest, attorneys' fees, and costs to which Trustmark is entitled.

**F. Overview of Trustmark's Claims under § 523(a)(2)(A) Based Upon the Debtors' Guarantor Liability**

Trustmark has brought three claims against the Debtors under § 523(a)(2)(A): one for false representations; one for false pretenses; and one for actual fraud.  Though other circuits have applied a uniform standard to all of these § 523(a)(2)(A) causes of action,[21] the Fifth Circuit has distinguished the elements of "actual fraud" from "false pretenses" and "false representations."  *RecoverEdge L.P.*, 44 F.3d at 1292–93.

> The distinction recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact.  [A debtor's promise . . . related to a future action which does not purport to depict current or past fact . . . therefore cannot be defined as a false representation or a false pretense].

*Pak v. Kim (In re Kim)*, No. 12–40813, 2013 WL 5376526, at *10 (Bankr. E.D. Tex. Sept. 25, 2013) (citing *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991)).

Moreover, there is also a distinction between false representations and false pretenses. *Wright v. Minardi (In re Minardi)*, 536 B.R. 171, 187 (Bankr. E.D. Tex. 2015) (quotation omitted) ("While false pretenses and false representation both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement."); *Argento v. Cahill (In re Cahill)*, No. 15-72418-REG, 2017 WL 713565, at *6 (Bankr. E.D.N.Y Feb. 27, 2017) ("While most times both conduct and

---

[21] *See, e.g.*, *Sauer Inc. v. Lawson (In re Lawson)*, 791 F.3d 214, 225 (1st Cir. 2015) (internal citations omitted) ("[W]e observe that, while there are other ways to give meaning to the distinction between 'actual fraud' and 'false representations' under § 523(a)(2)(A), they are not the most narrow available, nor are they consistent with the fraud exception's history.  Rather, reading 'false pretenses, false representations, and actual fraud' to be limited, roughly, to mean 'fraudulent misrepresentation and other actual frauds' would provide the most consistent and narrow reading of § 523(a)(2)(A) by barring from discharge only those debts that 'arise [ ] as a direct result of the debtor's [fraudulent conduct.'"") (quoting *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001)); *SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir. 1998); *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

explicit statements by the debtor exist, thereby establishing a fraud under both false pretenses and false representation, the creditor may be able to establish the debtor's conduct without a showing of explicit statements or explicit statements without a showing of the debtor's conduct and still be successful under § 523(a)(2)(A)."); *Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990) ("'False Pretense' is more like a con game than a stickup.  It is more like being dealt from the bottom of the deck than being mugged.  A false pretense is generally employed by stealth, implication, and misdirection, while fraud and false representations are typically implemented more by fabrication, explication, and diversion.").  Thus, the Court will separately examine Trustmark's claim for false representations, its claim for false pretenses, and its claim for actual fraud.

### G.  Trustmark's Claim Under § 523(a)(2)(A) for False Representations

Trustmark's first claim against the Debtors is based upon § 523(a)(2)(A) for false representations.  Trustmark contends that the Debtors obtained financing from Trustmark for BCGC through false representations.  To obtain a judgment that a debt is nondischargeable for false representations, the misrepresentations must have been: (1) knowing and fraudulent falsehoods, (2) describing past or current facts, (3) that were relied upon by the other party.  *Jacobson v. Ormsby (In re Jacobson)*, No. 06-51460, 2007 WL 2141961, at *2 (5th Cir. July 26, 2007); *In re Allison*, 960 F.2d at 483; *RecoverEdge L.P.*, 44 F.3d at 1292–93; *Pasagui v. Perez (In re Perez)*, No. 14–32266–H5, 2017 WL 991042, at *7 (Bankr. S.D. Tex. Mar. 13, 2017); *U.S. Merchs. Fin. Grp., Inc. v. Martin (In re Martin)*, No. 15–41103, 2017 WL 1316928, at *10 (Bankr. E.D. Tex. Apr. 7, 2017).  Additionally, Trustmark must prove the amount of its damages.  *See In re Jacobson*, 2007 WL 2141961, at *2 (affirming district court's affirmance of bankruptcy

court's determination that "[plaintiff]'s exhibits correctly reflected the amount of damages owed by [debtor].").  The Court now addresses each of the elements that Trustmark must satisfy.

1. <u>Knowing and Fraudulent Falsehoods</u>

The Debtors committed knowing and fraudulent falsehoods in their dealings with Trustmark.  When considering whether a knowing and fraudulent falsehood has been made, the subjective mindset of the promisor is the focus.  *Higgins v. Nunnelee (In re Nunnelee)*, 560 B.R. 277, 285 (Bankr. N.D. Miss. 2016).  "A misrepresentation is fraudulent if the maker . . . knows or believes . . . the matter is not as represented, or does not have the confidence in the accuracy of his representation as stated or implied, or knows . . . he does not have the basis for his representation as stated or implied.  *Id.* (quotations omitted) (citing *AT&T Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 407 (5th Cir. 2001)).  A misrepresentation by a debtor of his or her intention to perform contractual duties, for example, may be a false representation under the Code.  *Manheim Auto. Fin. Servs., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 131–32 (Bankr. N.D. Tex. 2005); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) (internal citations omitted) ("A promise to do an act in the future is actionable fraud when made with the intention, design, and purpose of deceiving, and with no intention of performing the act.  While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made."); *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 199 (Tex. Civ. App.—Houston [1st Dist.] 2014, pet. denied) ("A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time the promise was made.").  This intent may be inferred from the fact that the debtor failed to take any steps to perform under the contract.  *In*

*re Hurst*, 337 B.R. at 131; *Nwokedi*, 428 S.W.3d at 199 ("The speaker's intent at the time of the representation may be inferred from the speaker's acts after the representation was made.").

> Intent is a fact question within the realm of the trier of fact because it is dependent upon the credibility of the witnesses and the weight to be given their testimony . . . . [B]reach of a promise to perform combined with "slight circumstantial evidence" of fraud constitutes some evidence of fraudulent intent and is legally sufficient to support a verdict.

*Nwokedi*, 428 S.W.3d at 199 (citation omitted).  The debtor's silence regarding a material fact can also constitute a false representation.  *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 399 (5th Cir. 2017); *Mora v. Abraham (In re Abraham)*, No. 10-03227, 2014 WL 3406513, at *3 (S.D. Tex. July 7, 2014).  "When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an *overt act* is *not* required."  *In re Selenberg*, 856 F.3d at 399 (emphasis in original).

Trustmark asserts that the Debtors had no intention of performing under the Loan Documents as promised because: (1) almost immediately after executing the Loan Documents, the Debtors secretly transferred all of BCGC's assets to Mr. Tegeler, and then to FWM, despite express warranties to refrain from effectuating these transactions without first obtaining Trustmark's written consent; and (2) the Debtors made material misrepresentations of their intention to perform their contractual duties when they submitted to Trustmark a loan application for BCGC in early August of 2014.  Indeed, on August 7, 2014—eleven days before the loan closing at Trustmark's offices—the Debtors were already having substantive discussions with Huebel and his attorneys, through Stephens and the Debtors' attorney, to sell BCGC's assets to FWM.  [Finding of Fact No. 16].  Yet, the Debtors never informed Trustmark about a sale of BCGC's assets to FWM.[22]

---

[22] At trial, the Debtors testified that in their first meeting with Petrilla, in early August 2014, they informed her that BCGC would be merging with FWM.  Petrilla testified that they never informed her about any merger with FWM at

On August 18, 2014, the Debtors, acting on behalf of BCGC as its sole officers and owners, in order to obtain a line of credit from Trustmark, attended the loan closing at Trustmark's offices and executed the Revolving Loan Agreement, warranting, representing, and covenanting, in part, that:

> (a) "[N]one of the accounts or inventory forming the basis of the collateral securing the Borrower's indebtedness to Trustmark is or will be subject to any other superior liens, security interests or [other] encumbrances." [Finding of Fact No. 19(a)].
>
> (b) "The borrower will . . . [p]romptly notify Trustmark of all material adverse changes in Borrower's financial condition."  [Finding of Fact No. 19(c)].
>
> (c) "Until the note and all other obligations and liabilities of Borrower to Bank are fully paid, Borrower covenants that it will not, **without the prior written consent of Bank**: (a) Reorganize, merge or consolidate with, or acquire all or substantially all of the assets of any other company, firm or association, or make any other substantial change in its capitalization or character of its business; (b) Purchase or redeem any of its stock; (c) **Sell the majority of its assets used or useful in its business**, except in the ordinary course of business . . . ."

[Finding of Fact No. 19(d)] (emphasis added).

Additionally, on the same date, the Debtors, on behalf of BCGC, in order to obtain a line of credit from Trustmark, executed the Security Agreement, wherein BCGC represented and promised that it would not "sell, offer to sell, or otherwise transfer or dispose of the Collateral."

---

this meeting, and this Court believes Petrilla.  Aside from observing her testify in court and concluding that she is more credible than the Debtors on this point, the Court notes that **none** of the e-mails among the Debtors, Stephens, and LeBlanc (on behalf of BCGC) and Huebel, Rayne, Dinerstein, and Bethea (on behalf of FWM)—as they conducted negotiations about the transaction between BCGC and FWM—mentioned the word "merger."  There is one e-mail from Ms. Tegeler to Stephens in which Ms. Tegeler claims that "the attorney for FWM wants us to verify with our other lien holders [sic] that we are merging with another company and to make sure that they are not going to make our loans Due Immediately.  I am wondering if that is not going to just raise red flags."  [Pl.'s Ex. No. 12]. However, all of the communications from FWM's attorneys concern a sale of BCGC's assets to FWM, not a merger of the two companies; indeed, FWM's attorneys worked up and sent to the Debtors' counsel drafts of the Asset Purchase Agreement.  There was never any documentation drafted discussing a merger of the two entities; and in fact, the surreptitious transaction that occurred two days after BCGC closed its loan with Trustmark was the transfer of all of BCGC's assets, first to Mr. Tegeler, and then to FWM.  [*See* Finding of Fact Nos. 26–27].  Therefore, even assuming that the Debtors did inform Petrilla in their first meeting with her that BCGC would be merging with FWM, this representation was false, as no merger ever took place; rather, Mr. Tegeler, on behalf of BCGC, conveyed all of its assets to FWM, leaving BCGC (i.e., Trustmark's borrower) as a shell corporation that deprived Trustmark of its Collateral.

[Finding of Fact No. 20(c)]. Moreover, the Debtors, on behalf of BCGC, further represented and promised that BCGC would not "pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or other charge, other than the security interest provided for in the Security Agreement." [*Id.*].

Despite the above-referenced representations, one of the Debtors (i.e., Mr. Tegeler) immediately proceeded to act completely contrary to these representations. Specifically, on August 20, 2014—only two days after the loan closing—Mr. Tegeler, without obtaining written consent from Trustmark, surreptitiously transferred all of BCGC's assets to himself personally by executing the Conveyance. [Finding of Fact No. 26]. Then, one day later, on August 21, 2014, Mr. Tegeler—once again, without obtaining Trustmark's written consent—executed the Asset Purchase Agreement with Huebel and Huebel Ranch to transfer all of BCGC's assets, including all cash, accounts receivable, and inventory, among other assets, to FWM.[23] [Finding of Fact No. 27]. Thus, within forty-eight hours after signing the Loan Documents, Mr. Tegeler proceeded to violate five material provisions of these contracts (i.e., the provisions referred to above). The negotiations that Mr. Tegeler (and his attorney and CPA) conducted with Huebel and FWM's attorneys prior to the loan closing—none of which were disclosed to Trustmark—

---

[23] Section 1.1 of the Asset Purchase Agreement sets forth that FWM is acquiring BCGC's assets "free and clear of any and all Liens, except those encumbrances listed on Schedule 1.1." Schedule 1.1 then lists Trustmark's lien on BCGC's assets—thereby suggesting that FWM acquired the assets subject to Trustmark's lien. However, Section 4.18 of the Asset Purchase Agreement contains the following language: "Pursuant to the distribution from [BCGC] to [FWM], [FWM] assumed [BCGC's] **unsecured, uncollateralized, non-guaranteed line of credit** from Trustmark Bank ("Trustmark"), in the aggregate principal amount of $300,000.00 (the "Seller LOC")." [Pl.'s Ex. 10] (emphasis added). This language clearly indicates that FWM—and BCGC, for that matter—were taking the position that under the Asset Purchase Agreement, any debt owed by BCGC to Trustmark that FWM would be assuming was completely unsecured. Stated differently, FWM was acquiring BCGC's assets free and clear of Trustmark's lien (because Trustmark had no lien according to these parties). Needless to say, the Asset Purchase Agreement contradicts itself on this point and leaves one scratching one's head. What there is no confusion about, however, is that: (a) FWM took title to BCGC's assets, which in turn allowed FWM's existing lenders to obtain a lien on these assets by operation of law; and (b) these lenders eventually foreclosed on these assets when FWM defaulted under its loan agreements with these banks. The result left Trustmark with no collateral whatsoever securing the Note. *See supra* note 24. That is why Trustmark was left filing a proof of claim in the Debtors' main Chapter 7 case setting forth that as of the Petition Date it was an unsecured creditor. [Finding of Fact No. 55].

clearly reflect that Mr. Tegeler had every intention of unilaterally transferring all of BCGC's assets immediately after the loan closing despite representing in the Loan Documents that no such transfer would ever occur without first obtaining Trustmark's written consent.[24]  [Finding of Fact No. 16].  By conveying all of BCGC's assets to FWM, Mr. Tegeler: (1) allowed FWM's existing lenders to obtain a lien on these assets by operation of law;[25] (2) materially and adversely changed BCGC's financial condition; and (3) made a substantial change in the character of BCGC's business.  These circumstances were direct violations of the representations noted above in the Revolving Loan Agreement and the Security Agreement.  This Court finds that Mr. Tegeler's actions do not constitute mere breaches of contracts; they also constitute false representations.  He clearly knew, prior to signing the Loan Documents, that he would not be complying with material provisions of the Loan Documents.  Indeed, his actions of August 20 and 21, 2014, reflect that he had no intention of performing his contractual duties under the Loan Documents that he had just signed forty-eight hours before.  *Nwokedi*, 428 S.W.3d at 199 ("The speaker's intent at the time of the representation may be inferred from the speaker's acts after the representation was made."); *Spoljaric*, 708 S.W.2d at 434 (internal citations omitted) ("A

---

[24] This type of transfer strongly cuts against the Code's purpose.  *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) ("The two-step routine that [the plaintiff] alleges and that we must take as true—in which Debtor A transfers valuable property to B for nothing in order to keep it out of the hands of A's creditor and B then sells the property and declares bankruptcy in an effort to shield herself from liability for having colluded with A to defeat the rights of A's creditor—is as blatant an abuse of the Bankruptcy Code as we can imagine.  It turns bankruptcy into an engine for fraud.").

[25] FWM's lenders, Lone Star Bank and Mainland Bank, had extended financing to FWM long before Trustmark ever extended financing to BCGC; and these two banks had properly perfected security interests on all of FWM's assets by the time Trustmark perfected its security interest in BCGC's assets.  [Finding of Fact No. 36(b)(i)].  Hence, once FWM took title to BCGC's assets, the properly perfected security interests of Lone Star Bank and Mainland Bank attached to these newly acquired assets and therefore primed Trustmark's lien.  *Liberty Sport Aviation, L.P. v. Tex. Hill Country Bank*, No. 04-15-00480-CV, 2016 WL 4626238, at *6 (Tex. App.—San Antonio Sept. 7, 2016, pet. denied) ("[T]he long-standing general rule of priority of competing security interests in collateral, where both interests are perfected by filing, is that priority vests in the party who first properly filed a financing statement or other appropriate instrument."); *Franklin Nat'l Bank v. Boser*, 972 S.W.2d 98, 101 (Tex. App.—Texarkana 1998, pet. denied) ("In general, priority between conflicting security interests where both interests are perfected by filing vests in the party who first properly filed a financing statement.").

promise to do an act in the future is actionable fraud when made with the intention, design, and purpose of deceiving, and with no intention of performing the act.  While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made."); *In re Dunston*, 117 B.R. at 640 ("An intent to deceive may logically be inferred from a false representation . . . which the debtor knows or should know will induce another individual to part with property or (services).").

There is more.  On August 29, 2014, the Debtors delivered to Trustmark a signed loan application on behalf of BCGC.[26]  [Finding of Fact No. 33].  The loan application inquires: "Is the collateral being pledged owned by someone other than the business or the owners of the business?" [*Id.*].  The Debtors stated, "No." [*Id.*].  Although the loan application contained information describing the circumstances as of the date of the loan closing—August 18, 2014, two days prior to all of BCGC's assets being transferred to FWM—the Debtors, as of August 29, 2014, knew full well that all of BCGC's assets had in fact been transferred to FWM on August 21, 2014.  Hence, by delivering to Trustmark the signed loan application on August 29, 2014, representing that the Collateral was not owned by someone other than BCGC, the Debtors were knowingly leading Trustmark to believe the Collateral was still owned by BCGC when, in fact, it was not.[27]  Stated differently, the Debtors made a knowing and fraudulent falsehood.

---

[26] The Debtors had actually submitted the completed loan application to Trustmark prior to the loan closing held on August 18, 2014, and the bank reviewed and relied upon this application prior to approving the loan and attending the loan closing.  [Finding of Fact No. 14].  However, a bank officer noticed, after the loan closing was held, that the Debtors had not actually signed this application.  Hence, the loan officer contacted the Debtors and requested them to sign the application; they agreed to do so; she had the application delivered to them; and they then signed and returned the application (without making any changes) to Trustmark on August 29, 2014.  [Finding of Fact No. 33].

[27] These circumstances also constitute the quintessential example of deceit, which is an element of false pretenses, as subsequently described herein.  For their part, the Debtors contend that when they returned the signed loan application to Trustmark on August 29, 2014, they were making no false representations because the loan application's representations were set forth prior to the loan closing of August 18, 2014—i.e., at a time when BCGC still did have all of the Collateral.  Technically, the Debtors are correct, but the Court nevertheless finds this argument to be disingenuous.  As already discussed, it is clear that the Debtors, even before they signed the Loan

There is even more.  On September 17, 2014, Ms. Tegeler, as an officer of BCGC, signed and submitted to Trustmark a borrowing base certificate expressly representing and warranting that "there does not exist an Event of Default of any event or condition . . . under the terms of any agreement between the [Debtors and Trustmark] including, without limitation, any loan agreement, security agreement, deed of trust, note and mortgage."  [Finding of Fact No. 36]. This representation was absolutely false, as several defaults did indeed exist under the terms of the Loan Documents by this date.  *Henson v. First Tower Loan, Inc. (In re Henson)*, 103 F.3d 470, 472 (5th Cir. 1997) (holding that failure to obtain written consent "creates an incident of default"); *Harris v. Archer*, 134 S.W.3d 411, 445 (Tex. App.—Amarillo 2004, pet. denied) (holding that when all parties agree to a condition precedent that requires prior written consent, the failure to acquire such written consent results in the consequences stated in the agreement, i.e., a voided transaction).

First, by September 17, 2014, all of the Collateral had been conveyed to FWM, and the security interests of FWM's lenders therefore now attached to the Collateral; hence, the Collateral on which Trustmark had a lien when BCGC owned these assets was now subject to superior liens of FWM's lenders in violation of the Revolving Loan Agreement and the Security Agreement.  *Liberty Sport Aviation v. Tex. Hill Country Bank*, No. 04-15-00480-CV, 2016 WL 4626238, at *6 (Tex. App.—San Antonio Sept. 7, 2016, pet. denied); *Franklin Nat'l Bank v. Boser*, 972 S.W.2d 98, 101 (Tex. App.—Texarkana 1998, pet. denied).[28]  Thus, Ms. Tegeler's statement was a blatant misrepresentation of an existing fact.

---

Documents, had no intention of complying with the provisions concerning the conveyance of BCGC's assets (or, for that matter, several of the other provisions of the Loan Documents).

[28] *See supra* note 25.  Even if an argument could be cobbled together that Trustmark's lien was senior to the liens of FWM's lenders, the latter nevertheless acquired liens, however subordinate, and the mere creation of such liens resulted in an event of default of the Security Agreement.  Specifically, the Security Agreement contains an express representation that BCGC "shall not . . . pledge, mortgage, encumber or otherwise permit the Collateral to be subject

Second, neither BCGC nor the Debtors ever notified Trustmark of any material adverse changes in BCGC's financial condition as they were required to do under the Revolving Loan Agreement.  [Finding of Fact No. 36(b)(ii)].  Yet, by September 17, 2014, BCGC had been drained of all of its assets, as Mr. Tegeler, on August 20, 2014, had executed the Conveyance, transferring these assets to himself (with no consideration given to BCGC), [Finding of Fact No. 26], and then, the next day, transferred these same assets to FWM through his execution of the Asset Purchase Agreement, [Finding of Fact No. 27].  Thus, there was no question that there had been material adverse changes in BCGC's financial condition, as it had become a shell corporation by September 17, 2014.  The Debtors' silence about this fact was a misrepresentation on their part.  *In re Selenberg*, 856 F.3d at 399.

Third, BCGC's assets had been conveyed when Mr. Tegeler—almost immediately after the loan closing—first took title to them and then immediately sold them to FWM.  [Finding of Fact Nos. 26–27].  Yet, BCGC (or, more accurately, the Debtors, as officers of BCGC) never obtained prior written consent from Trustmark for these transfers of BCGC's assets, as required by the Revolving Loan Agreement.  [Finding of Fact No. 35–36].  Thus, as of September 17, 2014, there were multiple defaults that had occurred, and yet the Debtors failed to disclose any of these defaults to Trustmark when Ms. Tegeler submitted the borrowing base certificate to Trustmark.  Rather, she represented on this certificate that there were no defaults when she knew—or is charged with knowing—that there were at least three defaults.  *Espinoza v. Cargill Meat Sols. Corp.*, 622 F.3d 432, 441 (5th Cir. 2010) ("Texas law charges a person with knowledge of the contents of a document he or she signs.").

---

to **any lien, security interest, encumbrance, or other charge**, other than the security interest provided for in the Security Agreement."  [Finding of Fact No. 20] (emphasis added).

In response to Trustmark's allegations, the Debtors contend that Trustmark was aware all along of the Debtors' intentions to have BCGC merge with FWM, and therefore should have known that BCGC's assets would be conveyed to FWM. Although the Debtors have not provided any credible evidence to prove that Trustmark was aware of this so-called "merger" at the time the Loan Documents were executed on August 18, 2014, or on September 18, 2014, when Trustmark actually advanced $230,000.00 to BCGC, the Debtors have provided evidence to support their contention of Trustmark's awareness three months later of the transaction between BCGC and FWM. [Finding of Fact Nos. 23, 36, 46]. Specifically, the Debtors contend that Trustmark had actual knowledge of the transaction because of an e-mail dated November 17, 2014, from Petrilla to Ms. Tegeler, requesting FWM's tax identification number. [Finding of Fact No. 46].[29] Ms. Tegeler replied to this e-mail and provided FWM's tax identification number, and she requested a meeting to discuss the borrowing base report due to the purported merger between BCGC and FWM. [*Id.*].

---

[29] At trial, the Debtors testified that the November 17, 2014, e-mail proves that Petrilla, and therefore Trustmark, knew of the merger between BCGC and FWM. The Court disagrees that this e-mail proves that Trustmark was aware of any transaction between BCGC and FWM at any time prior to or even for several weeks after the loan closing held on August 18, 2014. The first time that Petrilla learned about FWM's existence was during a November phone call that she had with Ms. Tegeler. Petrilla had called Ms. Tegeler to inquire as to why BCGC had failed to timely submit the monthly borrowing base certificates for September 30, 2014, and October 31, 2014 required under the Loan Documents. [Finding of Fact No. 45–46]. During this conversation, Ms. Tegeler informed Petrilla that, in her (i.e., Ms. Tegeler's) words, BCGC had "merged" with an entity named FWM. [*Id.*]. Upon hearing this information, Petrilla requested Ms. Tegeler to provide financial information about FWM so that she could understand the effect of the transaction between BCGC and FWM. Once Petrilla received this information, she continued to communicate with Ms. Tegeler, and one of these communications was a November 17, 2014, e-mail that Petrilla sent to Ms. Tegeler requesting: (1) the tax ID number for FWM, as Petrilla, surprised by what she had learned, began considering what workout options Trustmark now had, one of which was to consider whether to extend a loan to FWM; and (2) to know the status of the borrowing base certificates for September and October 2014, as Trustmark had still not received these documents as required under the Loan Documents. Petrilla herself did not use the word "merger." Rather, in responding to Petrilla's e-mail, Ms. Tegeler stated that, "We would like to discuss our borrowing base report when you arrive because of the way we are doing it with the merger. It can be a bit confusing and I want to be sure you can see what the issue is." [Defs.' Ex. No. 7]. Thus, it was Ms. Tegeler, not Petrilla, who used the term "merger." This is hardly evidence that Trustmark has all along been aware of any "merger"—or, for that matter, any transaction—between BCGC and FWM. In fact, based upon the credible evidence introduced at trial, this Court finds that Trustmark had no knowledge whatsoever of any transaction between BCGC and FWM until Petrilla learned about FWM's existence during the phone call that she had with Ms. Tegeler in November of 2014.

There is no question that by November 17, 2014, Petrilla knew that *some* type of transaction had taken place between BCGC and FWM.  Indeed, Petrilla first learned about FWM's existence in November 2014 during a phone call she had with Ms. Tegeler.  [Finding of Fact No. 45].  Petrilla, surprised to hear this information, nevertheless made an effort to determine whether Trustmark could enter into a lender-borrower relationship with FWM. However, upon learning more details about what actually happened—namely, the surreptitious conveyance on August 20, 2014, of all of BCGC's assets to Mr. Tegeler, and then the secret transfer of these assets on August 21, 2014, to FWM in exchange for Mr. Tegeler acquiring a 50% interest in FWM—Petrilla concluded that she should refer the BCGC loan file to her supervisor, Cook.

These circumstances in no way substantiate the Debtors' contention that Trustmark has known all along that BCGC would be—to use Ms. Tegeler's word—"merging" with FWM.  Just the opposite: Petrilla's actions reflect that neither she, nor anyone else at Trustmark, was informed about the transactions that occurred on August 20, 2014, and August 21, 2014, and that once she discovered what had happened, she realized the seriousness of the situation because: (1) the Debtors, on behalf of BCGC, had failed to obtain Trustmark's *prior written consent* to transfer BCGC's assets, as required by the Loan Documents; and (2) Ms. Tegeler had provided a false borrowing base certificate on September 17, 2014, representing that BCGC had accounts receivable of $389,324.00 when, in fact, by this date, BCGC had no assets whatsoever.

For all of the above-referenced reasons, Trustmark has met its burden of establishing that the Debtors committed knowing and fraudulent falsehoods.

## 2.  The Debtors Described Past or Current Facts

The Fifth Circuit has explained that "a promise to perform acts in the future is not considered a qualifying misrepresentation merely because the promise subsequently is breached." *In re Allison*, 960 F.2d at 484. "A debtor's misrepresentations of his intentions, however, may constitute a false representation within the meaning of the dischargeability provision if, when the representation is made, the debtor has no intention of performing as promised." *Metz v. Bentley (In re Bentley)*, 531 B.R. 671, 688 (Bankr. S.D. Tex. 2015) (quoting *In re Allison*, 960 F.2d at 484).   Additionally, the Fifth Circuit has further noted that misrepresentations concerning a past or "current fact of his *future intention*" will satisfy this element.  *In re Allison*, 960 F.2d at 484 (emphasis added).

Trustmark asserts that the Debtors' misrepresentations in the Loan Documents describe past or current facts.  The Debtors contend that the representations made in these documents pertain to future facts, and not past or current facts.  This Court disagrees with the Debtors.

The Debtors executed the Loan Documents knowing full well that they would—within a few days—sell, transfer, deliver, and convey Trustmark's Collateral from BCGC to Mr. Tegeler, and then from Mr. Tegeler to FWM, without obtaining prior written consent from Trustmark. [Finding of Fact Nos. 26–27].  After all, the Debtors—without any disclosure whatsoever to Trustmark for the three weeks leading up to the loan closing held on August 18, 2014—had conducted negotiations with FWM and its attorneys, and they knew prior to executing the Loan Documents that contrary to the representations made therein (including that BCGC would not convey its assets without written consent from Trustmark), Mr. Tegeler would soon be executing the Conveyance and the Asset Purchase Agreement to transfer all of BCGC's assets to FWM.[30]

---

[30] Indeed, Ms. Tegeler's e-mail comment to Stephens that to request a waiver would "raise red flags" underscores that she knew that her husband would be transferring all of BCGC's assets to FWM, and she did not want to bring

Under these circumstances, the Court finds that the representations made in the Loan Documents are representations that the Debtors had no intention of performing as promised.

Additionally, Trustmark contends that Ms. Tegeler made false representations of current facts by representing in the borrowing base certificate that BCGC had eligible accounts receivable as of September 17, 2014, of $389,324.00, when, in fact, BCGC had absolutely no assets as of that day because Mr. Tegeler, in August 2014, had already executed the Conveyance and the Asset Purchase Agreement to ensure that all of BCGC's assets (including its accounts receivable) were transferred to FWM.  [Finding of Fact No. 36–37].  The representation in the borrowing base certificate that BCGC had eligible accounts receivable of $389,324.00 as of September 17, 2014, was unquestionably a representation—which was blatantly false— describing current facts.  Trustmark has therefore satisfied its burden in this respect.

Case law supports this conclusion.  In *Third Coast Bank*, the district court affirmed the bankruptcy court's ruling that the debtor's debt to a lender was nondischargeable under § 523(a)(2)(A) because the debtor had knowingly submitted borrowing base certificates containing false information about inventory values upon which the lender relied to advance loan proceeds. *Cohen v. Third Coast Bank, SSB*, No. 1:13-CV-610, 2014 WL 2729608, at *8–9 (E.D. Tex. June 13, 2014).  If *Third Coast Bank* is not a "white horse" case given the facts in the suit at bar, then it is at least a "grey mule."  Other cases also support this interpretation.  *See, e.g.*, *Bandi v. Becnel (In re Bandi)*, 683 F.3d 671, 676 (5th Cir. 2012) (holding that a misrepresentation about the "general overall financial condition of an entity or individual" is within the scope of a false misrepresentation under § 523(a)(2)); *In re Kakde*, 382 B.R. at 420–21 (holding that falsities on a borrowing base certificate issued by debtor were materially false statements).

this transaction to Trustmark's attention by asking Trustmark for the waiver.  Instead, her husband and she chose not to inform Trustmark, but rather proceeded to sign the Loan Documents knowing that they would be transferring BCGC's assets in violation of these documents almost immediately after the loan closing.

Aside from the misrepresentations about the conveyance of BCGC's assets and the false information in the borrowing base certificate, the Debtors also misrepresented how the proceeds advanced under the Note would be used.  In *Jacobson*, the borrower represented to the lender that he would use any loan proceeds advanced by the lender for a specific purpose.  *Jacobson v. Ormsby (In re Jacobson)*, No. 04-51572-RBK, 2006 WL 2796672, at *10 (W.D. Tex. Sept. 26, 2006).  Subsequently, the borrower immediately spent the loan proceeds to pay "existing debts or other obligations [unrelated to the specific purpose], which left no remaining funds" for that specific purpose.  *Id.*  The court held that the borrower's representations described past or current facts, and not future facts; and therefore, the debt was held to be nondischargeable under § 523(a)(2)(A).  *Id.*; *see also Kan. Nat'l Bank & Trust Co. v. Kroh (In re Kroh)*, 88 B.R. 972, 984 (Bankr. W.D. Mo. 1988) ("Further, the testimony of the Bank's officers clearly supports the Court's finding that the Bank relied on the misrepresentations made by [the debtor] concerning use of the loan proceeds.  The Bank was assured orally at least twice and in writing that the loan proceeds were to be used for the brothers' personal investment.").

Like the borrower in *Jacobson*, the Debtors, in their first meeting with Petrilla and in their loan application, stated that the loan proceeds were to be used to help fund BCGC's relocation, restructure of operations, general working capital, and operating expenses.  [Finding of Fact No. 13(d)].  Instead, the Debtors used all of the loan proceeds of $230,000.00 to pay for FWM's working capital and operating expenses.  [Finding of Fact No. 41].  Not one dime was spent on BCGC.  This is because contrary to what the Debtors repeatedly represented to Trustmark, they never intended BCGC's line of credit to be used for BCGC's operations.  Rather, they intended all along that any loan proceeds advanced under the Loan Documents would be used for FWM's operations.  Indeed, this is why Huebel insisted that the Debtors had

to procure a line of credit facility before any transaction between FWM and BCGC would be consummated. This is also why the Debtors made no disclosure to Trustmark about their ongoing negotiations with Huebel and FWM's attorney prior to the loan closing of August 18, 2014. [Finding of Fact Nos. 13(d), 15]. Indeed, that is why, when FWM's attorney was requesting the Debtors to obtain a waiver from Trustmark about the contemplated conveyance of assets by BCGC to FWM, Ms. Tegeler told Stephens that such a request would "raise red flags"—which led the Debtors to convince FWM to delete this waiver procurement provision in the Asset Purchase Agreement.[31] The Debtors most assuredly did not want Trustmark to know that all loan proceeds would be used for FWM's operations, as they knew that Trustmark would not establish the line of credit facility for BCGC and advance funds thereunder if it knew that the loan proceeds would be used by some entity other than BCGC (i.e., other than Trustmark's borrower). The Debtors no doubt breathed a sigh of relief when this provision was deleted: they consummated the Asset Purchase Agreement with FWM, which gave Mr. Tegeler a 50% stock interest in FWM; and they kept Trustmark completely in the dark about their intention to use all loan proceeds advanced under the Note solely for FWM's benefit. This Court finds that the Debtors' representations that the proceeds advanced under the Loan Documents would be used for BCGC's operations were representations describing current facts; indeed, like the debtor in

---

[31] Indeed, the e-mail communication between Stephens and Ms. Tegeler on August 7, 2014, reflects that Stephens was of the opinion that neither Huebel nor Rayne were concerned about Mr. Tegeler requesting a waiver from Trustmark; rather, it was solely FWM's attorney, Dinerstein, who was insisting that Mr. Tegeler procure such a waiver. [Finding of Fact No. 16(j)]. However, Dinerstein clearly backed off on his position because the transaction between FWM and BCGC was consummated without anyone ever obtaining a waiver from Trustmark. [Finding of Fact No. 25]. Stated differently, Dinerstein's client—i.e., FWM, or, more accurately, Huebel—ultimately did not insist upon this waiver—no doubt, because Huebel did not want to jeopardize the line of credit application that BCGC had submitted to Trustmark. [Id.]. After all, Huebel had made it clear to Mr. Tegeler that unless BCGC obtained a line of credit, there would be no deal between FWM and BCGC. [Finding of Fact Nos. 9, 31]. Eventually, after Trustmark approved the line of credit for BCGC, the Debtors, by submitting a false borrowing base certificate, deceived Trustmark into advancing $230,000.00, which the Debtors then funneled to FWM to pay that company's operational expenses. [Finding of Fact Nos. 35–41].

*Jacobson*, the Debtors here immediately spent the loan proceeds by transferring them to FWM to pay for FWM's operational expenses and salaries. [Finding of Fact No. 41].

Thus, for all of the above-referenced reasons, this Court concludes that Trustmark has satisfied its burden and finds that the Debtors' representations described past or current facts.

3.   Trustmark Relied Upon the Debtors' False Representations

The final element to obtain a judgment that a debt is nondischargeable for false representations is the necessity that Trustmark relied on the Debtors' representations. *Field v. Mans*, 516 U.S. 59, 74 (1995); *In re Bandi*, 683 F.3d at 675. Petrilla very credibly testified at trial that Trustmark relied upon the oral representations of the Debtors made at their initial meeting and the written representations made in the loan application, the Loan Documents, and the borrowing base certificate to establish the line of credit facility and to actually fund $230,000.00 under this facility. [Finding of Fact No. 14]. Because Trustmark's claim is brought under § 523(a)(2)(A), the test is whether Trustmark justifiably relied—as opposed to reasonably relied—upon the representations made by the Debtors. *Field*, 516 U.S. at 70; *see also Sanford Inst. for Sav. v. Gallo*, 156 F.3d 71, 74 (1st Cir. 1998) ("The rationale for placing this relatively low burden on the victim of the misrepresentation is rooted in the common law rule that the victim's contributory negligence is not a defense to an intentional tort."). As *Third Coast Bank* points out, "justifiable reliance does not impose a duty to investigate unless the falsity of the representation is readily apparent or obvious, or there are 'red flags' indicating that reliance is unwarranted." 2014 WL 2729608, at *9. A creditor has no duty to investigate a debtor's representation, unless the "falsity of the representation is readily apparent." *Guion v. Sims (In re Sims)*, 479 B.R. 415, 425 (Bankr. S.D. Tex. 2012) (citing *Field*, 516 U.S. at 70–71); *see also In re Minardi*, 536 B.R. at 187–88 ("Justifiable reliance does not require a plaintiff to demonstrate

reasonableness nor does it impose a duty to investigate unless the falsity is readily apparent."). To determine whether a creditor justifiably relies on a misrepresentation, the court must examine the "circumstances of a particular case and the characteristics of a particular plaintiff, [and] not . . . an objective standard." *In re Sims*, 479 B.R. at 425; *see also In re Minardi*, 536 B.R. at 187 (emphasis in original) (citation omitted) ("Justifiable reliance requires proof that a plaintiff *actually relied* upon the defendant's false representations and that such reliance was justified under the circumstances.").

Trustmark asserts that it justifiably relied on the oral representations the Debtors made at their initial meeting with Petrilla, and, additionally, justifiably relied upon the written representations made in the loan application, the Loan Documents, and the borrowing base certificate. Specifically, Trustmark asserts that at the time the Debtors executed all of the Loan Documents (on August 18, 2014), it had no reason to suspect that the Debtors would be conveying away all of BCGC's assets within forty-eight hours of the loan closing. After all, at their initial meeting the Debtors informed Petrilla that the purpose of the loan was to provide working capital for BCGC, leaving Petrilla to believe that BCGC would continue to be an operational entity, not a shell corporation. [Finding of Fact No. 13(d)]. Moreover, the only information that the Debtors gave to Trustmark to evaluate in its loan review process was information about BCGC. [Finding of Fact No. 14]. Indeed, the loan application itself refers only to BCGC as the prospective borrower; there was no reference to FWM. [*Id.*]. Further, during the period that Trustmark was evaluating the information that the Debtors had given to it about BCGC, the Debtors never once disclosed to Trustmark the fact that they were carrying on substantive discussions with Huebel and FWM's attorneys about FWM acquiring all of BCGC's assets. [Finding of Fact Nos. 15–16]. Additionally, at the loan closing, when the Debtors signed

all of the Loan Documents, they did not say one word about FWM to Trustmark.  [Finding of Fact No. 23].  Under all of these circumstances, the Court finds that Trustmark justifiably relied upon the representations that the Debtors made orally to it at the face-to-face meeting with Petrilla in early August of 2014 as well as the written representations made in the completed loan application and Loan Documents executed on August 18, 2014.  There were simply no "red flags" that would have required Trustmark to further investigate whether the Debtors' representations might be inaccurate and therefore should not be relied upon.  Moreover, Stephens had previously referred prospective borrowers to Trustmark, and there is no evidence that Trustmark had experienced any issues of dishonesty or lack of integrity with these individuals.  Here, Trustmark had a track record with Stephens' referred borrowers that gave it some level of comfort about the Debtors that it otherwise might not have had.

Further, there was nothing indicated on the face of the borrowing base certificate given to Trustmark on September 17, 2014, that revealed any falsehoods or abnormalities.  *Third Coast Bank*, 2014 WL 2729608, at *4, *10–11 (affirming bankruptcy court's nondischargeability judgment under § 523(a)(2)(A) for false representations on the grounds that the borrowing base certificates provided and certified by the debtor as correct by the debtor "were largely untrue").  As of September 17, 2014, Trustmark had no idea or information that Mr. Tegeler had already conveyed BCGC's assets (including its accounts receivable) to FWM, thereby leaving BCGC as nothing more than a shell corporation.  [Finding of Fact No. 36].  Indeed, the Debtors had not provided Trustmark with a copy of the Conveyance or the Asset Purchase Agreement (which memorialized the transfers of BCGC's assets the previous month) nor had the Debtors verbally informed Trustmark about these two transactions.  [Finding of Fact Nos. 26, 32].  Moreover, Ms. Tegeler expressly represented in the borrowing base certificate that there were no defaults under

76

the Loan Documents [Finding of Fact No. 36], which of course meant, among other things, that there had been no conveyance of BCGC's assets to any third party. Thus, when Ms. Tegeler delivered the borrowing base certificate to Trustmark on September 17, 2014, representing that BCGC had accounts receivable of $389,324.00, there were no red flags that Trustmark should have seen to lead it to believe that it should investigate before actually advancing funds to BCGC as requested by Ms. Tegeler.[32]   The only action that Trustmark took—and it was certainly legitimate and in the ordinary course of any lending institution's business—was to do some mathematical calculations in order to determine the exact amount of "eligible accounts receivable" under the Loan Documents so that the exact amount of the loan proceeds could be determined and wire transferred into BCGC's account.  [Finding of Fact Nos. 39–40].  Under all these circumstances, the Court finds that Trustmark justifiably relied upon the figures and representations made by Ms. Tegeler in the borrowing base certificate.

The Debtors contend that Trustmark did not justifiably rely on any of the above-referenced representations because Trustmark knew about the so-called "merger" between

---

[32] Even if the Debtors contend that Trustmark should have investigated whether BCGC did, in fact, have accounts receivable as of September 17, 2014, case law is clear that under the circumstances, Trustmark had no duty to investigate.  *Higgins v. Nunnelee (In re Nunnelee)*, 560 B.R. 277, 286 (Bankr. N.D. Miss. 2016) (citations, quotations, and alterations omitted) ("The justifiable reliance standard imposes no duty to investigate unless the falsity is readily apparent.  However, a promisee is required to use his senses and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him.  Consequently, if under the circumstances, the facts should be apparent to one of the promisee's knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning he is being deceived, reliance is not justified without further investigation."); *see also Shaw Steel, Inc. v. Morns (In re Morns)*, 230 B.R. 352, 361 (Bankr. N.D. Ill. 1999) ("Where no 'red flags' suggest that the debtor has made false statements, the creditor has no duty to investigate to determine the truth."); *Sanford Inst. for Sav. v. Gallo*, 156 F.3d 71, 75 (1st Cir. 1998) (without warning signs, bank was free to rely on statements without more, even if a title search was easy and a matter of policy).  After all, as of September 17, 2014, the Debtors had never orally informed Trustmark that BCGC's assets had all been transferred to FWM.  Nor had they sent Trustmark a copy of the Conveyance or the Asset Purchase Agreement evidencing the transfer of BCGC's assets.  [Finding of Fact Nos. 26, 32].  Rather, what Trustmark knew as of this date—or had justifiable reason to believe it knew based upon its due diligence conducted prior to the loan closing of August 18, 2014—was that its borrower was BCGC; BCGC was a company that had been operational for approximately six years; and BCGC had a history of generating and collecting accounts receivable.  On these facts, it was entirely justifiable for Trustmark to believe that the figures in the borrowing base certificate were true and accurate; therefore, Trustmark had no duty to investigate to determine if these figures were bogus.  Stated otherwise, there was nothing readily apparent suggesting that these account receivable figures were questionable.

BCGC and FWM.  Trustmark strongly disagrees.  This Court rejects the Debtors' position for the following reasons.

First, the Debtors assert that at their initial meeting with Petrilla in early August of 2014, they informed her about the "merger" with FWM.  Petrilla has denied that they did so, and this Court has already found her testimony to be more credible than the testimony of the Debtors on this point.  *See* Credibility Section.  Thus, this Court has found that no such disclosure was ever made at this initial meeting.  Accordingly, the Court rejects the Debtors' argument that Trustmark knew about the so-called "merger" prior to the loan closing, as the Debtors have simply failed to introduce any credible evidence that Trustmark had such information.  Indeed, as this Court has already noted, both the Debtors and Stephens admitted at trial, that for the several days leading up to the August 18, 2014, loan closing, they provided no information (orally or in writing) to Trustmark about their negotiations with FWM.  It simply strains credulity to believe the Debtors' version that they told Petrilla about FWM at their initial meeting, but then told her absolutely nothing thereafter about the multi-day negotiations with FWM's owner and attorneys. The fact is that they told her nothing at the initial meeting about any "merger."[33]

---

[33] Under Texas law, "a certificate of merger . . . must be filed for a merger . . . to become effective" if any domestic corporation is a party to the merger.  Tex. Bus. Orgs. Code Ann. § 10.151(a)(1)(A) (West 2018); *see also* Tex. Bus. Orgs. Code § 1.002(22) ("filing entity" includes corporations). "[A] merger that requires [such] a filing . . . takes effect on the acceptance of the filing of the certificate of merger by the secretary of state or county clerk, as appropriate." *Rosenbrock v. Deutsche Lufthansa, A.G., Inc.*, No. 6:16-CV-0003, 2016 WL 2756589, at *7 (S.D. Tex. May 9, 2016) (citing Tex. Bus. Orgs. Code § 10.007); *see also* Tex. Bus. Orgs. Code § 10.153(a).  Once a merger takes effect, "the separate existence of each domestic entity that is a party to the merger, other than a surviving or new domestic entity, ceases."  Tex. Bus. Orgs. Code § 10.008(a)(1).  The Court finds that the Debtors' transaction with BCGC and FWM did not constitute a merger under Texas law; and therefore, even if the Debtors did represent to Petrilla at their initial meeting that there would be a merger, this representation was false.  *See supra* note 5. Indeed, the Court finds that the evidence unequivocally reflects the transaction between these two entities—BCGC and FWM—contemplated merely an asset sale.  It is telling to note that the Debtors did not close BCGC's operating account at Frost Bank after the transaction of August 21, 2014, between BCGC and FWM was effectuated by the Asset Purchase Agreement.  [Finding of Fact No. 41].  If a true merger had actually occurred on that date, then that account at Frost Bank should have been closed.  [*Id.*].  Instead, the Debtors kept this account open; a few weeks later, Ms. Tegeler submitted the borrowing base certificate to Trustmark representing that BCGC had accounts receivable of $389,324.00, thereby leading Trustmark to believe that BCGC was still a viable, fully-operational entity; Trustmark then advanced $230,000.00 under the Note and wired these funds into BCGC's account; and then

Second, the Debtors argue that Trustmark knew about the "merger" by drawing the Court's attention to e-mail exchanges between Ms. Tegeler and Petrilla discussing the so-called "merger" in November 2014.  There is no question that this e-mail illustrates that, by **November of 2014**, Trustmark had knowledge of FWM owning BCGC's Collateral and that some type of transaction between BCGC and FWM had occurred.  [Finding of Fact No. 46].  However, the Debtors want this Court to use this fact to make a finding that Trustmark knew, even prior to the loan closing of August 18, 2014, about FWM's existence and the transaction that BCGC negotiated with FWM.  This, the Court will not do.  The evidence is clear that Petrilla first learned about FWM's existence in November 2014 during a phone call she had with Ms. Tegeler.  [Finding of Fact No. 45].  Petrilla had made the call to inquire why BCGC had failed to submit the monthly borrowing base certificates for September 30, 2014, and October 31, 2014, as required by the Loan Documents, and during this call, Ms. Tegeler responded that BCGC had "merged" with FWM.  [*Id.*].  Because this Court finds Petrilla's testimony very credible, this means the earliest Trustmark could have known about the "merger" with FWM was November 2014.  Thus, the finding that this Court makes is that when Trustmark established the line of credit facility on August 18, 2014, and when it actually advanced funds of $230,000.00 under the Note on September 18, 2014, Trustmark had no knowledge of FWM or any transactions that it had effectuated with BCGC.  Given this timeline, the Court finds that Trustmark justifiably relied upon all of the representations made by the Debtors from their initial meeting in August of 2014 through the delivery of the borrowing base certificate on September 17, 2014.[34]

Ms. Tegeler thereafter wrote three checks payable to FWM to drain BCGC's account of these funds so that FWM could use these funds as working capital.  [Finding of Fact Nos. 36–41].

[34] The Debtors also seem to argue that even if Trustmark did not know about the so-called "merger" until November of 2014, it consented to BCGC's conveyance of all of its assets to FWM because Petrilla e-mailed Ms. Tegeler requesting FWM's tax identification number in November of 2014.  At this point, Petrilla was simply trying to determine whether Trustmark could enter into a lender-borrower relationship with FWM in order to maximize the

4.  The Debtors' Conduct Caused Damage to Trustmark

There is no question that the Debtors' conduct caused damage to Trustmark.  Not only did the Debtors deprive Trustmark of the funds it loaned to BCGC by deliberately signing loan documents containing provisions they had no intention of complying with, they also intentionally submitted a borrowing base certificate that was patently false knowing that Trustmark would rely upon it to advance funds to a corporation (BCGC) that no longer had any assets to secure the advance.  The Debtors also deprived Trustmark from foreclosing on its lien on the Collateral to recover the $230,000.00 because they conveyed all of BCGC's assets to FWM, thereby allowing FWM's lenders to take a lien on these assets and effectively eviscerateTrustmark's lien, which in turn made the $256,716.54 Debt an unsecured loan.   [Finding of Fact No. 52–53, 55]; *see DZ Bank AG Deutsche Zentral-Genossenschaft Bank v. Meyer*, 869 F.3d 839, 843 (9th Cir. 2017) (holding that debtor's transfer, initiated as owner, from one corporation to another caused damage to the bank's interest because the bank no longer had assets on which to foreclose).  In fact, Lone Star Bank and Mainland Bank (FWM's lenders) declared a default under their respective loan agreements with FWM, and thereafter repossessed and liquidated FWM's assets, including the assets on which Trustmark had a lien, i.e., the Collateral.  [*Id.*].  Trustmark was left holding a non-performing loan with a principal balance of $230,000.00 from a borrower (BCGC) who, having given a lien to Trustmark on its assets to secure the loan, then ensured that this lien was eviscerated.  But for the skullduggerous actions of the borrower's principals—i.e., the Debtors—Trustmark would have suffered no harm.  Therefore, the Debtors undeniably caused

chances of recovering the $230,000.00 that Trustmark had already advanced to BCGC on September 18, 2014. Stated differently, she was trying to do "damage control" in the wake of learning that all of the assets of Trustmark's borrower, BCGC, had been surreptitiously transferred to FWM.  Her request for the tax identification number in November of 2014—when she had just learned about FWM's existence—in no way constitutes Trustmark's consent to BCGC's conveyance of the Collateral to FWM in August of 2014, when Petrilla had no knowledge whatsoever of FWM's existence.

damage to Trustmark.  *In re Kroh*, 88 B.R. at 984 ("The Bank has been damaged in the amount of the unpaid balance on each note, the interest accrued on the notes, and the attorney's fees incurred.  Absent, [the debtor's] misrepresentations the Bank would not have loaned the money to [the debtor] and these damages would not have occurred.").

In sum, Trustmark has met its burden in establishing all of the elements of a claim for false representations.  Therefore, this Court finds that the $256,716.54 Debt is nondischargeable. The Court now addresses Trustmark's claim for false pretenses.

## H.  Trustmark's Claim under § 523(a)(2)(A) for False Pretenses

Trustmark's second claim against the Debtors is based upon § 523(a)(2)(A) for false pretenses.  Trustmark contends that the following conduct of the Debtors constitutes false pretenses: (1) their actions taken to establish the line of credit facility at the August 18, 2014, closing; (2) their actions taken on September 17, 2014, to obtain a drawdown of $230,000.00 under the line of credit facility on September 18, 2014; and (3) their actions taken to transfer the loan proceeds of $230,000.00 from BCGC's account to FWM's account on September 19, 2014, November 5, 2014, and November 20, 2014.

To obtain a judgment that a debt is nondischargeable for false pretenses, the creditor must show that: (1) the debtor engaged in conduct "wronging one in his property rights by dishonest methods or schemes [such as] deprivation of something of value by trick, deceit, chicane[ry] or overreaching;" (2) there was scienter or intent; (3) causation; and (4) damages.  *Novartis Corp. v. Luppino (In re Luppino)*, 221 B.R. 693, 701–02 (Bankr. S.D.N.Y. 1998).  "While false pretenses and false representation both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement."

*In re Minardi*, 536 B.R. at 187 (quotation omitted).  Further, a false pretense "involves implied misrepresentation or conduct intended to create and foster a false impression . . . ."  *Leeb v. Guy (In re Guy)*, 101 B.R. 961, 978 (Bankr. N.D. Ind. 1988).  The Court now addresses each of the elements that Trustmark must satisfy.[35]

1.  The Debtors' Dishonest Conduct Injured Trustmark's Property Interest: Namely, its Lien on the Collateral

The Debtors' dishonest conduct prior to the loan closing resulted in injury to Trustmark's security interest.  In late July or early August of 2014, the Debtors and Stephens had their initial meeting with Petrilla to discuss obtaining a line of credit to help fund BCGC's relocation, restructure of operations, general working capital, and operating expenses.  [Finding of Fact No. 13(d)].  Importantly, the Debtors only indicated the need for financing for BCGC, and not for BCGC **and** FWM—or solely for FWM**.  [*Id.*].  They made no disclosures whatsoever about FWM in this meeting, and the loan application that they filled out and submitted soon thereafter stated that the proposed borrower was BCGC and that the purpose of the loan was to fund BCGC's operations.  [*Id.*].  The loan application made no reference at all to FWM.  [Pl.'s Ex. No. 13 at 9].  The Debtors led Trustmark to believe that the loan proceeds were to be used solely for BCGC's operations.  [*Id.*; Finding of Fact No. 13(d)].  Yet, while Trustmark was considering

---

[35] One court, in distinguishing between a claim for false representation and a claim for false pretenses, has stated the following:

> While most times both conduct and explicit statements by the debtor exist, thereby establishing a fraud under both false pretenses and false representation, the creditor may be able to establish the debtor's conduct without a showing of explicit statements or explicit statements without a showing of the debtor's conduct and still be successful under § 523(a)(2)(A).

*Argento v. Cahill (In re Cahill)*, No. 15-72418-REG, 2017 WL 713565, at *6 (Bankr. E.D.N.Y Feb. 27, 2017).  In the suit at bar, Trustmark has proven explicit representations made by the Debtors and therefore successfully met its burden on its claim for false representations.  Now, in assessing Trustmark's claim for false pretenses, this Court finds that Trustmark has proven sufficient misconduct by the Debtors, but this conduct is intertwined with express representations.  Thus, to the extent that this "false pretenses" section discusses express representations made by the Debtors, not only do they help Trustmark establish its claim for false pretenses, but they also help Trustmark further establish its claim for false representations.

BCGC's loan application during the first two weeks of August 2014, the Debtors, and their agents (Stephens and LeBlanc) were conducting substantive negotiations with FWM's principal (Huebel) and attorneys (Dinerstein and Bethea) concerning a sale of all of BCGC's assets to FWM; the Debtors said absolutely nothing to Trustmark about these communications.  [Finding of Fact No. 15].  The Debtors had a duty to not only verbally disclose to Trustmark at the initial meeting their true intention regarding the transfer of BCGC's assets to FWM and the use of the loan proceeds for FWM's operations, but they also should have made such disclosure in the loan application itself.  *See Check Control, Inc. v. Anderson (In re Anderson)*, 181 B.R. 943, 950 (Bankr. D. Minn. 1995) (citation omitted) (noting that false pretenses can also consist of "silence when there is a duty to speak"); *Minority Equity Capital Corp. v. Weinstein (In re Weinstein)*, 31 B.R. 804, 810 (Bankr. E.D.N.Y. 1983) (stating when finding that debtor's conduct amounted to false pretenses, that "[c]ase law has additionally gone so far as to extend an affirmative duty to a party in a business transaction to disclose all the facts the concealment of which would mislead the other side.").  Their silence was deafening.  The Debtors' failure to make these disclosures to Trustmark led Trustmark to believe that BCGC was the only borrower and BCGC's assets constituted the only collateral.  Indeed, Trustmark drafted the Loan Documents to reflect that BCGC was the only borrower and that BCGC's assets constituted the only collateral.

The Debtors then went to the loan closing on August 18, 2014, and signed the Loan Documents while continuing to say nothing about their negotiations with FWM, all of which led Trustmark to believe that: (1) its only borrower was BCGC; (2) any proceeds funded under the Note would be used for solely BCGC's operations; (3) any advances requested by the Debtors under the Note would be based upon eligible accounts receivable actually owned by BCGC; and (4) any outstanding balance under the Note was well secured by the Collateral.  The Debtors'

conduct was dishonest and harmed Trustmark because: (1) Trustmark did not have an opportunity to individually evaluate FWM's credit-worthiness; (2) Trustmark did not have any other opportunities to otherwise protect its security interest in the Collateral; (3) Trustmark did not have an opportunity to obtain a personal guaranty from Huebel prior to the loan closing; and (4) when FWM's lenders eventually foreclosed on all of FWM's assets—which, by that time, included the Collateral—Trustmark's collateral position was completely destroyed, rendering the $230,000.00 principal balance owed under the Note to be an unsecured debt. Stated differently, the Debtors' deceitful conduct through the first eighteen days of August of 2014 deprived Trustmark of its right to know to whom it was truly lending the money, the intended purpose of the loan, and how to properly secure the repayment of the loan—all of which eventually resulted in Trustmark being duped into advancing $230,000.00 as an unsecured loan that has never been repaid. The Court finds that the Debtors' conduct was dishonest and falls within the parameters of "false pretenses." *In re Dunston*, 117 B.R. at 641 ("This Court construes 'false pretense' in the context of Section 523(a)(2)(A) to mean, generally, a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor.").

The Debtors' deceptive conduct continued after the loan closing. Only forty-eight hours after the loan closing, Mr. Tegeler conveyed all of BCGC's assets (i.e., the Collateral) to himself and then the next day, he transferred these same assets to FWM. [Finding of Fact Nos. 26–27]. Neither the Debtors nor their advisors/agents, Stephens and LeBlanc, nor anyone else informed Trustmark of these transactions or provided Trustmark with a copy of the Conveyance or the Asset Purchase Agreement evidencing the transfer of the assets to FWM. [Finding of Fact No.

84

32].  Had the Debtors done so, Trustmark—which had not yet actually advanced any proceeds under the Note—would have discovered that its Collateral had been conveyed away, which of course would have led Trustmark to legitimately deny any request to advance any monies under the Note.[36]   While Mr. Tegeler testified—at least at some points during trial—that he did not read the Asset Purchase Agreement, he knew, or should have known, that the conveyance of all of BCGC's assets—to either himself or FWM, [Finding of Fact Nos. 26–27]—would result in a default of the Loan Documents unless he first obtained Trustmark's written consent for such a transfer, [Finding of Fact Nos. 19, 30].  *See Espinoza*, 622 F.3d at 441 ("Texas law charges a person with knowledge of the contents of a document he or she signs."); *Venture Cotton Coop. v. Freeman*, 494 S.W.3d 186, 199 (Tex. App.—Eastland 2015, no pet.) ("A party is bound to the contract he signs regardless of whether he read it . . . ."); *Donovan v. Mercer*, 747 F.2d 304, 308 n.4 (5th Cir. 1984) (recognizing the "long standing and generally accepted principle of contract law that, absent fraud or mental incompetence, a person who intentionally signs a document is bound by its contents, whether or not he in fact read the document."); *Master Fin., Inc. v. DeJulio (In re DeJulio)*, 322 B.R. 456, 462 (Bankr. M.D. Fla. 2005) ("failure to read . . . constitutes at a minimum a reckless indifference and disregard of the information readily available").  Yet, he failed to obtain such consent—despite the fact that Dinerstein (one of FWM's attorneys), in early August of 2014, brought to the Debtors' attention that they would need to obtain a waiver of the default provisions from Trustmark.[37]   [Finding of Fact No. 16(e)].

---

[36] The Note defines "default" to include the following: "A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment performance of this Note is impaired."  [Pl.'s Ex. No. 1 at 7].  Thus, Trustmark, had it known that its Collateral had been conveyed away, could have declared a default under the Note and refused to make any advance—thereby avoiding the possibility of incurring any damages.

[37] Eventually, the Debtors struck the provision in the draft of the Asset Purchase Agreement requiring them to obtain a waiver from Trustmark.  FWM did not object to the deletion of this provision, as Huebel (FWM's ultimate decision-maker) obviously decided that it was in FWM's best interest to consummate the Asset Purchase Agreement

At trial, the Debtors both admitted that they did not contact Trustmark to obtain waivers of any of the default provisions under the Loan Documents. [Finding of Fact No. 23]. Rather, deliberately keeping Trustmark totally in the dark, the Debtors transferred the Collateral to FWM so that Mr. Tegeler would receive a 50% stock interest in FWM. [Finding of Fact No. 26–28]. This Court finds that when the Debtors represented to Trustmark that the loan was for the purpose of funding BCGC's operations and that BCGC would not transfer its assets without Trustmark's consent, the Debtors knew that the loan proceeds would be used for FWM's operations and that without obtaining Trustmark's consent, they would be conveying the Collateral to FWM in exchange for Mr. Tegeler receiving 50% of FWM's stock. The Debtors had a duty to disclose these facts to Trustmark and obtain its written consent before proceeding with the conveyance of the Collateral, but they chose not to do so. *Phillips 66 Co. v. Miltenberger (In re Miltenberger)*, 538 B.R. 547, (Bankr. E.D. Mo. 2015) (quotation omitted) ("[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the 'false pretenses' provision of Section 523(a)(2)(A)."); *In re Weinstein*, 31 B.R. at 810 ("Case law has additionally gone so far as to extend an affirmative duty to a party in a business transaction to disclose all the facts the concealment of which would mislead the other side."); *In re Hurst*, 337 B.R. at 133 ("Put simply, if Party 1 is under a mistaken impression as to the truth of a set of facts and Party 2 is aware of the truth and of the mistaken impression, Party 2 is under a duty to correct that mistake prior to the consummation of the transaction."). The Debtors' chicanery deprived Trustmark of its right to protect its lien on the Collateral and

---

as soon as possible rather than risk a delay in Trustmark approving the line of credit for BCGC or, in the worst case scenario, risk Trustmark denying BCGC's request for a line of credit.

prevent the ultimate foreclosure sales by FWM's lenders of this Collateral, thereby eviscerating Trustmark's security interest.

Aside from the Debtors' concealment of the truth about the conveyance of the Collateral to Mr. Tegeler on August 20, 2014, and to FWM on August 21, 2014, the Debtors also falsely led Trustmark to believe that BCGC still owned the Collateral: (1) when they delivered the signed loan application on August 29, 2014, to Trustmark expressly representing in writing that the Collateral was not "owned by someone other than the business or the owners of the business" when, in fact, just eight days before, they had orchestrated the transfer of all of these assets to FWM;[38] and (2) when Ms. Tegeler submitted a blatantly inaccurate borrowing base certificate to Trustmark for the purpose of obtaining an advance under the Note.  Specifically, on or about September 17, 2014—i.e., thirty days after the loan closing, twenty-eight days after Mr. Tegeler conveyed all of the assets from BCGC to himself pursuant to the Conveyance, and twenty-seven days after Mr. Tegeler personally conveyed all of these same assets to FWM pursuant to the Asset Purchase Agreement—Ms. Tegeler, in her capacity as an officer of BCGC, submitted a borrowing base certificate to Trustmark in order to effectuate a drawdown under the Note. [Finding of Fact No. 36].  This borrowing base certificate, which she signed on September 17, 2014, represented to Trustmark that as of September 17, 2014, BCGC had total accounts receivable of $457,207.00, of which $67,883.00 were outstanding for more than ninety days,

---

[38] The Debtors had actually submitted the completed loan application to Trustmark prior to the loan closing held on August 18, 2014, and the bank reviewed and relied upon this application prior to approving the loan and attending the loan closing.  [Finding of Fact No. 14].  However, a bank officer noticed after the loan closing was held that the Debtors had not actually signed this application.  Hence, the loan officer contacted the Debtors and requested them to sign the application; they agreed to do so; she had the application delivered to them; and they then signed and returned the application to Trustmark on August 29, 2014.  [Finding of Fact No. 33].  The Debtors contend that they did not mislead Trustmark when they delivered the signed loan application on August 29, 2014, because the representations made therein were as of August 18, 2014—i.e., the date of the loan closing, which was two days prior to Mr. Tegeler stripping BCGC of all its assets so that they could be conveyed to FWM in order that he could obtain a 50% interest in FWM. The Court finds their argument disingenuous.  They knew full well on August 29, 2014, when they returned the signed loan application to Trustmark that the Collateral was, on that date, owned by an entity other than BCGC (namely, FWM).

thereby leaving total eligible accounts receivable to be $389,324.00. [Finding of Fact No. 37; Pl.'s Ex. No. 7; *see* Adv. Doc. No. 50, p. 4 of 9]. In fact, this representation was blatantly false, as Mr. Tegeler had conveyed all of BCGC's receivables, along with all of the company's other assets, almost a month before to FWM. [Finding of Fact Nos. 27, 36(b)(ii)]. Trustmark, not having been told by the Debtors about the conveyance to FWM, relied upon the borrowing base certificate representation in proceeding to advance $230,000.00 to BCGC by wire transferring these proceeds to BCGC's bank account on September 18, 2014. [Finding of Fact Nos. 38–40].

In fact, the deception by the Debtors was particularly egregious because of the express representations about the receivables made in the borrowing base certificate upon which Trustmark relied:

> **To the best of our knowledge and belief**, there have been no changes in the amounts stated above since the date of calculation which would cause the present balance of accounts and inventory to be less than the amount necessary to comply in all respects with this Certificate. **We hereby affirm, represent and warrant to you** the following as of the date hereof:
>
> (1) there does not exist an Event of Default of any event or condition which, with notice of lapse of time, or both, would constitute an Event of Default under the terms of any agreement between us, including, without limitation, any loan agreement, security agreement, deed of trust, note and mortgage; (2) that all the representations and warranties previously given to you were correct when made and are reaffirmed as correct now; and (3) that we are in compliance with all terms, covenants and conditions of all agreements between us.
>
> **We hereby confirm** to you that all of the above accounts, whether now owned or hereafter arising or acquired including but not limited to each and every account furnished to you under the provision of the Security Agreement, and all proceeds thereof and all liens, and securities, guarantees, remedies, and privileges pertaining hereto are, and heretofore have been assigned to you, and are and have been subject to a security interest in your favor, and have accordingly marked our records to reflect same.

[Pl.'s Ex. No. 13 (emphasis added); Finding of Fact No. 36].[39]  This language, together with the Debtors' continued silence about FWM's existence and the transfer of the Collateral to FWM, created a false picture of reality upon which Trustmark relied in advancing $230,000.00 under the Note on September 18, 2014.  The false representations upon which Trustmark relied were material.  First, contrary to the representation in the borrowing base certificate that "there have been no changes in the amounts stated above since the date of calculation which would cause the present balance of accounts . . . to be less than the amount necessary to comply in all respects with this Certificate," in fact there had been a huge change—as BCGC's accounts receivable had declined to zero on the date Mr. Tegeler executed the Conveyance conveying these receivables (and all of BCGC's other assets to himself).  [Finding of Fact No. 36].  Second, contrary to the representation in the borrowing base certificate that "there does not exist an Event of Default of any event or condition which . . . would constitute an Event of Default under the terms of any agreement" in fact there had been several Events of Default, including the following:

1. The accounts forming the basis of the Collateral securing BCGC's indebtedness to Trustmark had become subject to superior liens, security interests, or other encumbrances—i.e., FWM's lenders had obtained liens on the Collateral by operation of law once these assets were transferred by Mr. Tegeler to FWM on August 21, 2014. [Finding of Fact No. 36(b)(i)].

2. The Debtors, on behalf of BCGC, did not notify Trustmark of all material adverse changes in BCGC's financial condition.  [Finding of Fact No. 36(b)(ii)].  Such a change

---

[39] Although only Ms. Tegeler signed the borrowing base certificate, the Court construes the phrases "To the best of our knowledge and belief," "We hereby affirm, represent and warrant to you," and "We hereby confirm" to mean that Ms. Tegeler was speaking not only for herself, but also for her husband, in making these representations.

had occurred when Mr. Tegeler, on August 20, 2014, conveyed all of BCGC's assets to himself for no consideration.

3. Mr. Tegeler, without the prior written consent of Trustmark, had transferred all of BCGC's assets used or useful in its business, and these transfers were not in the ordinary course of BCGC's business. [Finding of Fact No. 36(b)(iv)].

4. Mr. Tegeler, on behalf of BCGC, had sold, offered to sell, and otherwise transferred and disposed of the Collateral by conveying these assets to himself on August 20, 2014, and then transferring these same assets to FWM the next day. [Finding of Fact No. 26–27].

5. Mr. Tegeler (and therefore BCGC) had subjected the Collateral to liens, security interests, encumbrances, and other charges, other than the security interest provided for in the Security Agreement. [Finding of Fact No. 20(c)]. Specifically, by transferring the Collateral to FWM, Mr. Tegeler allowed the security agreements of FWM's existing lenders to obtain liens on the Collateral.[40]

6. The Debtors, as guarantors of any balance owed under the Note, failed to keep Trustmark adequately informed of any facts, events, or circumstances which might in any way affect the Debtors' risks under the Guaranties. [Finding of Fact No. 21(b)]. Here, by denuding BCGC, the value of Mr. Tegeler's stock interest (which was community property, and therefore affected Ms. Tegeler's community property interest) declined because BCGC no longer had any assets or any cash flow to pay the salaries of Mr. Tegeler and Ms. Tegeler.[41] These circumstances were harmful to the personal financial condition of Mr.

---

[40] The Court notes that the Loan Documents contain two provisions wherein the Debtors (on behalf of BCGC) represent that no other liens will be granted on the Collateral. One of these provisions sets forth that no other senior liens will be granted; however, the other provision sets forth that no other liens (regardless of whether they are senior or junior to Trustmark's lien) will be granted.

[41] The record is unclear as to the exact amount of the salary that Ms. Tegeler received while BCGC was operational. There is no question, however, that she did receive a salary. [Nov. 28, 2017 Tr. 32:15-16].

and Ms. Tegeler, as guarantors of the Note, and they failed to notify Trustmark of these conditions.

Additionally, contrary to representation in the borrowing base certificate that "we are in compliance with all terms, covenants, and conditions of all agreements between us," in fact, the Debtors, as representatives of BCGC, and in their individual capacities, were not in compliance with the Loan Documents.  [Finding of Fact No. 36].

The submission of the above-referenced materially false borrowing base certificate, together with the Debtors' complete silence about the Conveyance and the Asset Purchase Agreement, constitute extreme dishonesty on the part of the Debtors that created a false impression upon which Trustmark relied to advance $230,000.00 on September 18, 2014.

Under the circumstances described above, this Court finds that Trustmark has met its burden in proving the existence of the first element of false pretenses.

2.  The Debtors Had Scienter or Intent to Deceive

"When deciding whether a creditor has satisfied the 'intent' prong of a 'false pretenses' dischargeability exception, the bankruptcy court must consider whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor, indicating an intent to deceive his creditor."  *In re Hurst*, 337 B.R. at 133; *see also In re Dunston*, 117 B.R. at 641. Here, the Debtors' sophistication, business acumen, and long-term experience in this business underscore that they were fully aware of their wrongful intentions and that they knew exactly what they were doing when they led Trustmark to believe that BCGC was the only borrower, that the loan proceeds would be used solely for BCGC's operational purposes, and that the Collateral was and would continue to be owned by BCGC.  [Finding of Fact Nos. 1–6].  The evidence reflects that prior to the loan closing on August 18, 2014, the Debtors were told by

Dinerstein (FWM's attorney) that they needed to procure a waiver from Trustmark with respect to conveyance of BCGC's assets. [Finding of Fact No. 16(e)]. Yet, rather than attempting to procure such a waiver, the Debtors chose to go radio silent on Trustmark, struck the provision in the last version of the Asset Purchase Agreement requiring them to obtain a waiver from Trustmark, and plowed ahead with signing the Loan Documents knowing that these documents prohibited conveyance of BCGC's assets without written consent of Trustmark.[42] [Finding of Fact No. 23]. Two days later, Mr. Tegeler executed the Conveyance to transfer all of BCGC's assets to himself without any consideration given in return to BCGC; one day later, Mr. Tegeler executed the Asset Purchase Agreement to transfer these same assets to FWM in exchange for a 50% interest in FWM; approximately four weeks later, Ms. Tegeler provided a blatantly false borrowing base certificate to Trustmark in order to induce Trustmark to advance funds under the Note; Trustmark, in reliance upon this materially inaccurate borrowing base certificate and unaware that the Collateral had been transferred to FWM, wire transferred $230,000.00 to BCGC's account at Frost Bank; and Ms. Tegeler thereafter transferred these funds out of BCGC's account over to FWM's account (with BCGC once again receiving no consideration), with the Debtors' knowledge that these funds would be used to pay obligations of FWM. Viewed in the aggregate, this Court finds that these circumstances present a picture of deceptive conduct by the Debtors, indicating a clear intent to deceive Trustmark. *See, e.g.*, *In re Hurst*, 337

---

[42] Huebel was pushing hard for the Debtors to move quickly to effectuate the transaction being negotiated between BCGC and FWM. [Nov. 28, 2017 Tr. 32:7-10]. The Debtors, knowing that they had to move BCGC's heavy equipment off of the real property owned by the Stuteses by August 31, 2014, and not wanting FWM to walk away from negotiations, clearly had a motive not to request a waiver from Trustmark. They knew that if they did request such a waiver, Trustmark might well refuse—which in turn would result in Trustmark refusing to provide the requested line of credit, which was a *sine qua non* to Huebel agreeing to any transaction between BCGC and FWM—a transaction it must be remembered that would result in Mr. Tegeler acquiring 50% of FWM's stock. Hence, the Debtors struck the provision in the Asset Purchase Agreement requiring them to obtain a waiver of default from Trustmark; and when they did so, Huebel and FWM's attorneys did not object—most likely because Huebel was anxious for BCGC to obtain a line of credit and be able, as soon as possible, to draw down under the Loan Documents so that the Debtors could then funnel the loan proceeds over to FWM for payment of FWM's debts.

B.R. at 133–34 (stating, when holding the debt made by the debtor nondischargeable for false pretenses, that "[i]ntent to deceive is present if a debtor intends or has reason to expect a creditor to act, or to refrain from action, in reliance upon the debtor's misrepresentation; a result is intended if a debtor either acts with desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct.").

Mr. Tegeler heavily relies on the affirmative defense that his dyslexia somehow undermined his ability to understand his actions at the time of his execution of the Conveyance and the Asset Purchase Agreement, which, collectively, resulted in FWM taking title to all of BCGC's assets.  But, the Court finds that Mr. Tegeler conveniently relies on his dyslexia to his benefit.  In one instance, Mr. Tegeler acknowledged that he, along with his wife and Stephens, met with Petrilla on August 18, 2014, at the loan closing.  [Finding of Fact No. 17].  At this meeting, the Debtors reviewed and signed all of Trustmark's Loan Documents, confirming that they read and understood their contents.  [*Id.*].  Mr. Tegeler never testified that his dyslexia affected his ability to read and understand the Loan Documents on this date.  Yet, in the next instance, he seems to allege that his dyslexia affected his ability to read and understand only the Conveyance and the Asset Purchase Agreement—which he signed two days after the Loan Documents.  [Finding of Fact Nos. 2, 26–27].  Further, Ms. Tegeler testified that while she was aware of Mr. Tegeler's dyslexia, she did not help him read or review any of the documents, despite the fact that she testified that it has been her practice for many years to frequently read documents to him when he had difficulty reading on his own.  [Finding of Fact No. 2].  The Court is unpersuaded by these contentions.  In fact, the Court is convinced that the Debtors understood their actions when they read and signed the Loan Documents, as well as when Mr. Tegeler signed the Conveyance and the Asset Purchase Agreement.

Moreover, this Court finds that, at trial, the Debtors failed to provide sufficient medical evidence to prove as a matter of law that Mr. Tegeler's dyslexia affected his understanding of the Conveyance and the Asset Purchase Agreement. Mr. Tegeler raised this affirmative defense and testified that his longstanding affliction with dyslexia negated any wrongful intent to deceive Trustmark.[43]  He seems to contend that dyslexia impaired his ability to read and understand complex documents, such as the Asset Purchase Agreement. However, the Debtors failed to introduce into evidence any report from any physician supporting the presence of his condition or a learning disability. Furthermore, the Debtors failed to introduce into evidence any mental examinations to demonstrate a causal link between Mr. Tegeler's alleged learning disability and his lack of understanding of the various transactions. Finally, the Debtors did not call any qualified licensed or certified medical professional to the stand to testify in support of this defense. As a matter of law, they needed to do so to meet their burden of proof with this Court that Mr. Tegeler suffers from dyslexia and that this affliction impaired his ability to read and understand his actions by executing the Conveyance and the Asset Purchase Agreement. *Burton v. Educ. Credit Mgmt. Corp. (In re Burton)*, 339 B.R. 856, 874 (Bankr. E.D. Va. 2006) ("The majority rule is that substantial and credible evidence, such as corroborating evidence, must be presented for the debtor to sustain his burden of proof regarding his medical condition."); *see also Tirch v. Pa. Higher Educ. Assistance Agency (In re Tirch)*, 409 F.3d 677, 681 (6th Cir. 2005) (denying discharge of student loans when the only evidence presented at the trial court

---

[43] An intent to deceive may be inferred from "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 400 (5th Cir. 2017) (quoting *General Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005)). Here, Mr. Tegeler was not a "dumb but honest" debtor, but instead intended to deceive Trustmark or, at the very least, acted with reckless disregard for the truth. *In re Acosta*, 406 F.3d at 372; *see also Helena Chem. Co. v. Richmond (In re Richmond)*, 429 B.R. 263, 289–90 (Bankr. E.D. Ark. 2010) (holding that when debtor "blindly signed" documents brought to him by agent, debtor had reckless disregard for the truth); *see also Norris v. First Nat'l Bank in Luling (Matter of Norris)*, 70 F.3d 27, 30–31 (5th Cir. 1995) (quoting *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 305 (11th Cir. 1994)) (affirming bankruptcy judge's determination that lying on financial statements constituted "reckless disregard for the truth")).

level was the debtor's testimony that she was unable to work, which was "unsupported by competent medical or psychological evidence"); *Pobiner v. Educ. Credit Mgmt. Corp. (In re Pobiner)*, 309 B.R. 405, 419 (Bankr. E.D.N.Y. 2004) (concluding that the debtor's failure to provide corroborating evidence from a physician or psychotherapist precluded a hardship discharge based on a mental condition).   Therefore, this Court rejects this defense because the Debtors have failed to prove with any credible and competent evidence that Mr. Tegeler suffers from dyslexia.   *Bodnar v. Bodnar*, 441 F.2d 1103, 1104 (5th Cir. 1971) (dismissing the plaintiff's case for failing to submit to a mental examination for the purpose of determining her competency to understand the nature and effect of litigation).   Accordingly, the Debtors have failed to satisfy their burden of showing that Mr. Tegeler's dyslexia rendered him unable to read and understand the Conveyance and the Asset Purchase Agreement.[44]

Given these circumstances, this Court finds that Mr. Tegeler—as with the Loan Documents that he signed at the loan closing—read (or is charged with having read) the Conveyance and the Asset Purchase Agreement, and understood (or is charged with understanding) the language contained therein[45]; and therefore knew, or is charged with having known, that the transfer of BCGC's assets described therein constituted transactions that, pursuant to the Loan Documents, first required written consent from Trustmark.   His failure to

---

[44] The Court notes that there was no testimony that *Ms. Tegeler* has dyslexia.  Therefore, she certainly cannot claim that she did not understand the Conveyance and the Asset Purchase Agreement.  Indeed, it was Ms. Tegeler who, prior to the loan closing, told Stephens in an e-mail that asking Trustmark for a waiver regarding a transfer of BCGC's assets would "raise red flags" [Finding of Fact No. 16(k)]—so she certainly understood what her husband was doing when he executed the Conveyance and the Asset Purchase Agreement, and her knowledge is imputed to him.  *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 485–86 (5th Cir. 1992); *Amerisafe, Inc. v. Ernst (In re Ernst)*, 570 B.R. 750, 755 (Bankr. W.D. La. 2017).

[45] *Espinoza v. Cargill Meat Sols. Corp.*, 622 F.3d 432, 441 (5th Cir. 2010) ("Texas law charges a person with knowledge of the contents of a document he or she signs."); *Venture Cotton Coop. v. Freeman*, 494 S.W.3d 186, 199 (Tex. App.—Eastland 2015, no pet.) ("A party is bound to the contract he signs regardless of whether he read it . . . ."); *Donovan v. Mercer*, 747 F.2d 304, 308 n.4 (5th Cir. 1984) (recognizing the "long standing and generally accepted principle of contract law that, absent fraud or mental incompetence, a person who intentionally signs a document is bound by its contents, whether or not he in fact read the document.").

obtain Trustmark's written consent despite knowing that he had to do so underscores his intent—as well as Ms. Tegeler's intent[46]—to impair Trustmark's security interest in the Collateral in order to allow him to obtain a 50% ownership interest in FWM and move BCGC's equipment from Spring, Texas, to FWM's yard in Cleveland, Texas—a move that the Debtors were under pressure to effectuate due to their poor relationship with Mr. and Ms. Stutes and due to Huebel's insistence that any agreement between BCGC and FWM had to be done posthaste.  [Finding of Fact No. 7].

Furthermore, the Debtors also retained legal counsel (LeBlanc) and an accountant (Stephens), both of whom were actively involved in the transactions.  [Finding of Fact Nos. 10–11].   Mr. Tegeler testified that he did not read the drafts or the final version of the Asset Purchase Agreement, and he relied on the business professionals to achieve the business objectives.  [Finding of Fact No. 30].  From August 1, 2014, through August 19, 2014, the Debtors, their legal counsel, Huebel (FWM's principal), Huebel's legal counsel (Dinerstein and Bethea), and Stephens all engaged in extensive e-mail conversations about obtaining a waiver from Trustmark regarding default provisions in the Loan Documents.  [Finding of Fact Nos. 16–17, 24–25].  This chain of e-mails fully reveals that the transaction between BCGC and FWM was going to result in a default of Trustmark's loan agreements—and that all of these individuals were aware of this issue.   [*Id.*].   The Debtors were therefore on notice from their own advisors/agents that they needed to obtain a waiver from Trustmark with respect to BCGC

---

[46] The Court finds that Ms. Tegeler was aware of the conveyance of BCGC's assets to Mr. Tegeler as well as the transfer of these same assets to FWM.  Indeed, Ms. Tegeler participated in the negotiations for the asset sale with Mr. Tegeler, Stephens, and FWM's representatives.  [Finding of Fact No. 16(k)].  More importantly, her e-mail inquiry to Stephens underscores her intent to impair Trustmark's security interest: "Good afternoon.  Evidently, the attorney for FWM wants us to verify with our other lien holders [sic] that we are merging with another company and to make sure that they are not going to make our loans Due Immediately.  I am wondering if that is not going to just *raise red flags*.  What are your thoughts?"  [*Id.*] (emphasis added).  Ms. Tegeler was thus fully aware that she (or Mr. Tegeler), on behalf of BCGC, needed to obtain Trustmark's written consent.  Therefore, Ms. Tegeler had as much intent as Mr. Tegeler to impair Trustmark's security interest in the Collateral.

conveying all of its assets to FWM.  *F.D.I.C. v. Adam*, 18 F.3d 936, 1994 WL 83598, at *3 n.6 (5th Cir. 1994); *Woodward v. Ortiz*, 237 S.W.2d 286, 290 (Tex. 1951).[47]

At trial, Mr. Tegeler testified that after he received notice about the need for a waiver from Trustmark, he spoke with Stephens, and during this conversation, Stephens and he decided that they were not going to request any waivers from Trustmark.  [Finding of Fact Nos. 24–25].  At the same time, on August 7, 2014, Ms. Tegeler was also fully aware that the contemplated transaction with FWM and the request for waivers from Trustmark would "raise red flags." [Finding of Fact No. 16(k)].  Stephens agreed with Ms. Tegeler's view that the transaction with FWM and waiver request would "raise red flags."   [Finding of Fact No. 16(k)–(l)].   What transpired after this conversation is a bit unclear.  It is easily conceivable that Stephens told the Debtors that requesting such waivers from Trustmark would cause a delay in obtaining approval for the loan or result in an outright denial of the loan, and that they therefore concluded with LeBlanc and Stephens that they were not going to obtain a waiver from Trustmark.  What is clear, however, is that on August 19, 2014, the day after the loan closing, LeBlanc, based on his understanding of the Debtors' intentions, without further explanation, revised the Asset Purchase Agreement and intentionally deleted the requirement to obtain any waivers from Trustmark. [Finding of Fact No. 25].   As the Debtors' agent, LeBlanc's act of intentionally deleting the requirement to obtain a waiver from Trustmark is imputed to the Debtors.  *Tow v. Henley (In re*

---

[47] Case law is clear that if one's agent receives notice, such notice is imputed to the principal:

> All were agents of the County.  Tinkler and Ferguson were charged with the duty of furnishing to the County, through Rankin, full information of all outstanding interests in the land.  That was the purpose for which they were employed and paid.  If they or either of them had actual notice of the Woodward judgment, Hidalgo County as their principal and Rankin as the County's attorney were charged with notice thereof even though the information concerning the existence of the judgment was not in fact communicated to the County or Rankin.

*Woodward v. Ortiz*, 237 S.W.2d 286, 290 (Tex. 1951); *see also F.D.I.C. v. Adam*, 18 F.3d 936, 1994 WL 83598, at *3 n.6 (5th Cir. Feb. 25, 1994) ("[N]otice to the agent is sufficient to impute notice to the principal, regardless of whether the agent ever actually notifies the principal.") (citing *Woodward*, 237 S.W.2d at 290).

*Henley)*, 480 B.R. 708, 803 (Bankr. S.D. Tex. 2012) ("Whatever an agent does, within the scope of his or her actual (or apparent) authority, binds the principal.").  Trustmark knew nothing about these changes in the Asset Purchase Agreement—indeed, Trustmark knew nothing about the BCGC-FWM transaction because the Debtors kept Trustmark completely out of the loop; therefore, the line of credit facility remained in place, and the Debtors successfully deleted the applicable provision without objection from FWM.[48]

Under all of these circumstances described above, this Court finds that the Debtors intentionally removed the provision in the Asset Purchase Agreement that required a waiver from Trustmark before BCGC conveyed its assets.  Mr. Tegeler then proceeded to sign the Asset Purchase Agreement, and thereafter orchestrated the conveyance of all of BCGC's assets over to FWM without notifying Trustmark.  [Finding of Fact No. 27].  These circumstances undeniably indicate that Trustmark has proven scienter.  Specifically, the Debtors knew that: (1) the Loan Documents contained language that BCGC's assets could not be conveyed without Trustmark's written consent; (2) the transaction that they were negotiating with Huebel and FWM required that BCGC's assets be conveyed to FWM; (3) by requesting a waiver from Trustmark requiring its written consent for BCGC to convey all of its assets, Trustmark might well refuse to do so— which, in turn, would nix the transaction with FWM and thereby prevent Mr. Tegeler from

---

[48] The evidence indicates that Huebel made it clear to the Debtors that any transaction between BCGC and FWM had to be done quickly and would only be done if BCGC could first establish a line of credit with a financial institution.  [Finding of Fact No. 9].  Thus, although FWM's attorneys and chief financial officer (Rayne) had initially raised the issue of the need to obtain a waiver from Trustmark, once the Debtors (after communication with Stephens and LeBlanc) decided that they did not want to make such a request from Trustmark, Huebel (who was clearly the ultimate decision-maker for FWM) did not balk when LeBlanc deleted the provision from the final draft of the Asset Purchase Agreement.  [Finding of Fact No. 24].  Huebel's immediate objective was for FWM to have access to a line of credit, and he clearly concluded that by not objecting to the Debtors' deletion of this provision, the chances increased that the line of credit for BCGC would be established sooner rather than later.  And, in fact, this is exactly what happened—the result of which allowed BCGC to obtain an advance of $230,000.00, all of which funds the Debtors then transferred to FWM for no consideration so that FWM's debts could be paid.  Huebel thus accomplished his ultimate objective of obtaining Trustmark's loan proceeds for use in FWM's operations.

acquiring his desired 50% stock ownership in FWM;[49] (4) by deciding not to risk asking Trustmark for a waiver, and therefore deleting the applicable provision in the Asset Purchase Agreement (to which FWM obviously had no objection, as it was quite willing to take title to BCGC's assets and use the line of credit proceeds in order to prolong its own corporate life), they could quickly effectuate the transaction with FWM; (5) Mr. Tegeler signed the Asset Purchase Agreement conveying title of all of BCGC's assets to FWM aware that by conveying these assets, he was violating the representations in the Loan Documents that he, on behalf of BCGC and himself (as a guarantor), would not convey all of BCGC's assets without first obtaining Trustmark's written consent; and (6) by conveying all of BCGC's assets to FWM, they were harming Trustmark's security interest in the Collateral because Trustmark had no security interest in FWM's assets, and because FWM's lenders had an existing security interest in FWM's assets, these security interests would attach to the Collateral, thereby impairing Trustmark's lien.

Not only did the Debtors have scienter with respect to the transfer of BCGC's assets to FWM; they also had scienter with respect to wrongly extracting $230,000.00 of loan proceeds from Trustmark.  Specifically, Ms. Tegeler, on September 17, 2014, submitted a borrowing base certificate to Trustmark representing that, as of that date, BCGC had accounts receivable of $389,324.00 [Finding of Fact No. 36], and she submitted this certificate knowing full well that

---

[49] The evidence is clear that BCGC had to remove its assets from the Spring, Texas yard owned by Mr. and Ms. Stutes by August 31, 2014.  [Finding of Fact No. 7].  The evidence also indicates that Huebel made it clear to the Debtors that any transaction between BCGC and FWM had to be done quickly and would only be done if BCGC could first establish a line of credit with a financial institution.  [Finding of Fact No. 9].  Hence, there is no question that the Debtors had motive **not** to request a waiver from Trustmark due to the risk that doing so would kill their negotiations with Huebel and put BCGC's tangible assets in harm's way by providing an avenue for Mr. and Ms. Stutes to charge rent for these assets being on their property after August 31, 2014, and/or file suit against BCGC for private nuisance.  *See e.g., Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 605 (Tex. 2016) (confirming that "a defendant may be held liable for intentionally causing a nuisance based on proof that he intentionally created or maintained a condition that substantially interferes with the claimant's use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it").

Trustmark would rely upon this accounts receivable figure to advance funds to BCGC under the Note.  [Finding of Fact Nos. 38–40].  Yet, as of September 17, 2014, Ms. Tegeler was absolutely aware that her husband had orchestrated the transfer of all of BCGC's assets the previous month to FWM.  [Finding of Fact Nos. 26–27].  Hence, she knew that BCGC had no accounts receivable as of September 17, 2014, but nevertheless failed to disclose this fact to Trustmark. Rather, she let Trustmark rely on the false accounts receivable figure in the borrowing base certificate to advance $230,000.00 to BCGC, and she then transferred these proceeds over to FWM's account, with BCGC receiving no consideration.  [Finding of Fact No. 36, 41].  If this is not scienter, then nothing is.[50]

For all of the reasons set forth above, this Court finds that Trustmark has met its burden in establishing that the Debtors had scienter.

### 3.  The Debtors' Actions Caused Trustmark to Lose its Property Interest

When discussing Trustmark's false representation claim above, this Court noted that Trustmark had to demonstrate its justifiable reliance on the express representations made by the Debtors.  Trustmark does not bear such a burden in its claim for false pretenses.  According to one court:

> With respect to [justifiable reliance], it is not meaningful to examine into the
> "justifiable reliance" of a creditor in the case of fraudulent or deceitful conduct

---

[50] Ms. Tegeler's scienter is imputed to Mr. Tegeler.  *Tower Credit, Inc. v. Gauthier (In re Gauthier)*, 349 F. App'x 943, 945–46 (5th Cir. 2009)(internal citations and quotations omitted) ("We impute fraud to debtors only if the fraudulent representations were made by a formal partner or agent . . . .  Where we have imputed fraud from one spouse to another, we have relied on agency theory, and done so only where the spouses were involved in a business or scheme."); *Amason v. Franklin Life Ins. Co.*, 428 F.2d 1144, 1147 (5th Cir. 1970) (citing *Blanton v. Austin*, 392 S.W.2d 140 (Tex. Civ. App. 1965)); *In re Allison*, 960 F.2d at 485–86 ("The agency theory has been applied to impute the fraudulent acts of one spouse to the other in cases in which the other spouse was involved in a business or scheme."); *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1281–82 (5th Cir. 1992) (internal citations and quotations omitted) ("Second, Billye and Jack Luce were partners in the Luce Partnerships during the time of Jack Luce's fraudulent misrepresentations to both [creditors].  Third, Jack Luce acted on behalf of the Luce Partnerships and in the ordinary course of the business of the Partnerships when he made the false representations. As Jack Luce's partner, Billye Luce certainly shared in the monetary benefits of Jack Luce's fraud."); *In re Ernst*, 570 B.R. at 755 (finding that imputation of fraudulent intent from spouse to spouse is appropriate when spouses "are engaged in business together").

100

> involving non-disclosure or concealment.  But "reliance" in classic fraud is, in reality, nothing more nor less than the element of causation, since it is the creditor's reliance which provides the causal link between the debtor's false representation and the creditor's damage.  Thus, in a case involving false pretenses or fraud based upon the debtor's non-disclosure or concealment, classic reliance cannot and need not be proved, but the creditor must nevertheless establish a causal link between the debtor's misconduct and the creditor's injury.

*In re Luppino*, 221 B.R. at 701; *see also In re Bentley*, 531 B.R. at 688 ("Fraud by non-disclosure is a subcategory of fraud because, where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts.") (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997)).

It is clear to this Court that the Debtors concealed the following material facts from Trustmark: (1) their active negotiations with FWM before the loan closing [Finding of Fact No. 16]; (2) the waiver discussions that the Debtors and their representatives had with FWM, its principal (Huebel), and FWM's attorneys [*id.*]; (3) the transfer of all of BCGC's assets to Mr. Tegeler for no consideration, two days after the loan closing [Finding of Fact No. 26]; (4) the transfer of the same assets from Mr. Tegeler to FWM three days after the loan closing [Finding of Fact No. 27]; and (5) the inaccuracy of the accounts receivable figures of BCGC on the borrowing base certificate submitted to Trustmark by Ms. Tegeler (on behalf of BCGC) on September 17, 2014, [Finding of Fact No. 36].  Without knowledge of these pertinent facts, Trustmark had no idea that its security interest in the Collateral would be eviscerated.  Moreover, although the court in *Luppino* suggests that there is no need to examine Trustmark's justifiable reliance in this suit, there is no question that a reasonable and prudent bank would not lend money to a company similarly situated to BCGC while knowing all of the facts the Debtors failed to disclose.  Stated differently, but for the Debtors' conduct involving secret negotiations with FWM and their non-disclosure of the material facts mentioned above, Trustmark would not

have extended the loan to BCGC—which in turn, would have prevented the Asset Purchase Agreement from being effectuated and Trustmark's lien on the Collateral from being impaired. It is clear that the Debtors' misconduct caused Trustmark to provide funding of $230,000.00 that it would not have otherwise provided and to lose its lien on the Collateral, thereby rendering it an unsecured creditor.

      4.   The Debtors' Conduct Caused Damage to Trustmark

As previously discussed herein, there is no question that the Debtors' conduct caused damage to Trustmark. Not only did the Debtors deprive Trustmark of the funds it loaned to BCGC by deliberately signing loan documents containing provisions they had no intention of complying with, they also intentionally submitted a borrowing base certificate that was patently false knowing that Trustmark would rely upon it to advance funds to a corporation (BCGC) that no longer had any assets to secure the advance. The Debtors also deprived Trustmark from foreclosing on its lien on the Collateral to recover the $230,000.00 because they conveyed all of BCGC's assets to FWM, thereby allowing FWM's lenders to take a lien on these assets and effectively eviscerating Trustmark's lien, which in turn made the $256,716.54 Debt an unsecured loan. [Finding of Fact Nos. 52–55]. *See Meyer*, 869 F.3d at 843 (holding that debtor's transfer, initiated as owner, from one corporation to another caused damage to the bank's interest because the bank no longer had assets on which to foreclose). In fact, Lone Star Bank and Mainland Bank (FWM's lenders) declared a default under their respective loan agreements with FWM, and thereafter repossessed and liquidated FWM's assets, including the assets on which Trustmark had a lien, i.e., the Collateral. [Finding of Fact No. 52]. Trustmark was left holding a non-performing loan with a principal balance of $230,000.00 from a borrower (BCGC) who, having given a lien to Trustmark on its assets to secure the loan, then ensured that this lien was

eviscerated.  But for the skullduggerous actions of the borrower's principals—i.e., the Debtors—Trustmark would have suffered no harm.  Therefore, the Debtors undeniably caused damage to Trustmark.  *In re Kroh*, 88 B.R. at 984 ("The Bank has been damaged in the amount of the unpaid balance on each note, the interest accrued on the notes, and the attorney's fees incurred.  Absent, [the debtor's] misrepresentations the Bank would not have loaned the money to [the debtor] and these damages would not have occurred.").

In sum, Trustmark has met its burden in establishing all of the elements of a claim for false pretenses.  The Court now turns to Trustmark's claims for actual fraud.

## I.   Trustmark's Claim under § 523(a)(2)(A) for Actual Fraud

Trustmark's third claim against the Debtors is based upon § 523(a)(2)(A) for actual fraud.  There are two separate and distinct avenues for prevailing under an "actual fraud" claim under § 523(a)(2)(A), and Trustmark has introduced evidence for both.  One approach is to show: (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor relied on such representations; and (5) the creditor sustained losses as a proximate result of the representations (the "*Selenberg* Approach").  *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 398 (5th Cir. 2017).

The other approach involves no representation by the debtor, but rather acts by the debtor that allows a piercing of the corporate veil to impose individual liability.  This approach is a relatively newly-adopted avenue brought forth by the Supreme Court's watershed opinion of *Husky International Electronics, Inc. v. Ritz*, 136 S. Ct. 1581 (2016), as well as the Fifth Circuit's opinion of *Husky International Electronics, Inc. v. In re Ritz (In re Ritz)*, 832 F.3d 560 (5th Cir. 2016) on remand from the Supreme Court.

The Court now addresses each of these two approaches in the suit at bar.

1. <u>The First Avenue for Proving a Claim for Actual Fraud: The *Selenberg* Approach</u>

A review of the evidence in the suit at bar leads this Court to find that Trustmark has satisfied the five elements required to prove actual fraud under the *Selenberg* Approach. The Court now addresses these five elements.

### a. *The Debtors Made Representations*

With respect to the first element, the Debtors made the following representations: (1) that the purpose of the loan was to help fund BCGC's relocation and restructure of operations [Finding of Fact No. 13(d)]; (2) that none of the accounts or inventory forming the basis of the collateral securing BCGC's indebtedness to Trustmark would ever be subject to any other superior liens, security interests, or other encumbrances [Finding of Fact No. 19(a)]; (3) that so long as all or any portion of the indebtedness to Trustmark remains unpaid, BCGC would not make any material change in the current ownership of the business, in the personnel controlling operations, and in the active management of the company or its successors or assigns [Finding of Fact No. 19(b)]; (4) that the Collateral was not owned by someone other than BCGC or the Debtors [Finding of Fact No. 33]; (5) that the borrowing base certificate dated September 17, 2014, representing that BCGC had accounts receivable totaling $389,324.00 as of that date was true and accurate [Finding of Fact No. 36]; (6) that BCGC did not reorganize, merge or consolidate with, or acquire all or substantially all of the assets of any other company, firm, or association, or make any other substantial change in its capitalization or character of its business [Finding of Fact No. 19(d)]; (7) that the Debtors, on behalf of BCGC, had not sold the majority of BCGC's assets used or useful in its business, except in the ordinary course of BCGC's business [*id.*]; (8) that the Debtors, on behalf of BCGC, would not pledge, mortgage, encumber

or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or other charge, other than the security interest granted to Trustmark [Finding of Fact No. 19]; (9) that the Debtors, on behalf of BCGC, would establish adequate means of obtaining from BCGC on a continuing basis information regarding BCGC's financial condition [Finding of Fact Nos. 19(c), 22]; and (10) that the Debtors, on behalf of BCGC, would keep Trustmark adequately informed from such means of any facts, events, or circumstances which might in any way affect the risks of the Debtors, as guarantors, under the Loan Documents, [Finding of Fact No. 21(b)].

### b. The Debtors Knew the Representations Were False at the Time the Representations Were Made

Trustmark has met its burden in proving that the Debtors knew that the representations were false at the time the representations were made.

#### i. Representations Regarding the Purpose of the Loan Proceeds

The Debtors knew that their representations relating to BCGC's intended use of the loan proceeds were false. [Finding of Fact No. 13(d)]. The Debtors never intended to use the loan proceeds for BCGC's business operations. [Finding of Fact No. 41]. Indeed, for several days prior to the loan closing of August 18, 2014, the Debtors conducted negotiations with FWM about conveying BCGC's assets to FWM, and none of these negotiations were disclosed to Trustmark; in fact, Ms. Tegeler pointed out in an e-mail to Stephens that requesting a waiver from Trustmark about conveyance of BCGC's assets would "raise red flags." [Finding of Fact No. 16(k)]. After Mr. Tegeler's calculated scheme to convey the assets from BCGC to himself, and then to FWM—which allowed him to acquire 50% of the stock of FWM—Ms. Tegeler orchestrated an equally calculated scheme to obtain a drawdown under the Note for $230,000.00

and a transfer of these loan proceeds from BCGC's account to FWM's account.[51]  [Finding of Fact No. 41].  Specifically, Ms. Tegeler requested an advance under the Note to be transferred to BCGC's bank account at Frost Bank, and Trustmark—after receiving and relying upon the materially false borrowing base certificate signed by Ms. Tegeler—processed the request on September 18, 2014.  [Finding of Fact Nos. 37–40].  After the loan proceeds posted to BCGC's bank account, Ms. Tegeler wrote three separate checks to FWM for the total sum of $230,000.00.  [Finding of Fact No. 41].  Stated differently, she transferred all of the loan proceeds to FWM, with BCGC receiving no consideration in return.  [*Id.*].  Mr. Tegeler admitted at trial that the loan proceeds were used entirely for FWM's working capital and operating expenses.  [*Id.*].  Ms. Tegeler corroborated Mr. Tegeler's testimony and admitted that 100% of the proceeds advanced under the Note were used for FWM's operations.  [Nov. 27, 2017 Tr. 121:2-5].  Thus, the Debtors' actions show that they knew all along that their representations regarding the use of the loan proceeds were false.  *C.f. Mozeika v. Townsley (In re Townsley)*, 195 B.R. 54, 62 (Bankr. E.D. Tex. 1996) (holding that the plaintiff's claim under § 523(a)(2)(A) fails because "[t]here is no evidence before the Court that Townsley knew the representations he was making to be false at the time he made them or that he had no intention to carry out the promises made at the time they were made.  The mere fact that his optimistic projections did not come true are certainly not badges of fraud.").

ii.   *Representations Set Forth in the Loan Application*

Next, the Debtors knew that the representations responding to the inquiries on the loan application were false.  [Finding of Fact No. 33].  After the loan closing held on August 18,

---

[51] Actually, Ms. Tegeler attempted to mislead Trustmark into advancing $300,000.00, which was the maximum amount of the line of credit that Trustmark had approved.  [Pl.'s Ex. No. 7 at 32].  However, when Trustmark's loan officer, relying upon the false accounts receivable figures set forth in the borrowing base certificate, did the appropriate calculations under the Loan Documents, there were only sufficient eligible accounts receivable to justify advancing $230,000.00.  [Finding of Fact No. 38].

2014, Trustmark realized that it did not have in its file a signed loan application from BCGC; rather, it had a fully completed loan application that was unsigned. [*Id.*]. Therefore, one of Trustmark's loan administrative assistants sent the Debtors a copy of the completed loan application, and requested them to verify, sign, and return the document to Trustmark. [*Id.*]. On August 29, 2014, the Debtors signed and returned this document to Trustmark. [*Id.*]. The problem with the Debtors' action relates to a material question posed on the loan application. [*Id.*]. Specifically, the question reads as follows: "Is the collateral being pledged owned by someone other than the business or the owners of the business?" [*Id.*]. The Debtors answered this question by striking the "no" circle. [*Id.*]. Yet, by August 29, 2014, the Debtors knew that the Collateral was not owned by the business (i.e., BCGC) or the owner of the business (i.e., Mr. Tegeler), but rather by FWM, as Mr. Tegeler had conveyed the Collateral to FWM on August 21, 2014. [*Id.*]. And, the entity that now owned the Collateral (FWM) was owned not only by Mr. Tegeler, but also by Huebel. [*Id.*]. Because Huebel had no ownership interest in BCGC (i.e., Trustmark's borrower), and because the Collateral was now owned by FWM (not a borrower of Trustmark), the representation made by the Tegelers on the loan application was patently false and they knew this. [*Id.*]. The Debtors argue that this representation was not false because the information contained in the loan application was accurate at the time the Debtors actually filled out this application (i.e., prior to the loan closing and prior to Mr. Tegeler's execution of the Conveyance and the Asset Purchase Agreement). The Court is not persuaded by this argument. The Debtors knew on the date that they actually signed the loan application that FWM owned the Collateral, and therefore they knew that they were making misrepresentations to Trustmark by striking the "no" circle.[52]

---

[52] At the very least, the Debtors were acting under false pretenses with respect to Trustmark—if not actually making a misrepresentation—by returning the signed loan application after the loan closing with the box checked "no," even

*iii.*     *The Borrowing Base Certificate Representations*

Finally, the Debtors knew the representations in connection with the borrowing base certificate submitted on September 17, 2014, were false.  [Finding of Fact No. 36].  As of August 21, 2014, BCGC no longer had any assets because of Mr. Tegeler's execution of the Conveyance and the Asset Purchase Agreement.  [Finding of Fact Nos. 26–27].  However, on September 17, 2014, Ms. Tegeler submitted to Trustmark a signed borrowing base certificate, representing that BCGC's eligible accounts receivable totaled $389,324.00.  [Finding of Fact No. 36].  Yet, by September 17, 2014, all of BCGC's assets, including its accounts receivable, had been already conveyed from BCGC to Mr. Tegeler, and then to FWM—and the Debtors were certainly aware of this fact.  [Finding of Fact Nos. 26–27].  Thus, the representation that BCGC had eligible accounts receivable of $389,324.00 on September 17, 2014, was patently false.  The only accurate borrowing base certificate that Ms. Tegeler could have submitted on September 17, 2014, would have reflected that BCGC had no receivables against which it could borrow.

**c.  The Debtors Made Their False Representations with the Intention and Purpose to Deceive Trustmark**

With respect to the third element, the Debtors made the above-referenced representations with the intention and purpose to deceive Trustmark.  The Debtors clearly had no intention of performing as promised because they did not take any steps to perform any of their contractual duties.  *In re Allison*, 960 F.2d at 484; *In re Hurst*, 337 B.R. at 133.  In fact, they took immediate steps to violate their contractual duties.  The Debtors, after making several warranties, representations, and covenants in the Loan Documents on August 18, 2014, to refrain from conveying BCGC's assets without first obtaining Trustmark's written consent [Finding of Fact

---

though they filled out the loan application before the loan closing. *Wright v. Minardi (In re Minardi)*, 536 B.R. 171, 187 (Bankr. E.D. Tex. 2015) ("While 'false pretenses' and 'false representation' both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement.").

No. 19(d)], proceeded to furtively transfer all of BCGC's assets (with no consideration to BCGC) forty-eight hours after the loan closing and thereafter made no disclosure to Trustmark [Finding of Fact No. 26–27]; but instead, acting as if BCGC still had all of its receivables, submitted a borrowing base certificate on September 17, 2014, making this representation to Trustmark.  [Finding of Fact No. 36].  Moreover, the Debtors purposely conveyed BCGC's assets—first to Mr. Tegeler and then to FWM—free and clear of all liens, including Trustmark's lien.  [Finding of Fact No. 28].  Finally, Ms. Tegeler gave a materially false borrowing base certificate to Trustmark in order to induce Trustmark to advance $230,000.00 under the Note— which Trustmark did by wire transferring this sum of money to BCGC's account; Ms. Tegeler then transferred all of these loan proceeds to FWM's account for FWM's use before Trustmark could discover the Debtors' wrongdoing and rectify the situation.  [Finding of Fact Nos. 37, 41]. Therefore, it is clear that the Debtors had every intention of secretly transferring all of BCGC's assets immediately after the loan closing despite representing at the loan closing that no such transfer would ever occur without first obtaining Trustmark's written consent.  *See In re Sheridan*, 57 F.3d 627, 635 (7th Cir. 1995) ("[W]hen a creditor entrusts the debtor with money to use for a specific purpose and the debtor has no intention of using it in that manner, a misrepresentation exists upon which a debt can be held non-dischargeable."); *see also Deady v. Hanson (In re Hanson)*, 470 B.R. 808, 816 (Bankr. N.D. Ill. 2012) ("Proof that the debtor never put the money toward the stated purpose allows a court to infer the requisite intent."); *Beverly Enters. v. Eversole (In re Eversole)*, 110 B.R. 318, 324–25 (Bankr. S.D. Ohio 1990) (inferring intent when "a false representation which the debtor knows or should know will induce another to make a loan").  For these reasons, Trustmark has satisfied this element.

#### d.   Trustmark Relied on the Debtors' False Representations

With respect to the fourth element, Trustmark relied on the above-referenced representations made by the Debtors.  At trial, Petrilla very credibly testified to the processes and procedures she performs in order to qualify prospective borrowers for lines of credit.  [Finding of Fact No. 13(e)].  Specifically, she said when loan officers are doing their due diligence and underwriting, she and other loan officers are responsible for gathering financial information for all prospective borrowers and guarantors for the loan application.  [Finding of Fact No. 136].  Further, she testified that Trustmark relies on the information gathered in order to properly qualify the prospective borrower for the loan.  [*Id.*].  In addition to information submitted for the loan application, Petrilla also testified that Trustmark requests prospective borrowers to submit accurate borrowing base certificates, reflecting the prospective borrowers' current accounts receivable and other assets.  [*Id.*].  Like the information gathered on the loan application, Trustmark also relies on the information submitted on the borrowing base certificates.  [*Id.*].  Therefore, there is sufficient evidence in the suit at bar to prove that Trustmark justifiably relied on the Debtors' representations made on the loan application, the Loan Documents, and the borrowing base certificate that Ms. Tegeler submitted to Trustmark on September 17, 2014.

#### e.   The Debtors' Representations and Conduct Caused Damage to Trustmark

The final element Trustmark must prove under the *Selenberg* approach is that Trustmark sustained a loss as a proximate result of the Debtors' false representations.  *In re Selenberg*, 856 F.3d at 398.  Trustmark must show that the two types of causation are met: (1) the Debtors' misrepresentations were the actual or "but for" cause of Trustmark's harm; and (2) the Debtors' misrepresentations were the proximate cause of the injury—i.e., they foreseeably could have produced the injury Trustmark suffered.  *First Nat'l Bank of Omaha v. O'Brien (In re O'Brien)*,

555 B.R. 771, 782 (Bankr. D. Kan. 2016); *see also Gomez v. Saenz (In re Saenz)*, 534 B.R. 279, 299 (Bankr. S.D. Tex. 2015) (holding that foreseeable injury resulting from a debtor's misrepresentation was nondischargeable actual fraud under § 523(a)(2)(A)); *S. Title Ins. Corp. v. Mohiuddin (In re Mohiuddin)*, Adv. No. 16–3151, 2017 WL 2123870, at *11 (Bankr. S.D. Tex. May 16, 2017) (same).

In this suit, it is clear that Trustmark has established actual cause. Actual cause—or "but for" causation—"means that [the debtor's] misrepresentations must have played a substantial part, and so were a substantial factor, in affecting [the creditor's] course of conduct that result[ed] in his loss." *In re O'Brien*, 555 B.R. at 782 (internal citations and quotations omitted). Here, Trustmark approved the line of credit facility because the Debtors, as officers of BCGC, represented to Trustmark that the purpose of the loan was for BCGC's business. [Finding of Fact No. 13(d)]. Subsequently, the Debtors, on behalf of BCGC, executed the Loan Documents, representing in writing that BCGC would not convey its assets without first obtaining Trustmark's written consent. [Finding of Fact No. 19(d)]. But for these explicit representations, among others, Trustmark would not have approved the establishment of the line of credit facility. Moreover, Trustmark actually advanced $230,000.00 of loan proceeds under the Note to BCGC in reliance upon certain representations that Ms. Tegeler (as an officer of BCGC) made in the borrowing base certificate of September 17, 2014. [Finding of Fact Nos. 38, 40]. First, she represented that BCGC had eligible accounts receivable of $389,324.00—which was untrue because BCGC, by that time, had absolutely no assets at all due to the conveyance of these assets to FWM. [Finding of Fact No. 36(a)]. Second, she represented that there were no defaults in any of the Loan Documents as of September 17, 2014—which was also untrue because, given that the Debtors had orchestrated the transfer of BCGC's assets to FWM in August of 2014,

there were numerous defaults in the Loan Documents.  [Finding of Fact No. 36(b)].  But for the representations made in this borrowing base certificate, Trustmark would not have wire transferred $230,000.00 to BCGC's account on the next day.   [Finding of Fact No. 40].  Therefore, the first type of causation is met because the Debtors' misrepresentations actually caused Trustmark's injury.  *In re Kroh*, 88 B.R. at 984 ("Finally, the element of proximate cause has been established . . . . Absent, [the debtor's] misrepresentations the Bank would not have loaned the money to [the debtor] and these damages would not have occurred.").[53]

Similarly, Trustmark has also established proximate cause.  Proximate cause—or legal causation—is largely a question of foreseeability.  *In re O'Brien*, 555 B.R. at 782.  Stated differently, a fraudulent representation is the proximate cause of a loss if, but only if, the loss might reasonably be expected to result from the reliance.  *Id.* at 782–83; *In re Mohiuddin*, 2017 WL 2123870, at *11 ("Reliance is a proximate cause of a plaintiff's loss if the evidence shows that the loss was a reasonably foreseeable consequence of the plaintiff's reliance.").   Here, Trustmark has proven that the Debtors' misrepresentations have proximately caused damages of $256,716.54—i.e., the amount of the advance made on September 18, 2014, which is the outstanding principal balance owed under the Note, plus accrued unpaid interest and accrued unpaid late charges as of the Petition Date.  [Finding of Fact No. 55].  It was easily foreseeable that Trustmark would be damaged by any amount that it advanced to BCGC because of the Debtors' misrepresentations in the loan application and the Loan Documents (which led Trustmark to establish the line of credit facility), their improper and surreptitious conveyance of

---

[53] Although it was only Ms. Tegeler who signed the borrowing base certificate, the certificate itself uses the phrases "To the best of our knowledge and belief," "We hereby affirm, represent and warrant to you," and "We hereby confirm." Thus, this Court construes this borrowing base certificate to mean that the representations were made by both Ms. Tegeler and Mr. Tegeler, who, it must be remembered, owned 100% of BCGC's stock and was BCGC's President. [Finding of Fact Nos. 6, 8]. Moreover, Ms. Tegeler was an officer of BCGC, and her misrepresentations are imputed to the company and the company's 100% stockholder and President (i.e., Mr. Tegeler). *In re Luce*, 960 F.2d at 1281–82; *In re Allison*, 960 F.2d at 485–86; *In re Ernst*, 570 B.R. at 755.

all of BCGC's assets after the loan closing (which undermined Trustmark's lien position), their misrepresentations in the borrowing base certificate causing the advance, and their transfer of the loan proceeds from BCGC's account to FWM's account.  The Debtors' actions were an attempt to provoke $230,000.00 to be advanced under the Note—and Trustmark did just that—so that these funds could then be funneled to FWM for its use.  Because the Debtors were attempting to produce the result that occurred, the harm to Trustmark was reasonably expected (i.e., foreseeable) based upon Trustmark's reliance of the Debtors' misrepresentations.  *See, e.g.*, *In re Weinstein*, 31 B.R. at 810 ("The fraud which created the illusion of available security is clearly the proximate cause of [the plaintiff's] loss as the equity cushion would have absorbed the $100,000 loss and as [the plaintiff] would not have otherwise advanced credit on such vulnerable terms.  Accordingly, the non-dischargeability of the $100,000 overadvance guarantee debt is established.").

In sum, Trustmark has met its burden in establishing all of the elements of its claim for actual fraud based on the *Selenberg* approach.  The Court now turns to Trustmark's claim for actual fraud based upon piercing the corporate veil of BCGC.

2.  <u>The Second Avenue for Proving a Claim for Actual Fraud: Piercing the Corporate Veil</u>

The Fifth Circuit has recognized that "[i]t is well settled law that when corporate officers directly participate in or authorize the commission of a wrongful act, even if the act is done on behalf of the corporation, they may be personally liable."  *Gen. Motors Acceptance Corp. v. Bates*, 954 F.2d 1081, 1085 (5th Cir. 1992) (quoting *Moss v. Ole S. Real Estate, Inc.,* 933 F.2d 1300, 1312 (5th Cir. 1991)).  Indeed, in Texas, section 21.223(b) of the Texas Business

Organization Code[54] permits a creditor of a corporation to pierce the corporate veil and impose personal liability on an officer, director, or shareholder.  *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 832 F.3d 560, 563 (5th Cir. 2016).  In order for a creditor to pierce the corporate veil, the creditor must prove that the corporation's officers "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate."  Tex. Bus. Orgs. Code Ann. § 21.223(b) (West 2018).  Thus, § 21.223(b) has two prongs that must be satisfied: (1) proof of actual fraud; and (2) proof of a direct personal benefit to the owner of the corporation.  In the suit at bar, Trustmark can therefore pierce BCGC's corporate veil and impose liability for the $256,716.54 Debt on BCGC's officers (i.e., the Debtors) if Trustmark can prove that they used BCGC to perpetrate an actual fraud on Trustmark **and** that they did so for their direct personal benefit.  The Court now examines the evidence regarding these two elements.

### a.  Proof of Actual Fraud Under § 21.223

Trustmark may satisfy the "actual fraud" prong of § 21.223 by proving that the Debtors "made . . . transfer[s] . . . with actual intent to hinder, delay, or defraud [Trustmark]."  Tex. Bus. & Com. Code Ann. § 24.005(a)–(a)(1) (West 2018); *In re Ritz*, 567 B.R. at 739.  Trustmark may satisfy this prong in two ways.

The first approach is to obtain an admission from the Debtors themselves that they actually intended to hinder, delay, or defraud Trustmark when they transferred BCGC's assets first to Mr. Tegeler, and then from Mr. Tegeler to FWM.  However, accomplishing such a task is an arduous feat, because rarely does a person admit to fraudulent conduct.  *Rembert v. AT&T Universal Card Serv., Inc. (In re Rembert)*, 141 F.3d 277, 282 (6th Cir. 1998); *In re Ritz*, 567

---

[54] Hereinafter, any reference to § 21.223(b) refers to this specific section of the Texas Business Organizations Code ("TBOC").

114

B.R. at 740; *Am. Express Travel Related Servs. Co. v. Golchin (In re Golchin)*, 175 B.R. 366, 367–68 (Bankr. S.D. Cal. 1993); *Neary v. Darby (In re Darby)*, 376 B.R. 534, 540–41 (Bankr. E.D. Tex. 2007). In the suit at bar, neither Mr. Tegeler nor Ms. Tegeler gave any testimony admitting that he or she intended to hinder, delay, or defraud Trustmark. In fact, not surprisingly, they each expressly testified that they did not intend to hinder, delay, or defraud Trustmark. [Oct. 25, 2017 Tr. 51:15-18; Nov. 27, 2017 Tr. 119:8-10].[55] Therefore, Trustmark has failed to establish actual fraud through this "direct evidence" approach.

The other avenue to satisfy the "actual fraud" prong of § 21.223 is to introduce circumstantial evidence of the Debtors' intent to hinder, delay, or defraud Trustmark. *In re Ritz*, 567 B.R. at 740. The Fifth Circuit has held that since "direct evidence of actual fraud is often scarce, TUFTA supplies a non-exclusive list of eleven factors, commonly known as badges of fraud, that courts may consider in determining whether a debtor actually intended to defraud creditors under TUFTA." *In re Ritz*, 832 F.3d at 567 (citation omitted).[56] The badges of fraud expressly set forth in TUFTA include the following:

(1) the transfer was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer was concealed;

(4) before the transfer was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

---

[55] In the Credibility Section, the Court discusses why it does not find the Debtors to be credible witnesses. Hence, their testimony that they did not intend to defraud Trustmark is not convincing. That said, they expressly denied intending to hinder, delay, or defraud Trustmark, and there is nothing in the record indicating that they ever expressly communicated to anyone that they intended to hinder, delay, or defraud Trustmark. Therefore, this Court cannot make a finding that the Debtors themselves ever expressly admitted to actually intending to hinder, delay, or defraud Trustmark.

[56] TUFTA is the Texas Uniform Fraudulent Transfer Act. Tex. Bus. & Com. Code § 24.001. TUFTA was enacted "to protect creditors from being defrauded or left without recourse due to the actions of unscrupulous debtors." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 89 (Tex. 2015).

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tex. Bus. & Com. Code § 24.005(b); *In re Ritz*, 567 B.R. at 740.

"An individual badge of fraud is not conclusive but a concurrence of many badges of fraud in the same case can make a strong case of fraud." *Doyle v. Kontemporary Builders, Inc.*, 370 S.W.3d 448, 454 (Tex. App.—Dallas 2012, pet. denied). Indeed, courts have held that an inference of fraud can be shown through "several of these 'indicia of fraud.'" *Roland v. United States*, 838 F.2d 1400, 1403 (5th Cir. 1988); *see also In re Ritz*, 832 F.3d at 568; *In re Ritz*, 567 B.R. at 740–41 (citation omitted) (to find requisite intent, "several of these 'badges of fraud'" must be present); *Mladenka v. Mladenka*, 130 S.W.3d 397, 405 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (explaining that when "several of these badges of fraud' are found, they can be a proper basis for an inference of fraud"). Moreover, the Fifth Circuit has held that "[n]ot all, or even a majority of the 'badges of fraud' must exist to find actual fraud." *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1066 (5th Cir. 2008). In fact, there is ample case law that the presence of only four badges of fraud is sufficient to establish requisite intent. *See, e.g.*, *Cipolla v. Roberts*

*(In re Cipolla)*, 541 F. App'x 473, 479 (5th Cir. 2013); *Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.)*, 421 B.R. 251, 300 (Bankr. W.D. Tex. 2009); *Mladenka*, 130 S.W.3d at 405.

It is noteworthy that several of the badges involve analysis of "transfers."  In analyzing these "transfers," it is important to focus on not only whether a debtor himself conveyed away his own personal assets to a third party, but also whether a debtor who has decision-making authority of a company authorizes that entity to transfer assets to himself or other third parties. *See, e.g., Int'l Beauty Prods., LLC v. Beveridge (In re Beveridge)*, 416 B.R. 552, 575–76 (Bankr. N.D. Tex. 2009) (individual debtor who was president of company authorized the company to transfer over $300,000.00 to his own 100% entity, and the court held that these transfers were nondischargeable because the funds were "obtained through actual fraud within the meaning of section 523(a)(2)."); *see also Nwokedi*, 428 S.W.3d at 206 (holding that the individual debtor authorized a $75,000 fraudulent transfer where he was the signatory on both corporate bank accounts).

In the suit at bar, there are several transfers on which this Court focuses in order to conclude that Trustmark has proven numerous badges of fraud, and thus that the Debtors committed "actual fraud" under § 21.223.  The Court now reviews the eleven badges of fraud to explain why Trustmark has satisfied the "actual fraud" prong of § 21.223.

### i.    *Badge #1: The Transfers Were Made to Insiders*

The first badge of fraud involves whether transfers of assets to insiders occurred. According to the Bankruptcy Code, the term "insider" includes a "relative of the debtor." [57]  11 U.S.C. § 101(31)(A)(i).  The Fifth Circuit has held that two factors should be considered in

---

[57] This Court expressly applies the term "relative" to include the Debtor himself.  Congress permits a broad interpretation of the statutory definitions within § 101 containing the words "includes" and "including," as these words are not limiting.  11 U.S.C. § 102(3).  Furthermore, a relative also includes a spouse.  *In re Knippen*, 355 B.R. 710, 733 (Bankr. N.D. Ill. 2006).

determining whether the term "insider" exists under 11 U.S.C. § 101(31): (1) the closeness of the relationship between the debtor and the transferee; and (2) whether the transactions were conducted at arm's length. *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992) (finding close relationship to exist based in part on parties having been married for twenty years and having maintained frequent contacts after their divorce); *see also Prisbrey v. Noble*, 505 F.2d 170, 175 (10th Cir. 1974) (internal quotations omitted) ("Courts give close scrutiny to intrafamily transactions" and "the relationship of the parties in conjunction with other circumstances often makes a trustee's case compelling notwithstanding the absence of direct evidence of fraud."); *In re Wren Alexander Invs., LLC*, No. 08–52914–RBK, 2011 WL 748131, at *10 (Bankr. W.D. Tex. 2011) (focusing on the relationship between principals of two companies in finding close relationship between the companies); *Bank of Am., N.A. v. Fulcrum Enters., LLC*, 20 F. Supp. 3d 594, 605 (S.D. Tex. 2014) (finding that the parties were married to each other for over thirty years, the parties were cordial after the divorce, and one party assisted the other party with the business affairs sufficiently demonstrated the closeness of the relationship between the parties); *Miller v. Schuman (In re Schuman),* 81 B.R. 583, 586 (9th Cir. B.A.P. 1987) ("The tests developed by the courts in determining who is an insider focus on the closeness of the parties and the degree to which the transferee is able to exert control or influence over the debtor."); *Loeber v. Loeber (Matter of Loeber)*, 12 B.R. 669, 675 (Bankr. D. N.J. 1981) (citations omitted) ("[W]here property is transferred to relatives, the transfer will be subject to close scrutiny and the relationship of the parties in conjunction with other circumstances will often make the trustee's case compelling notwithstanding the absence of direct evidence of fraud."). Given the Code's definition of "insider" and the case law's interpretation of this term, this Court finds that Mr. Tegeler and Ms. Tegeler are both insiders.

In the suit at bar, this Court focuses on the following transfers involving these two insiders: (1) the transfer on August 20, 2014, of the Collateral from BCGC to Mr. Tegeler [Finding of Fact No. 26]; (2) the transfer on August 21, 2014, of the Collateral from Mr. Tegeler to FWM [Finding of Fact No. 27]; (3) the transfer on September 18, 2014, of loan proceeds of $230,000.00 from Trustmark to BCGC's account effectuated by the actions of Ms. Tegeler [Finding of Fact No. 40]; (4) the transfer of $155,000.00 by Ms. Tegeler on September 19, 2014, from BCGC's account to FWM's account [Finding of Fact No. 41]; (5) the transfer of $35,000.00 by Ms. Tegeler on November 6, 2014, from BCGC's account to FWM's account [*id.*]; and (6) the transfer of $40,000.00 by Ms. Tegeler on November 20, 2014, from BCGC's account to FWM's account [*id.*].  For the reasons set forth below, this Court finds that all six of the transfers were made to insiders.

### a)  Transfer of BCGC's Property

On August 20, 2014, Mr. Tegeler conveyed 100% of BCGC's assets—in his capacities as the president and sole shareholder of BCGC—to himself [Finding of Fact No. 26]; he gave no consideration to BCGC for these assets.  [*Id.*].  One day after this transfer to himself, Mr. Tegeler conveyed those same assets to FWM—a company in which he acquired an ownership interest by virtue of his transferring the assets to FWM.  [Finding of Fact No. 27].  Thus, Mr. Tegeler, the 100% owner of BCGC, drained all of the assets out of BCGC, and conveyed them to FWM, in order to obtain a 50% interest in this entity.  *Williams v. Houston Plants & Garden World, Inc.*, 508 B.R. 11, 17 (Bankr. S.D. Tex. 2014) (holding that transfers were made to insiders when the debtor owned the transferor and transferee companies).  Neither of these transactions came within hailing distance of being at arm's length.  The Court finds that both of these transactions constituted transfers made to an insider.

119

### b)  Transfer of BCGC's Loan Proceeds to FWM

Ms. Tegeler is also an insider under the Code.  Not only is she married to Mr. Tegeler; she assisted in BCGC's business affairs with Mr. Tegeler, and operated as an agent of BCGC in her capacity as the company's vice president [Finding of Fact Nos. 1, 4].  She also—as BCGC's authorized representative—requested a loan advance under the Note from Trustmark on September 12, 2014 [Finding of Fact No. 35], thereby leading Trustmark on September 18, 2014, to wire transfer $230,000.00 in loan proceeds to BCGC's bank account [Finding of Fact No. 40]; and then, with BCGC receiving no consideration, she wrote three checks totaling $230,000.00 payable to FWM.  [Finding of Fact No. 41].

Just like her husband's transfers of August 20 and August 21, 2014, Ms. Tegeler's transfers of the $230,000.00 from BCGC's account over to FWM's account were not done at arm's length.  Indeed, draining the account of a corporation owned 100% by one's spouse and moving these funds, for no consideration, over to the account of a company owned 50% by this spouse is the epitome of a transaction that is the very opposite of an arm's length deal.  Based upon these circumstances, the Court finds that: (1) the deposit of $230,000.00 into BCGC's account was a transfer to an insider because Mr. Tegeler and Ms. Tegeler had complete control over BCGC—indeed, they alone were the signatories on BCGC's account into which the $230,000.00 was deposited [Finding of Fact No. 40]; and (2) the three checks signed by Ms. Tegeler funneling the loan proceeds of $230,000.00 from BCGC's account over to FWM's account were transfers to insiders because at the time the checks were written, Mr. Tegeler owned 50% of FWM and Ms. Tegeler was both a corporate officer of FWM with signatory authorization  on FWM's bank account as well as an administrative secretary for this company. [Finding of Fact No. 42].

Given the findings about the above-referenced transfers, there is no question that the first badge of fraud under TUFTA is significantly present in the suit at bar.

    ii.   *Badge #2: The Debtors Retained Possession or Control of the Property Transferred After the Transfer Was Made*

### a) Transfer of BCGC's Property to FWM

In early August 2014—when the Debtors decided to buy out the Stuteses' ownership interests in BCGC—Ms. Tegeler conveyed her 25% ownership interest in BCGC to Mr. Tegeler to help facilitate this objective.[58] [Nov. 28, 2017 Tr. 27:6–28:12]. Next, Mr. Tegeler used the $2.7 million loan from Lindley to buy out the Stuteses' 50% ownership interest in BCGC. [Finding of Fact No. 3]. As a result of these transactions, Mr. Tegeler became BCGC's sole shareholder. [Finding of Fact No. 26]. Thus, Mr. Tegeler had complete control of BCGC's assets when he executed the Conveyance on August 20, 2014, transferring 100% of BCGC's assets to himself personally and giving no consideration to BCGC in return. [*Id.*]. The following day, Mr. Tegeler—still in complete control of these assets—executed the Asset Purchase Agreement and sold these same assets to FWM—an entity in which he acquired a 50% interest by virtue of the conveyance of these assets and for which his wife became an officer. [Finding of Fact Nos. 27, 28, 42]. Under all of these circumstances, this Court finds that Mr. Tegeler retained control of BCGC's property after BCGC conveyed the Collateral to himself and after he then transferred these same assets to FWM.

---

[58] The record is devoid of any testimony as to why the Debtors believed that it was important for Ms. Tegeler to transfer her 25% interest in BCGC to Mr. Tegeler in order to facilitate Mr. Tegeler's purchase of the 50% interest owned by the Stuteses. In any event, Mr. Tegeler became the 100% owner of BCGC, although his ownership interest was clearly community property in which Ms. Tegeler had an interest as it was acquired during their marriage. *Rusk v. Rusk*, 5 S.W.3d 299, 303 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (citations omitted) ("Community property consists of the property, other than separate property, acquired by either spouse during marriage. In Texas property possessed by either spouse during the marriage is presumed to be community property absent clear and convincing evidence to the contrary."); *see also S-Line LLC v. B2B Supply*, No. 3:14-CV-2284-M, 2015 WL 4745069, at *7 (N.D. Tex. Aug. 10, 2015) ("Texas law is clear that stocks purchased by either spouse during the marriage are community property."); *Rippy v. Rippy*, 49 S.W.2d 494, 496 (Tex. Civ. App. 1932) (holding that oil stock held in the name of the decedent during the marriage was presumed to be community property).

### b)  Transfer of BCGC's Loan Proceeds to FWM

Although Ms. Tegeler transferred her stock interest in BCGC to Mr. Tegeler, she remained an officer of BCGC and, in that capacity, she requested from Trustmark an advance under the Note [Finding of Fact No. 35], resulting in Trustmark wire transferring $230,000.00 into BCGC's account [Finding of Fact No. 40]; and thereafter, she wrote three checks totaling $230,000.00 to FWM.  [Finding of Fact No. 41].  Ms. Tegeler retained possession or control of the loan proceeds once the funds were wired into BCGC's account because she was an officer of BCGC and a signatory on this account; and further, she retained control once she transferred these monies into FWM's account because she was also a signatory on FWM's bank account. [Finding of Fact No. 42].  Ms. Tegeler corroborated Mr. Tegeler's testimony and admitted that the $230,000.00 transfer from Trustmark into BCGC's bank account was thereafter used entirely for FWM's payroll and expenses.  [Finding of Fact No. 41].

Given the findings about the above-referenced transfers, there is no question that the second badge of fraud is present in the suit at bar.

### iii.    *Badge #3: The Transfers Were Concealed from Trustmark*

"The term 'conceal' means '[t]o keep from being seen, found, observed, or discovered; hide.'"  *Haag v. Nw. Bank (In re Haag)*, No. 10–07917–EWH, 2012 WL 4465353, at *5 n.10 (B.A.P. 9th Cir. Sept. 27, 2012) (citing The American Heritage Dictionary of the English Language, 4th ed. p. 381 (2000)).  In *In re Adeeb*, the court found there was no concealment when a debtor "reveal[ed] the transfers to his creditors [and] recover[ed] substantially all of the property before he filed his bankruptcy petition."  *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1345 (9th Cir. 1986) ("Although a concealment may be undone simply by disclosing the existence of the property, disclosure does not undo a transfer.  However, a transfer may be

undone by recovering the property."). The Fifth Circuit found there was concealment when a debtor disclosed to the creditor use of and potential interest in the property where the debtor retained possession and benefits of ownership of the property **after** the transfer. *Lightfoot v. Cullen Ctr. Bank (In re Lightfoot)*, 35 F.3d 561, 1994 WL 500040, at *1 (5th Cir. 1994) ("[A debtor's] partial disclosure of his interest in the [property] did not remove the obstacle to creditors' recovering the sums owed them and did not undo the concealment."). Additionally, the Seventh Circuit found concealment where the debtor failed to reveal transfers and attempted to recover property previously transferred prior to filing bankruptcy. *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 566 (7th Cir. 1989).

### a) Concealment of Transfers of BCGC's Property in August of 2014

Here, the Debtors argue that they disclosed the transfers to Trustmark because Mr. Tegeler informed Petrilla in their initial meeting that BCGC was undergoing a merger with FWM. Trustmark contends, in the first instance, that Mr. Tegeler never stated that BCGC would be merging with any third party—and this Court has already found that no such statement was made by the Debtors at this meeting. [Finding of Fact No. 13(d)]. Moreover, at trial, the Debtors and Stephens admitted that none of the parties had provided Trustmark with a copy of the Conveyance or the Asset Purchase Agreement or orally disclosed these transfers.[59] [Finding of Fact No. 32]. Alternatively, even if the Debtors did represent at their initial meeting with Petrilla that BCGC would be merging, they never stated when and, moreover, no merger in fact

---

[59] Trustmark first learned about the transfer of BCGC's assets to FWM in November 2014. [Finding of Fact No. 45]. At that time, Petrilla called Ms. Tegeler to inquire why BCGC had not been providing monthly borrowing base certificates for September 30, 2014 and October 31, 2014, and Ms. Tegeler, in this conversation, informed Petrilla that BCGC had "merged" with FWM. [*Id.*]. It was only after Petrilla learned about this alleged "merger" that the Debtors provided her with a copy of the Asset Purchase Agreement. [Finding of Fact No. 46]. They never provided her with a copy of the Conveyance.

took place.[60]  Rather, what occurred were two conveyances—neither of which were disclosed to Trustmark—that resulted in a complete evisceration of Trustmark's security interest in the Collateral.  First, on August 20, 2014, Mr. Tegeler, as president of BCGC, executed the Conveyance transferring all of BCGC's assets (i.e., the Collateral) to himself for no consideration.  [Finding of Fact No. 26].  Then, the very next day, Mr. Tegeler, in order to acquire 50% of FWM's stock, executed the Asset Purchase Agreement transferring all of these same assets to FWM, which subsequently lost all of its assets (including the Collateral) to foreclosure by  Lone Star Bank and Mainland Bank, which were holding notes and security agreements under which FWM had defaulted.  [Finding of Fact No. 27, 52].  The Court finds that this conveyance scheme was not only **not** disclosed to Trustmark, but was also outside the usual mode of BCGC's business and supports a finding of concealment.  *Spohn v. Carney (In re Carney)*, 558 B.R. 250, 269 (Bankr. N.D. Ill. 2016) (finding that a creditor can prove concealment by demonstrating that the debtors made transfers in secret or outside the usual mode of business).

Finally, the Debtors have failed to provide any evidence to support their defense that Trustmark waived the default event in writing—i.e., waived the default that occurred pursuant to the Loan Documents prohibiting a transfer of BCGC's assets without first obtaining Trustmark's written consent.[61]  Indeed, Mr. Tegeler testified that he did not obtain written consent from

---

[60] The transaction that occurred between BCGC and FWM was not a merger, but rather an asset purchase by FWM of all of BCGC's assets with BCGC receiving no consideration at all.  *See supra* note 33.

[61] The Loan Documents contain an integration clause [Findings of Fact Nos. 19(e), 20(d)], and the Debtors cannot refute the validity of this clause or the documents as a whole.  The Debtors simply contend that BCGC merged with FWM, and that Trustmark was aware, prior to the loan closing, that such a merger would eventually take place.  The Debtors have woefully failed to prove that Trustmark knew of the proposed merger with FWM—or, for that matter, any other transaction with FWM—at the time of the loan closing or before.  Additionally, the Debtors fail to assert that the Loan Documents are ambiguous.  Thus, even if the Debtors affirmatively informed Trustmark prior to the loan closing that BCGC would be merging with or conveying assets to FWM, it is well settled that this Court should not enforce parol evidence of any "prior or contemporaneous agreements introduced to vary, add to, or contradict

Trustmark before or after transferring all of BCGC's assets to himself personally, *Tow v. Pajooh (In re CRCGP LLC)*, No. 04–31993, 2008 WL 4107490, at *19 (Bankr. S.D. Tex. Aug. 28, 2008) (finding concealment when the properties were transferred to the defendant personally), and Stephens testified that he did not contact Trustmark to request even verbal assurances to waive the default events articulated in the Loan Documents.  [Finding of Fact No. 32].

### b)  Concealment of Transfers of $230,000.00 of BCGC's Loan Proceeds to FWM in September and November of 2014

Aside from the Debtors concealing the transfers in August 2014 of BCGC's assets first to Mr. Tegeler and then to FWM, the Debtors also concealed the transfers of the $230,000.00 loan proceeds from BCGC's account to FWM's account.  Specifically, after Trustmark advanced $230,000.00 under the Note by wire transferring this amount to BCGC's account on September 18, 2014, Ms. Tegeler thereafter wrote three checks to transfer all of these proceeds into FWM's account—and these monies were then used entirely to pay obligations of FWM.  [Finding of Fact No. 41].   Neither Mr. Tegeler nor Ms. Tegeler ever informed Trustmark about these three transfers or that the loan proceeds, once transferred, were used to pay obligations of FWM instead of BCGC.  [*Id.*].   Rather, they concealed the fact that they transferred BCGC's proceeds to FWM.

---

terms of a fully integrated written instrument." *Beijing Metals & Minerals Imp./Exp. Corp. v. Am. Bus. Ctr., Inc.*, 993 F.2d 1178, 1182–83 (5th Cir. 1993).  And, there is no question that the Loan Documents prohibit conveyance of BCGC's assets without Trustmark's written consent—which the Debtors never obtained.  [Finding of Fact Nos. 19(d), 36(b)].  While the Court notes that Petrilla requested and obtained FWM's federal employer identification number three months after the loan closing, there is no further evidence to demonstrate Trustmark's awareness of the transaction between BCGC and FWM prior to Petrilla first gaining knowledge during her phone call with Ms. Tegeler in November 2014.  [Finding of Fact No. 45].  Indeed, Petrilla made this request because, surprised by Ms. Tegeler's disclosure in November of 2014 about the transaction between BCGC and FWM and suddenly realizing that FWM now owned the assets that secured repayment of the $230,000.00 advance under the Note, Petrilla began looking into the possibility of Trustmark entering into a lender/borrower relationship with FWM in order to protect Trustmark's lien on the Collateral and maximize the chances for repayment of the outstanding balance under the Note.  However, such a lender-borrower relationship never developed.  Indeed, eventually FWM's operations ceased and Huebel filed his own Chapter 7 petition.  [Finding of Fact No. 52; *supra* note 17].

Given this Court's findings about the Debtors' concealment of the transfer of BCGC's assets to FWM and their subsequent concealment of the three transfers of the loan proceeds of $230,000.00 from BCGC's account to FWM's account, there is no question that TUFTA's third badge of fraud is present in the suit at bar.

> iv.    *Badge #4: The Debtors Had Not Been Sued or Threatened with Suit Before the Transfers Were Made*

There is no evidence showing that the Debtors had been sued or threatened with suit before any of the relevant transfers were made. Therefore, this badge of fraud is not present.

> v.    *Badge #5: The Transfers Were Not Substantially All of the Debtors' Assets*

The record is clear that Mr. Tegeler owned 100% of BCGC as of the loan closing on August 18, 2014. [Finding of Fact No. 8]. The record is also clear that Mr. Tegeler, by executing the Conveyance, transferred all of BCGC's assets to himself on August 20, 2014, and then turned around the next day and transferred these same assets to FWM. [Findings of Fact Nos. 26–27]. The record is devoid of the value of Mr. Tegeler's stock interest in BCGC when its assets were conveyed to FWM. Stated differently, this Court has never seen a balance sheet of BCGC in order to assess the value of Mr. Tegeler's 100% interest in this company.[62] Moreover, there is no balance sheet in the record showing all of the Debtors' assets. Therefore, this Court cannot make any finding that the transfer of BCGC's assets from Mr. Tegeler to FWM on August 21, 2014, was substantially all of the Debtors' assets. Accordingly, given this evidentiary record, this badge of fraud is not present.

---

[62] Of course, because BCGC was founded during the marriage of Mr. and Ms. Tegeler, his 100% interest in the company is community property. *Rusk*, 5 S.W.3d at 303 (internal citations omitted) ("Community property consists of the property, other than separate property, acquired by either spouse during marriage. In Texas property possessed by either spouse during the marriage is presumed to be community property absent clear and convincing evidence to the contrary.").

### vi.    _Badge #6: The Debtors Did Not Abscond_

Unlike the debtor in _In re Sissom_, the Debtors here did not abscond.  _In re Sissom_, 366

B.R. 677, 694–95 (Bankr. S.D. Tex. 2007) (debtor absconded by failing to appear at his meeting

of creditors and not returning his attorney's phone calls, so much so that the attorney sent an e-

mail stating that "I am definitely not representing you any more [sic].  It is impossible to get in

touch with you.").  In the suit at bar, the Debtors have always appeared in court as scheduled;

they attended their meeting of creditors on December 16, 2016 [Main Case Doc. No. 8]; and they

have not avoided communicating with their attorney.  Thus, this badge of fraud is not present.

### vii.    _Badge #7: The Debtors Removed or Concealed Assets_

This badge of fraud is similar to the third badge of fraud.  In _In re Houston Drywall, Inc._,

this Court found that the defendants concealed their assets when they failed to disclose the

assignments of their partnership interests in exchange for receivables.  _West v. Seiffert (In re_

_Houston Drywall, Inc.)_, No. 05–95161–H4–7, 2008 WL 2754526, at *23 (Bankr. S.D. Tex. July

10, 2008).  This Court also found that one of the defendants, acting on behalf of the debtor

corporation, also concealed the corporate assets when he transferred these assets to a company in

which he and the other defendants maintained an interest.  _Id._  Conversely, in _In re SMTC_

_Manufacturing of Texas_, the court found no concealment where the transfers "were made in the

ordinary course of business for a legitimate business purpose [i.e., to reduce the cost of its

expenses] and not concealed from anyone." 421 B.R. at 304.  The facts in this suit are much

more similar to the facts in _In re Houston Drywall, Inc_. than those in _In re SMTC Manufacturing_

_of Texas_.

Testimony at trial revealed that there were several separate and distinct instances where

the Debtors removed or concealed assets.  The first instance occurred on August 20, 2014, when

Mr. Tegeler—in his capacity as the President of BCGC—conveyed all of BCGC's assets (which included the Collateral) to himself personally by executing the Conveyance, with BCGC receiving no consideration at all.  [Finding of Fact No. 26].  The second instance occurred on August 21, 2014, when Mr. Tegeler—in his individual capacity—conveyed these same assets to FWM by execution of the Asset Purchase Agreement, with Mr. Tegeler himself receiving consideration (a 50% stock interest in FWM) but BCGC once again receiving nothing.  [Finding of Fact No. 27].  Stephens and Mr. Tegeler both admitted that they did not provide Trustmark with the documentation evidencing these conveyances.  [Finding of Fact No. 32].  They also admitted that they made no verbal disclosure to Trustmark of these transfers.  [*Id*.].  In fact, their admissions are consistent with the testimony of Trustmark's loan officers, who credibly denied ever having discussions with the Debtors or Stephens about these conveyances. [*Id*.].  Thus, there is no question that Mr. Tegeler surreptitiously removed BCGC's assets in two distinct transactions, both of which he concealed from Trustmark.

Further concealment of assets occurred in two subparts: (1) on September 17, 2014, Ms. Tegeler, in order to persuade Trustmark to advance funds under the Loan Documents, submitted a blatantly false borrowing base certificate that concealed BCGC's true financial condition.  This borrowing base certificate represented that BCGC had accounts receivable totaling $389,324.00, when, in fact, it had no receivables—or any other assets for that matter—because Mr. Tegeler had transferred all of BCGC's assets to FWM the previous month.  [Finding of Fact No. 36(a)]. Ms. Tegeler knew at the time she submitted the borrowing base certificate that her husband had transferred all of BCGC's assets to FWM the previous month, and yet she concealed this fact from Trustmark.   Trustmark, in justifiable reliance on the borrowing base certificate and believing that BCGC did in fact have receivables of $389,324.00 as of September 17, 2014,

effectuated a $230,000.00 advance under the Note by wire transferring this amount to BCGC's bank account—which therefore became property of BCGC; and (2) Ms. Tegeler thereafter wrote three checks—aggregating $230,000.00—one on September 19, 2014, for $155,000.00, one on November 5, 2014, for $35,000.00, and one on November 20, 2014, for $40,000.00, transferring these funds from BCGC's account to FWM, with BCGC receiving no consideration in return. [Finding of Fact Nos. 38, 40, 41].  Ms. Tegeler failed to disclose to Trustmark that all of these loan proceeds were going to be transferred to FWM's bank account to pay for expenses of FWM. Indeed, once Trustmark processed the wire transfer so as to deposit the $230,000.00 into BCGC's account, Trustmark could not have known how the Debtors were actually going to use the monies unless the Debtors fully disclosed their intentions, which, in this instance, they did not.  Not only did they fail to disclose what they were going to do with the funds, they thereafter completely concealed how they actually used these proceeds.

Taking all of these circumstances into account, this Court finds that the transfers of BCGC's assets (i.e., the loan proceeds of $230,000.00) in August, September, and November of 2014 were not made in the ordinary course of BCGC's business for a legitimate business purpose and were completely concealed by the Debtors from Trustmark.  These circumstances are very similar to those in *In re Houston Drywall* and wholly unlike those in *In re SMTC Manufacturing of Texas*.

Therefore, the Court finds that there are six separate and distinct instances (August 20, 2014, August 21, 2014, September 17, 2014, September 19, 2014, November 5, 2014, and November 20, 2014) where the Debtors removed or concealed BCGC's assets.  Therefore, this badge of fraud is overwhelmingly present in the suit at bar.

> viii.   *Badge #8: The Value of the Consideration Received Was Not Reasonably Equivalent to the Value of the Asset Transferred*

Under TUFTA, "reasonably equivalent value" is defined as including, "without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." Tex. Bus. & Com. Code § 24.004. "There need not be a dollar-for-dollar exchange to satisfy the reasonable equivalence test; rather, the Court should simply compare 'the value of what went out [of the debtor's estate] with the value of what came in.'" *In re SMTC Mfg. of Tex.*, 421 B.R. at 300 (quoting *Mancuso v. T. Ishida USA, Inc. (In re Sullivan)*, 161 B.R. 776, 781 (Bankr. N.D. Tex. 1993)); *see also Besing v. Hawthorne (In re Besing)*, 981 F.2d 1488, 1495 (5th Cir. 1993) ("[A] court must base its determination upon subsidiary fact findings regarding the value of the property transferred and the 'value' received in exchange.").

Trustmark obtained a lien on the Collateral (i.e., certain assets owned by BCGC) on August 18, 2014. [Finding of Fact No. 20(a)]. On August 20, 2014, Mr. Tegeler, as an officer of BCGC, executed the Conveyance in order to transfer all of BCGC's assets (including the Collateral) to himself personally. [Finding of Fact No. 26]. BCGC received absolutely no consideration from Mr. Tegeler [*id.*]; nor did BCGC receive any consideration the next day when Mr. Tegeler transferred all of these same assets to FWM. [Finding of Fact No. 27]. Moreover, when Ms. Tegeler wrote three checks on BCGC's account in order to transfer the loan proceeds of $230,000.00 from BCGC's account to FWM's account, BCGC once again received no consideration whatsoever. [Finding of Fact No. 41]. Thus, with respect to all five transfers of BCGC's assets, BCGC did not receive reasonably equivalent value because it received **no** value whatsoever.

Therefore, this badge of fraud is very much present in the suit at bar.

130

ix.   *Badge #9: The Debtors Were Insolvent or Became Insolvent Shortly After the Transfers*

The Code defines insolvency as the "financial condition such that the sum of such . . . debts is greater than all of such entity's property, at a fair valuation . . . ." 11 U.S.C. § 101(32)(A). Texas law echoes the Code's definition of insolvency. *Osherow v. Nelson Hensley & Consol. Fund Mgmt., L.L.C. (In re Pace)*, 456 B.R. 253, 273 (Bankr. W.D. Tex. 2011). This Court has "broad discretion when considering evidence to support a finding of insolvency," and Trustmark may prove the Debtors' insolvency by "any appropriate means," including the Debtor's bankruptcy schedules. *Matson v. Strickland (In re Strickland)*, 230 B.R. 276, 282 (Bankr. E.D. Va. 1999). Trustmark must offer proof of insolvency at the time of the transfer— not at the time of the filing of the bankruptcy petition—above "mere speculative evidence of the insolvency." *Official Emp't-Related Issues Comm. of Enron Corp. v. Arnold (In re Enron Corp.)*, 318 B.R. 655, 662 (Bankr. S.D. Tex. 2004).

At trial, Trustmark introduced no evidence proving that the Debtors, in their individual capacities, were insolvent or became insolvent at the time of, or shortly after, any of the transfers that occurred in 2014. Thus, the Court finds that Trustmark has not carried its burden on this issue. Therefore, this badge of fraud is not present.

x.   *Badge #10: The Transfers Occurred Shortly Before or Shortly After a Substantial Debt Was Incurred*

Under § 24.002(5) of TUFTA, debt "means a liability on a claim," and under § 24.002(3), claim "means a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Thus, the $230,000.00 advance made by Trustmark on September 18, 2014, is a "debt" owed by BCGC under the Note and by the Debtors, in their

individual capacities, under the Guaranties.[63]   The question here is whether this debt is "substantial."

Here, the Court finds that the $230,000.00 drawdown is a substantial debt incurred by the Debtors.   *See In re Sissom,* 366 B.R. at 698 (finding $50,000 to be a substantial debt); *In re Cowin*, No. 13–30984, 2014 WL 1168714, at *30 (Bankr. S.D. Tex. Mar. 21, 2014) (finding $52,880.00 to be a substantial debt); *In re Houston Drywall, Inc.*, 2008 WL 2754526, at *24 (finding $53,869.95 to be a substantial debt); *In re Ritz*, 567 B.R. at 750 (finding $163,999.38 to be a substantial debt).   Indeed, it is worth noting that in the schedules that the Debtors have filed in their main chapter 7 case, they represent that their net monthly income is $2,966.84 [Main Case No. 16-35634, Schedule I, Doc. No. 27 at 3]; and that the aggregate value of their assets is $501,460.47, which figure includes exempt property.   [Main Case No. 16-35634, Schedule C-1, Doc. No. 139-1 at 34].   Given these figures, there is no question that the $256,716.54 Debt is substantial.

Hence, the Court must determine whether the Debtors incurred this substantial debt shortly before or shortly after the transfers that are the subject of this lawsuit.   This Court, interpreting the tenth badge of fraud under TUFTA, has previously held that

---

[63] There is no question that the Guaranties are guaranties of payment, not collection.   This is so because the Guaranties contain the following language:

> This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness.

[Pl.'s Ex. 5 ¶ 1; Pl.'s Ex. 6 ¶ 1].   *See, e.g., Sterling Prop. Mgmt., Inc. v. Tex. Commerce Bank, Nat'l Ass'n*, 32 F.3d 964, 967 (5th Cir. 1994) (citation omitted) ("A guaranty of payment, which is also known as an absolute guaranty, requires the guarantor to pay immediately upon the principal obligor's default."); *Haggard v. Bank of the Ozarks, Inc.*, 668 F.3d 196, 199 (5th 2012) ("[A] guaranty of payment (or unconditional guaranty) does not require as a condition precedent to its enforcement that the principal debtor be joined in the suit seeking payment because the guarantor is 'akin to a co-maker in that the holder of the note can enforce it against either party.") (quoting *Cox v. Lerman*, 949 S.W.2d 527, 530 (Tex. App.—Houston [14 Dist.] 1997, no pet.)); s*ee also Herman v. White (In re White)*, 519 B.R. 832, 838 (Bankr. N.D. Okla. 2014) (examining a guaranty obligation as a debt under § 523(a)(6)).

"[a]lthough there is no specific length of time which limits 'shortly before or shortly after,' the Court believes that the Code's use of 90 days for preferential transfers, and up to one year for insiders, is a reasonable analogy." *In re Houston Drywall, Inc.*, 2008 WL 2754526, at *24. The chart below outlines the timeline of relevant events in the suit at bar:

| **Date** | **Relevant Event** |
| --- | --- |
| 08/18/2014 | BCGC and the Debtors personally incurred a potentially substantial debt when the loan closed and the Loan Documents (including the Guaranties) were signed, and BCGC therefore had the right to draw down under the Note, as long as the borrowing base certificates showed sufficient eligible accounts receivable.  [Finding of Fact No. 21]. |
| 08/20/2014 | Mr. Tegeler transferred all of BCGC's assets to himself, with BCGC receiving no consideration.  [Finding of Fact No. 26]. |
| 08/21/2014 | Mr. Tegeler transferred all of the assets formerly owned by BCGC to FWM, with Mr. Tegeler receiving a 50% interest in FWM, but BCGC once again received no consideration.  [Finding of Fact No. 27]. |
| 09/17/2014 | Ms. Tegeler submitted a false borrowing base certificate to Trustmark and requested an advance under the Note.  [Finding of Fact Nos. 36–40]. |
| 09/18/2014 | Trustmark advanced and transferred $230,000.00 to BCGC's bank account held at Frost Bank, and therefore BCGC and Debtors incurred a substantial debt.  [Finding of Fact No. 40]. |
| 09/19/2014 | Ms. Tegeler transferred $155,000.00 from BCGC's account to FWM's account by writing a check payable for $155,000.00, with BCGC receiving no consideration.  [Finding of Fact No. 41]. |
| 11/05/2014 | Ms. Tegeler transferred $35,000.00 from BCGC's account to FWM's account by writing a check payable for $35,000.00, with BCGC receiving no consideration.  [Finding of Fact No. 41]. |
| 11/20/2014 | Ms. Tegeler transferred $40,000.00 from BCGC's account to FWM's account by writing a check payable for $40,000.00, with BCGC receiving no consideration.  [Finding of Fact No. 41]. |

In the suit at bar, the relevant time period is between August 18, 2014, and November 20, 2014.  BCGC—and therefore the Debtors, individually, through the Guaranties—incurred a substantial debt of $230,000.00 approximately four weeks **after** Mr. Tegeler orchestrated the transfers of BCGC's assets first to himself and then to FWM.  Stated differently, the transfers in

August of 2014 of all of BCGC's assets for no consideration occurred shortly before the substantial debt of $230,000.00 was incurred.  These circumstances alone lead this Court to find that this tenth badge is present.

But, there is more.  The debt of $230,000.00 that incurred on September 18, 2014, occurred approximately eight weeks **before** all of the loan proceeds were furtively transferred out of BCGC's account over to FWM's account.  [Finding of Fact No. 40].  Stated otherwise, the three transfers (one in September and two in November of 2014) of all of the loan proceeds from BCGC's account to FWM's account occurred shortly after the substantial debt of $230,000.00 was incurred.  [*Id.*].  These circumstances provide a separate and independent reason for this Court to find that this badge is present.

In sum, this Court finds that the tenth TUFTA badge of fraud is present in the suit at bar.

xi.   *Badge #11: The Debtors Transferred the Essential Assets of the Business to a Lienor Who Transferred the Assets to an Insider of the Debtors*

There is nothing in the record to demonstrate that the Debtors transferred BCGC's assets to Trustmark, or any other lienor, who then transferred the assets to an insider of the Debtors. This badge of fraud is therefore not present.

xii.   *There is One Additional Badge Not Expressly Enumerated in § 24.005(b) of TUFTA that Reveals the Debtors' Intent to Hinder, Delay, or Defraud Trustmark*

TUFTA states that when determining whether a transfer was fraudulent, consideration may be given, among other factors, to the eleven enumerated badges of fraud.  Tex. Bus. & Com. Code § 24.005(b).  Further, the Fifth Circuit has held that the eleven factors set out in TUFTA are "non-exclusive."  *In re Soza*, 542 F.3d at 1066.  Stated differently, the "list is not exhaustive, [and] a court may also consider other suspicious facts suggesting that a transfer was made with

actual fraudulent intent." *In re 1701 Commerce, LLC*, 511 B.R. 812, 836 (Bankr. N.D. Tex. 2014).  Therefore, this Court will consider additional "suspicious facts" to aid in the finding that the Debtors intended to hinder, delay, or defraud Trustmark from collecting the $256,716.54 Debt.

The Fifth Circuit has found that "debtors with business acumen . . . are to be held to a higher standard." *Jordan v. Se. Nat'l Bank (In re Jordan)*, 927 F.2d 221, 226 (5th Cir. 1991), *overruled on other grounds*, *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257 (5th Cir. 1993); *see also Mgmt. Jets Int'l, Inc. v. Mutschler (In re Mutschler)*, 45 B.R. 482, 492 (Bankr. D. N.D. 1984) ("Where the debtor is an individual of intelligence and experience in financial matters, courts have been more inclined to hold him responsible for uttering a false financial statement.").

Here, Mr. Tegeler is an experienced businessman who should be held to a higher standard.[64]  In fact, he testified that he was a successful businessman because he was dealing with very large oilfield companies, which required sophistication and experience.  [Finding of Fact No. 3].  He also testified that he spent sixteen years working for various drill pipe manufacturers in the oil and gas industry after he attended college.  [Finding of Fact No. 2].  He also formed BCGC in September of 2008, serving as the company's President.  [Finding of Fact No. 4, 6].  Additionally, Mr. Tegeler testified that he borrowed $2.7 million and negotiated this same million dollar transaction without the assistance of a CPA or an attorney.[65]  Finally, Mr.

---

[64] Mr. Tegeler's level of experience only further strengthens Trustmark's claim relating to his intent to deceive.  *See Kan. Nat'l Bank & Trust Co. v. Kroh (In re Kroh)*, 88 B.R. 972, 985 (Bankr. W.D. Mo. 1988) ("[W]hen a debtor is an individual of intelligence and experience in financial matters, the mere fact that a financial statement is false and that it is known to be false is sufficient to establish an intent to deceive.").

[65] Mr. Tegeler testified that he did not hire an attorney or a CPA to help him borrow $2.7 million from Lindley in July of 2014.  Mr. Tegeler did, however, testify that Stephens assisted him with the promissory note evidencing the $2.7 million loan.  He did not testify as to what Stephens' capacity was in connection with this transaction.

Tegeler signed the Asset Purchase Agreement, which describes his level of sophistication as follows:

> [Mr. Tegeler] is an "accredited investor" within the meaning of Rule 501 of Regulation D [the definition of this term is found in 17 C.F.R. § 230.501] promulgated under the Securities Act, has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of the transactions contemplated by this Agreement.

[Finding of Fact No. 3].

Thus, Mr. Tegeler, as an experienced businessman, should know that when he conveyed 100% of BCGC's assets to himself by signing the Conveyance, this transaction in and of itself, was a transaction that required Trustmark's written consent, especially after he had just signed three separate documents that prohibited a transfer of the Collateral: (1) the Guaranty ("[Mr. Tegeler] has not and will not, without the prior written consent of [Trustmark], sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of [BCGC's] assets") [Pl.'s Ex. No. 5 at 23]; (2) the Revolving Loan Agreement ("[BCGC] . . . will not, without the prior written consent of [Trustmark], sell the majority of its assets used or useful in its business") [Pl.'s Ex. No. 2 at 13, ¶ 14(c)]; and (3) the Security Agreement ("[BCGC] shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral."). [Pl.'s Ex. No. 3 at 16–17].

Despite these unambiguous provisions within the Loan Documents, Mr. Tegeler, without first obtaining written consent from Trustmark, conveyed BCGC's assets to himself and gave no consideration to BCGC in return. [Finding of Fact No. 26]. His explanation is that he did not read the Conveyance or the Asset Purchase Agreement and, moreover, relied upon the advice of Stephens to execute these two documents.[66]   This explanation does not come within hailing

---

Notwithstanding Stephens' limited assistance in this transaction, Mr. Tegeler unequivocally testified that he negotiated the terms of this $2.7 million transaction on his own.  [Nov. 7. 2017 Tr. 88:8-19].

[66] Mr. Tegeler cannot escape contractual provisions by which he is bound by using the excuse that he did not read the documents and, instead, relied upon the instructions of Stephens to sign the Conveyance and the Asset Purchase

distance of being credible.   A reasonable person, let alone a sophisticated businessman, should know that signing a document entitled "Asset Purchase Agreement"—which unequivocally describes the sale of all of BCGC's assets—is prohibited without Trustmark's prior written consent.   Again, Mr. Tegeler's conduct demonstrates his blatant disregard for straightforward covenants that he agreed to only two days earlier.   [Finding of Fact No. 22].   Mr. Tegeler's business acumen certainly encompasses his understanding (especially with the assistance of his CPA and attorney) of very simple prohibitive provisions that he otherwise deliberately disregarded.   Therefore, this Court finds that Mr. Tegeler's significant level of sophistication combined with his lack of credibility is an additional badge of fraud for purposes of determining whether there is sufficient circumstantial evidence to establish his intent to hinder, delay, or defraud Trustmark.

Ms. Tegeler is just as experienced and sophisticated as her husband.   She has not only earned a bachelor's degree, but she has also completed some coursework in an English master's degree program.   [Finding of Fact No. 1].   Ms. Tegeler has worked side-by-side with Mr. Tegeler at BCGC since the company began operations in September 2008.   [Finding of Fact No. 4].   Her financial experience resulting from her responsibilities at BCGC underscores her sophistication as well.   [*Id.*].   Specifically, she managed BCGC's finances, including BCGC's accounts receivable.   [*Id.*].   When she became an officer of FWM, she assumed the same responsibilities.   [Finding of Fact No. 42].   Moreover, Ms. Tegeler executed the same Loan Documents as Mr. Tegeler, knowing full well the covenants and warranties given to Trustmark, including the

Agreement.   *Espinoza*, 622 F.3d at 441 ("Texas law charges a person with knowledge of the contents of a document he or she signs."); *Venture Cotton Coop.*, 494 S.W.3d at 199 ("A party is bound to the contract he signs regardless of whether he read it . . . ."); *Donovan*, 747 F.2d at 308 n.4 (recognizing the "long standing and generally accepted principle of contract law that, absent fraud or mental incompetence, a person who intentionally signs a document is bound by its contents, whether or not he in fact read the document."); *Master Fin., Inc. v. DeJulio (In re DeJulio)*, 322 B.R. 456, 462 (Bankr. M.D. Fla. 2005) ("failure to read . . .   constitutes at a minimum a reckless indifference and disregard of the information readily available").   Having signed the documents, Mr. Tegeler is charged with knowing the content set forth therein.

covenants and warranties of these four separate documents: (1) the Guaranty ("[Ms. Tegeler] has established adequate means of obtaining from [BCGC] on a continuing basis information regarding [BCGC's] financial condition . . . [and] agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect [Ms. Tegeler's] risks under this Guaranty") [Pl.'s Ex. No. 6 at 23]; (2) the Revolving Loan Agreement ("Promptly notify [Trustmark] of all material adverse changes in [BCGC's] financial condition") [Pl.'s Ex. No. 2 at 11–12, ¶ 12(i)]; (3) the Security Agreement (BCGC shall refrain from furnishing to Trustmark any "false or misleading" warranties, representations, or statements "in any material respect") [Pl.'s Ex. No. 3 at 18]; and (4) the Note (BCGC shall refrain from furnishing to Trustmark any "false or misleading" warranties, representations, or statements "in any material respect"). [Pl.'s Ex. No. 1 at 7].

Ms. Tegeler, by virtue of executing the Loan Documents, was obligated to notify Trustmark of BCGC's financial condition when Mr. Tegeler executed the Conveyance and the Asset Purchase Agreement. But, she failed to fulfill this obligation by remaining silent and continuing to act contrary to the promises she made to Trustmark. Moreover, she knowingly sent to Trustmark false statements about BCGC's financial condition—i.e., the borrowing base certificate of September 17, 2014, representing that BCGC had eligible accounts receivable of $389,324.00, when she knew that BCGC had no assets as of that date. Her misdeeds did not end there. Upon receiving the wire transfer of $230,000.00, Ms. Tegeler proceeded to drain BCGC's account when she wrote three checks payable to FWM. [Finding of Fact No. 41]. Indeed, Ms. Tegeler had the same obligation to promptly notify Trustmark that she planned on transferring to FWM—and did in fact transfer to FWM—the entire $230,000.00 of the loan proceeds by November 20, 2014, as this was a material change in BCGC's financial condition and these

proceeds were used for purposes contrary to what the Debtors had represented in the loan application and the Loan Documents. Nevertheless, Ms. Tegeler did nothing to exhibit candor in her dealings with Trustmark.

Finally, Ms. Tegeler's true dishonest colors are underscored by her e-mail to Stephens of August 4, 2014. [Finding of Fact No. 16(k)]. In this e-mail, she informs Stephens that to request a waiver from Trustmark of the provisions in the Loan Documents prohibiting the transfer of BCGC's assets would "raise red flags" [*Id.*], thus telegraphing to Stephens that she did not want to risk requesting such a waiver from Trustmark because this request would alert the bank that her husband and she intended to transfer BCGC's assets to FWM—a transaction that she knew would certainly cause Trustmark to refuse to provide financing to BCGC. Thus, Ms. Tegeler chose to keep Trustmark in the dark, a choice that seriously erodes her credibility with this Court—particularly when she testified that Trustmark knew from the outset about BCGC's contemplated transaction with FWM. If she were really telling the truth on this point, she would not have told Stephens that a request from Trustmark for a waiver would "raise red flags." Ms. Tegeler is hoist by her own e-mail petard.

For all these reasons, this Court finds that Ms. Tegeler's high level of sophistication, combined with her lack of credibility, constitutes an additional badge of fraud for purposes of determining whether there is sufficient circumstantial evidence to establish her intent to hinder, delay, or defraud Trustmark.

In sum, the presence of this additional badge favors a finding of the Debtors' actual intent to hinder, delay, or defraud Trustmark.

*xiii.*　　*Summary of the Badges of Fraud Analyzed Above*

The "actual fraud" prong of § 21.223 is satisfied by introducing circumstantial evidence, which is accomplished by finding the existence of a sufficient number of badges of fraud pursuant to TUFTA.  In the present suit, this Court has reviewed and analyzed twelve badges of fraud.  The Court concludes that a total of seven badges of fraud are present, which supports a finding of the Debtors' intent to hinder, delay, or defraud Trustmark.  *See In re Cipolla*, 541 F. App'x at 479; (finding that four badges of fraud is sufficient); *Faulkner v. Kornman (In re Heritage Org., L.L.C.)*, No. 04–35574–BJH–11, 2008 WL 5215688, at *8 (Bankr. N.D. Tex. Dec. 12, 2008) (finding that three badges of fraud is sufficient to support a finding that the defendant intended to hinder, delay, or defraud the plaintiff); *Mladenka*, 130 S.W.3d at 405 (finding that four badges of fraud is sufficient); *Berland v. Mussa (In re Mussa)*, 215 B.R. 158, 170 (Bankr. N.D. Ill. 1997) (finding that seven badges of fraud is sufficient).  Thus, there are sufficient badges of fraud for the Court to find that the Debtors committed "actual fraud" under the veil-piercing statute of the TBOC.  *In re Ritz*, 567 B.R. at 741–42.  The first prong of § 21.223 of the TBOC is therefore satisfied.  The question now is whether the second part of the veil-piercing test under § 21.223 of the TBOC can be met.

**b.  Mr. Tegeler's "Actual Fraud" Was For His Direct Personal Benefit, and Ms. Tegeler's "Actual Fraud" Was For Her Direct Personal Benefit**

The second part of the veil-piercing test under § 21.223 of the TBOC requires the Court to determine whether the Debtors received direct personal benefits from the transfers from BCGC to Mr. Tegeler and FWM.  Tex. Bus. Orgs. Code § 21.223(b); *In re Ritz*, 832 F.3d at 569. The record reflects that the Debtors received direct personal benefits from the actual fraud that they perpetrated—i.e., from Mr. Tegeler's transfer of all of BCGC's assets to himself and then to

140

FWM, and then Ms. Tegeler's transfers of the $230,000.00 loan proceeds from BCGC's account to FWM's account.

The major personal benefit Mr. Tegeler received from his transfer of BCGC's assets to FWM is set forth in the Asset Purchase Agreement: he obtained a 50% ownership interest in FWM.  [Finding of Fact Nos. 28, 31].  Stated differently, by secretly conveying to FWM all of BCGC's assets (which included Trustmark's Collateral)—thereby impairing Trustmark's lien due to the prior existing liens of FWM's two banks—Mr. Tegeler added an asset to his personal balance sheet in the form of stock in FWM.[67]  The record is devoid as to the exact value of this stock as of August 21, 2014 (the date of the execution of the Asset Purchase Agreement); however, the stock clearly had finite value—at least in Mr. Tegeler's mind.  *See CLC Creditors' Grantor Trust v. Howard Sav. Bank (In re Commercial Loan Corp.)*, 396 B.R. 730, 744 (Bankr. N.D. Ill. 2008) ("The stock was 'value' because it constituted consideration sufficient to support a simple contract.  The Trust argues that the stock had no value because CLC was insolvent at the time of the sales, but stock in a corporation may have value even though the corporation is insolvent (in the 'balance sheet' sense that its liabilities exceed its assets))."[68]

Ms. Tegeler received a direct personal benefit because the stock interest that her husband acquired by conveying BCGC's assets was—and still is—community property.  *Rusk v. Rusk*, 5 S.W.3d 299, 303 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (internal citation omitted) ("Community property consists of the property, other than separate property, acquired by either spouse during marriage.  In Texas, property possessed by either spouse during the marriage is presumed to be community property absent clear and convincing evidence to the contrary."); *see*

---

[67] The Court notes that Mr. Tegeler also received a tax benefit by having BCGC transfer the Collateral to him, in his individual capacity, rather than immediately transfer these assets directly to FWM.  [Nov. 6, 2017 Tr. 23:5-6].

[68] FWM's operations eventually shut down, but not until 2016.  [Finding of Fact No. 52].

*also S-Line LLC v. B2B Supply*, No. 3:14-CV-2284-M, 2015 WL 4745069, at *7 (N.D. Tex. Aug. 10, 2015) ("Texas law is clear that stocks purchased by either spouse during the marriage are community property."); *Rippy v. Rippy*, 49 S.W.2d 494, 496 (Tex. Civ. App. 1932) (holding that oil stock held in the name of the decedent during the marriage was presumed to be community property).

The second personal benefit that Mr. Tegeler received by conveying BCGC's assets to FWM is that he became part of the management of FWM.   [*See* Finding of Fact No. 28]. Meanwhile, Ms. Tegeler received a personal benefit because she became an officer of FWM. [Finding of Fact No. 42].  And both Mr. Tegeler and Ms. Tegeler became signatories on FWM's operating account.  [*Id.*].

The third personal benefit that Mr. Tegeler received was that the $230,000.00 of loan proceeds advanced by Trustmark to BCGC ultimately ended up in FWM's bank account and were used to pay FWM's obligations to its creditors.  [Finding of Fact No. 41].  Because Mr. Tegeler was a 50% shareholder of FWM, the use of the BCGC loan proceeds of $230,000.00 to pay FWM's obligations constitutes a personal benefit to Mr. Tegeler.  *In re Ritz*, 567 B.R. at 759–61 (citing cases where stockholders of privately held companies received personal benefits when they transferred funds to these companies); *W. Builders of Amarillo, Inc. v. Morrison (In re Morrison)*, 361 B.R. 107, 120 (Bankr. W.D. Tex. 2007) ("However, [the debtor] was the majority stockholder and President of [the company].  He alone ran the company and made all the decisions regarding its operation.  Any benefit to [the company] was a personal benefit to [the debtor].").  Likewise, because Mr. Tegeler's stock interest is community property, Ms. Tegeler also received a personal benefit.  *Bobbitt v. Alamo Cas. Co.*, 241 S.W.2d 464, 465-66 (Tex. Civ. App. 1951); *Brand v. Brand*, 102 S.W.2d 310, 312 (Tex. Civ. App. 1937).

Finally, in testifying that FWM used the $230,000.00 to pay expenses, Mr. Tegeler did not specifically articulate what obligations or bills required payment; but, in drawing an inference that Mr. Tegeler's testimony relating to bills included payment of employee salaries, the Court finds that Mr. Tegeler received another direct personal benefit for his transfers and his wife's transfers to FWM. There is sufficient evidence to support that Mr. Tegeler was collecting wages from FWM. Indeed, the Debtors' schedules reflect a Texas Workforce claim for Mr. Tegeler's unpaid wages: they represent that on August 4, 2016, FWM was ordered to pay Mr. Tegeler $14,156.91. [Main Case Doc. No. 21 at 5; Main Case Doc. No. 49 at 6; Main Case Doc. No. 94 at 6; Main Case Doc. No. 95 at 6; Main Case Doc. No. 139 at 6]. There is great importance in the fact that a debtor collects a salary because "salaries and other benefits may constitute a 'direct personal benefit' to an individual for veil-piercing purposes . . . ." *Linkers Prods. Corp. v. Canary, LLC*, No. 4:16–cv–706, 2017 WL 1088350, at *6 (S.D. Tex. Feb. 24, 2017). In analyzing this inference, the Court finds that the use of BCGC's loan proceeds to pay his own FWM salary was a direct personal benefit. Meanwhile, Ms. Tegeler received a direct personal benefit from the payment of her husband's salary, as this salary was community property.

In sum, Trustmark has carried its burden to show that the second prong of § 21.223 has been satisfied.

Thus, Trustmark has satisfied the two prongs of § 21.223, which means it has pierced BCGC's corporate veil to impose personal liability on the Debtors for the $256,716.54 Debt. However, merely piercing the corporate veil to establish personal liability on the Debtors for the $256,716.54 Debt does not automatically mean that this debt is a nondischargeable obligation

under § 523(a)(2)(A).  Trustmark must still satisfy the elements of this particular Code provision to prevent the Debtors from obtaining a discharge of the $256,716.54 Debt.

### i. *Mr. and Ms. Tegeler's Personal Liability for the $256,716.54 Debt is a Nondischargeable Obligation Under 523(a)(2)(A)*

Section 523(a)(2)(A) requires the Court to inquire whether the personal obligation of Mr. Tegeler and Ms. Tegeler for $256,716.54 is a "debt for money [or] property to the extent obtained by . . . actual fraud."  To satisfy this requirement, Trustmark must show that "(1) money was obtained; (2) obtaining the money was done through the Debtor[s'] actual fraud; and (3) as a result of these circumstances, a personal debt of the Debtor[s] was created."  *In re Ritz*, 567 B.R. at 762.

First, there is sufficient evidence to show that money was obtained.  Specifically, after the loan closing established the line of credit facility for BCGC, Mr. Tegeler executed the Conveyance and caused BCGC to convey all of its assets to himself personally [Finding of Fact No. 26], and then he conveyed those assets to FWM to obtain a 50% interest in FWM.  [Finding of Fact No. 27].  Subsequently, Ms. Tegeler requested an advance under the Note [Finding of Fact No. 35], provided a blatantly false borrowing base certificate of BCGC to Trustmark [Finding of Fact 36]—upon which Trustmark relied to advance $230,000.00 to BCGC—and Ms. Tegeler then transferred these funds from BCGC's account to FWM's account.  [Finding of Fact Nos. 38, 40–41].  Thus, "money was obtained" in that $230,000.00 was deposited into BCGC's account, and then funneled to FWM.  [Finding of Fact No. 41].  The Fifth Circuit rejects the "receipt of benefits" theory and does not mandate an express finding that a debtor himself/herself obtained the money or property by fraudulent means.  *Deodati v. M.M Winkler & Assocs. (In re M.M. Winkler & Assocs.)*, 239 F.3d 746, 749 (5th Cir. 2001) ("The language of the statute includes no 'receipt of benefit' requirement.  The statute focuses on the character of the debt, not

the culpability of the debtor or whether the debtor benefitted from the fraud."); *Chromatic Color Corp. v. Pryor (In re Pryor),* 992 F.2d 324, 1993 WL 152116, at *2 n.4 (5th Cir 1993) ("[T]he 'better view' is that it is not necessary that the property be actually procured for the debtor himself.") (quoting *McMillan v. Firestone (In re Firestone)*, 26 B.R. 706, 714 (Bankr. S.D. Fla. 1982)).   Thus, the mere fact that the Debtors established a line of credit facility for BCGC, obtained proceeds of $230,000.00 for BCGC under the Note, and then transferred these monies to FWM, sufficiently evidences "that money was obtained."   Therefore, this first element has been met.

Second, obtaining the $230,000.00 for FWM was done by the Debtors through "actual fraud"—as that term is defined by TUFTA.   Stated differently, the circumstantial evidence (under the badge of fraud analysis that this Court has already done above) shows that the Debtors committed "actual fraud."

Third, as a result of these circumstances, a personal debt of the Debtors was created: the $230,000.00 advance of funds on September 18, 2014, was an extension of credit under the Note. Once Trustmark advanced these funds to BCGC, an actual debt was created, and this debt became a personal debt of both Mr. Tegeler and Ms. Tegeler because Trustmark has pierced the corporate veil.[69]

The Court notes that the facts in the suit at bar are similar to those in *In re Ritz*, a case where: (1) the individual debtor was also found to be personally liable for an obligation of his 100%-owned corporation through piercing this company's veil; and (2) this personal debt was held to be nondischargeable under § 523(a)(2)(A).   567 B.R. at 773.   In *In re Ritz*, the debtor transferred funds out of his company's operating account to the accounts of other entities in which he owned stock or otherwise controlled, and in so doing, he received a personal benefit.

---

[69] And, it must be remembered, the Debtors are also personally liable due to the Guaranties.

*In re Ritz*, 567 B.R. at 764. In the suit at bar, there were two types of transfers: (1) a transfer by Mr. Tegeler of all of BCGC's assets (tangible and intangible) to FWM in August of 2014 so that Mr. Tegeler could acquire 50% of FWM's stock—which was clearly a personal benefit to both him and his wife; and (2) Ms. Tegeler's three transfers, aggregating $230,000.00, from BCGC's account to FWM's account—which was also a personal benefit to both Mr. Tegeler and Ms. Tegeler given their community property ownership of 50% of FWM's stock, their status of being signatories on FWM's account, and the fact that Mr. Tegeler received paychecks from FWM (which were community property, thereby also benefitting Ms. Tegeler). Thus, the circumstances here fit within the fact pattern that the Supreme Court in *Ritz* described as follows:

> It is of course true that the transferor does not "obtai[n]" debts in a fraudulent conveyance. But the recipient of the transfer—who, with the requisite intent, also commits fraud—can "obtai[n]" assets "by" his or her participation in the fraud. If that recipient later files for bankruptcy, any debts "traceable to" the fraudulent conveyance, will be nondischargeable under § 523(a)(2)(A). Thus, at least sometimes a debt "obtained by" a fraudulent conveyance scheme could be nondischargeable under § 523(a)(2)(A) . . . . Such circumstances may be rare because a person who receives fraudulent conveyed assets is not necessarily (or even likely to be) a debtor on the verge of bankruptcy, but they make clear that fraudulent conveyances are not wholly incompatible with the "obtained by" requirement.

*Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1589 (2016) (internal citations omitted).

Here, just as in *Ritz*, the rare circumstances described by the Supreme Court do in fact exist. The Debtors orchestrated fraudulent transfers to themselves and now find themselves in Chapter 7.

In sum, this Court finds that the three elements of § 523(a)(2)(A) have been established. Therefore, the $256,716.54 Debt is nondischargeable under the "piercing the corporate veil" approach allowed by *Ritz*, 832 F.3d at 567–68.

## J.  Trustmark's Claim under 11 U.S.C. § 523(a)(6) for Willful and Malicious Injury

146

Even if the $256,716.54 Debt is not dischargeable under Trustmark's claims brought pursuant to § 523(a)(2)(A), for false representation, false pretenses, or actual fraud, this Court finds that the $256,716.54 Debt is nondischargeable under § 523(a)(6).

The Supreme Court has established guidelines for determining whether a debt arises from "willful and malicious injury" under § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 59 (1998). In *Kawaauhau*, the Court held that § 523(a)(6) does not except from discharge debts arising from negligently inflicted injury. *Id.* Rather, it applies only to "acts done with the actual intent to cause injury," and excludes intentional acts that merely happen to cause injury. *Id.* at 61. "Willful," as used in the provision, "modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Id.* (emphasis in original). The Supreme Court also noted that the language of § 523(a)(6) mirrors the definition of an intentional tort, which requires that an actor "intend '*the consequences of an act,' not simply 'the act itself.'"* *Id.* at 61–62 (emphasis in original) (citation omitted). Further, as to the "malicious injury" requirement of § 523(a)(6), the Fifth Circuit has held that the word "malicious" creates an "implied malice standard." *Miller v. J.D. Abrams, Inc.* (*In re Miller*), 156 F.3d 598, 605 (5th Cir. 1998). A debtor acts with implied malice when he acts "with the actual intent to cause injury." *Id.* at 606. The test for willful and malicious injury under § 523(a)(6), therefore, is condensed into a single inquiry of whether there exists "either an objective substantial certainty of harm or a subjective motive to cause harm" on the part of the debtor. *Id.; Williams v. Int'l Bhd. of Elec. Workers Local 520 (In re Williams)*, 337 F.3d 504, 508–09 (5th Cir. 2003).

Injuries covered under this section "are not confined to physical damage or destruction; an injury to intangible personal property or property rights is sufficient." *Collier on Bankruptcy*

¶ 523.12[4] (16th ed. 2018). "Thus, the conversion of another's property [or interest in property] without the owner's knowledge or consent, done intentionally and without justification and excuse, is a willful and malicious injury within the meaning of the exception." *Id.*; *see also Monson v. Galaz (In re Monson)*, 661 F. App'x 675, 684 (11th Cir. 2016) ("[W]here the debtor has knowledge of the lienholder's claim and subsequently sells or disposes of the property at issue without notice to the lienholder, that act constitutes a willful and malicious injury under § 523(a)(6)."). Stated differently, "a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice." *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934); *see also Herman v. White (In re White)*, 519 B.R 832, 839 (Bankr. N.D. Okla. 2014) ("There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one."). Here, the circumstances reflect that the Debtors' actions amount to conversion of Trustmark's property interest in the Collateral that was willful and malicious under either the "objective substantial certainty of harm" standard or the "subjective motive to cause harm" standard.[70]

1. Objective Substantial Certainty of Harm

"Although federal law governs a debt's dischargeability, courts look to state law to determine whether a conversion has occurred." *State Farm Mut. Auto Ins. Co. v. Rodriguez (In*

---

[70] This Court notes that the Debtors, by violating the Loan Documents, committed breaches of several contracts. The fact that Trustmark has breach of contract claims, however, does not mean that Trustmark is barred from recovering under a tort claim for conversion. *Walker*, 142 F.3d at 824 ("In addition, under Texas law, a claim for breach of contract and the tort of conversion may arise from the same set of facts."); *Vickery v. Tex. Carpet Co.*, 792 S.W.2d 759, 762 (Tex. App.—Houston [14th Dist.] 1990, writ denied) (finding that plaintiffs proved their case of breach of contract and conversion, which claims arose from the same set of facts).

*re Rodriguez)*, 568 B.R. 328, 342 (Bankr. S.D. Cal. 2017). The tort of conversion may, under varying circumstances, constitute a willful and malicious injury. *Am. First Credit Union v. Gagle (In re Gagle)*, 230 B.R. 174, 182 (Bankr. D. Utah 1999); *Mabank Bank v. Grisham (In re Grisham)*, 245 B.R. 65, 74 (Bankr. N.D. Tex. 2000) (finding the requisite intent to harm the bank's security interest by selling the bank's collateral without the bank's written consent or payment of the proceeds to the bank constituted conversion, resulting in a denial of the discharge under § 523(a)(6). Consequently, to prevail on a § 523(a)(6) conversion claim, Trustmark must establish: (1) that a conversion has occurred under Texas law; and (2) that the conversion is willful and malicious. *In re Rodriguez*, 568 B.R. at 343.

In *In re Gagle,* the bank obtained a perfected security interest in the debtors' truck to collateralize a personal loan. 230 B.R. at 176. The security agreement memorialized the debtors' promise to obtain written permission from the bank before altering the collateral or selling the collateral before the debt was repaid. *Id.* at 177. In dire need of cash, one of the debtors disassembled the truck and sold the parts to pay for his family's household expenses. *Id.* The debtors thereafter filed a chapter 7 bankruptcy petition. *Id.* at 178. Subsequently, the bank filed an adversary proceeding against the debtors to except from discharge the balance of the personal loan pursuant to §523(a)(6). *Id.* The court held that the debt was nondischargeable under § 523(a)(6) because the debtor intentionally injured the bank's security interest by selling the truck parts for cash without the bank's permission—acts that amounted to conversion of the bank's property interest. *Id.* at 182–183.

In the suit at bar, the Debtors harmed Trustmark's security interest in the Collateral. Here, similar to *In re Gagle,* Mr. Tegeler conveyed all of the Collateral from BCGC to himself, and then conveyed the same assets to FWM without giving any consideration to BCGC and

149

without obtaining Trustmark's written consent as required by the Loan Documents. [Finding of Fact Nos. 26–27]. Mr. Tegeler accomplished the conversion when he signed documents—i.e., the Conveyance and the Asset Purchase Agreement—on August 20, 2014, and August 21, 2014, respectively, allowing FWM to obtain title to the Collateral. [*Id.*]. Unlike *In re Gagle*, Mr. Tegeler did not sell the assets in order to use the sale proceeds to pay family expenses. However, like *In re Gagle*, he conveyed the Collateral for his own personal benefit. As consideration for conveying those assets to FWM, Mr. Tegeler received a 50% ownership interest in FWM (an interest, it should be noted, on which he did not grant a lien to Trustmark). Soon after Mr. Tegeler obtained his interest in FWM, he went on FWM's payroll because he became an officer of FWM. Ms. Tegeler—who also became an officer of FWM—soon thereafter requested an advance under the Note and then transferred the entire amount of the loan proceeds from BCGC to FWM for payment of FWM's operational expenses. [Finding of Fact No. 41]. Subsequently, the Collateral was foreclosed upon by two of FWM's lenders, after FWM had defaulted under its loan agreements with these lenders. [Finding of Fact No. 52]. At the moment Mr. Tegeler conveyed the Collateral to himself, he intentionally injured Trustmark's property, i.e., its security interest in the Collateral, because he knew—or objectively should have known—that the Collateral was pledged to Trustmark and that transferring title of these assets to himself and then to FWM would impair Trustmark's property right (i.e., its lien on the Collateral), given that FWM's lenders already had a properly perfected lien on FWM's assets. His actions alone constitute not only a breach of Trustmark's Security Agreement, among other contracts, but also constitute acts of conversion that are willful and malicious.

They are willful because Mr. Tegeler knew—or is charged with knowing[71]—that Trustmark had a lien on the Collateral and he knew that transferring the Collateral to FWM would impair this lien, as the security agreements of FWM's existing lenders granted FWM a lien on the Collateral as soon as it was transferred to FWM.[72]  *In re White*, 519 B.R. at 840 ("Willful injury may also be established indirectly by evidence of both the debtor's knowledge of the creditor's lien rights and the debtor's knowledge that the conduct will cause particularized injury."); *J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 802 (Bankr. N.D. Ohio 2001).

> [I]n the context where a debtor has converted a creditor's collateral, it has been held . . . that the "willful" requirement of § 523(a)(6) may be indirectly established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the creditor's lien rights; and (2) the debtor knew that his conduct would cause injury to those rights.

*In re Jones*, 276 B.R. at 802.  Mr. Tegeler's acts are malicious because his acts of transferring the Collateral were substantially certain to cause Trustmark injury: its first lien on the Collateral was eviscerated by virtue of the fact that the security agreements of FWM's existing lenders subsumed the Collateral as soon as it was transferred to FWM.  *In re White*, 519 B.R. at 839 ("The term 'malicious' requires proof 'that the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause the injury.'") (quoting *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004)).

---

[71] Mr. Tegeler claims that he did not read the Conveyance and the Asset Purchase Agreement and, additionally, at certain points in the trial, claimed that he did not read the Loan Documents.  *See* Credibility Section.  However, there is no question that he signed all of these documents, and therefore is charged with knowing what is set forth therein.  *Espinoza*, 622 F.3d at 441 ("Texas law charges a person with knowledge of the contents of a document he or she signs."); *Venture Cotton Coop.*, 494 S.W.3d at 199 ("A party is bound to the contract he signs regardless of whether he read it . . . ."); *Donovan*, 747 F.2d at 308 n.4 (recognizing the "long standing and generally accepted principle of contract law that, absent fraud or mental incompetence, a person who intentionally signs a document is bound by its contents, whether or not he in fact read the document.").

[72] As the 50% owner of FWM, Mr. Tegeler is charged with having familiarity with the financial affairs of this company.  *See Moore v. Rock Creek Oil Corp.*, 59 S.W.2d 815, 818–19 (Tex. Comm'n App. 1933) ("The stockholders of a corporation are the beneficial owners of the corporate property, and are therefore vitally interested in knowing the true condition of its affairs.").

Ms. Tegeler also harmed Trustmark's security interest at a separate and distinct time from the injury inflicted by her husband. After Trustmark received the false borrowing base certificate that Ms. Tegeler provided on September 17, 2014, Trustmark advanced $230,000.00 under the Note by wire transferring this amount into BCGC's operating account on September 18, 2014. [Finding of Fact No. 40]. Once these funds were deposited into BCGC's account, they became BCGC's property; and once they became BCGC's property, Trustmark's lien under the Loan Documents attached to these proceeds. [Finding of Fact No. 20, 41]. Hence, when Ms. Tegeler moved these proceeds over to FWM's account in order to pay the operational expenses of FWM (a company owned 50% by her husband)—with BCGC receiving no consideration— she knew, or objectively should have known, that the proceeds were pledged to Trustmark and that funneling these funds to FWM without giving consideration to BCGC in return would impair Trustmark's property right—i.e., its lien on the funds—and also impair Trustmark's ability to ever collect amounts owed under the Note due to BCGC having no assets whatsoever on which Trustmark could execute upon obtaining a judgment. Her actions not only breached the Loan Documents, but also constitute acts of conversion that are willful and malicious.

They are willful because Ms. Tegeler knew—or is charged with knowing[73]—that Trustmark had a lien on all proceeds on deposit at BCGC's operating account and she knew that transferring these proceeds to FWM's account would destroy this lien. *In re White*, 519 B.R. at 840 ("Willful injury may also be established indirectly by evidence of both the debtor's

---

[73] There is nothing in the record indicating whether Ms. Tegeler read the Loan Documents, the Conveyance, and the Asset Purchase Agreement. However, she knew about these documents and the effect thereof through her discussions with Stephens, and, additionally, she signed the Loan Documents. Hence, like her husband, she is charged with knowing what is set forth therein. *Espinoza*, 622 F.3d at 441 ("Texas law charges a person with knowledge of the contents of a document he or she signs."); *Venture Cotton Coop.*, 494 S.W.3d at 199 ("A party is bound to the contract he signs regardless of whether he read it . . . ."); *Donovan*, 747 F.2d at 308 n.4 (recognizing the "long standing and generally accepted principle of contract law that, absent fraud or mental incompetence, a person who intentionally signs a document is bound by its contents, whether or not he in fact read the document.").

knowledge of the creditor's lien rights and the debtor's knowledge that the conduct will cause particularized injury."); *In re Jones*, 276 B.R. at 802.

> [I]n the context where a debtor has converted a creditor's collateral, it has been held . . . that the "willful" requirement of § 523(a)(6) may be indirectly established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the creditor's lien rights; and (2) the debtor knew that his conduct would cause injury to those rights.

*In re Jones*, 276 B.R. at 802.  Ms. Tegeler's acts are malicious because transferring the loan proceeds from BCGC's account to FWM's account was substantially certain to cause Trustmark injury: its first lien on these proceeds was completely destroyed when these funds were transferred to FWM's account so that FWM could use all of their proceeds to pay its operating expenses.  *White*, 519 B.R. at 839 ("The term 'malicious' requires proof 'that the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause the injury.'") (quoting *In re Moore*, 357 F.3d at 1129).  Moreover, by transferring the $230,000.00 from BCGC's account to FWM's account, without BCGC receiving any consideration in return, Ms. Tegeler completely deprived BCGC of any assets, which, in turn, meant that Trustmark had no assets on which it could execute or garnish should Trustmark ever obtain a judgment against BCGC due to its failure to timely pay the balance owed under the Note.

The Debtors' conduct here can be contrasted with the conduct of the debtor in *In re White* to underscore why the Debtors' acts were willful and malicious towards Trustmark.  In *In re White*, the debtor sold a machine and infused the sale proceeds back into his 100%-owned company's operations.  The creditor holding a lien on the machine sought a judgment of nondischargeability against the debtor based upon § 523(a)(6).  The bankruptcy court held that although there was a lien on the machine when the debtor sold it, the debtor did not act willfully and maliciously because: (1) the contract between the debtor and the creditor was poorly worded,

and the debtor therefore did not understand that there was a lien on this particular asset; and (2) the debtor plowed the sale proceeds back into the corporate borrower's operations, rather than into his own pocket. *In re White*, 519 B.R. at 839.  By contrast, in the suit at bar, the Loan Documents are unambiguous and the Debtors have known all along that Trustmark had a valid lien on the assets of its corporate borrower (i.e., BCGC); Mr. Tegeler transferred the Collateral to FWM in order to obtain a personal benefit—i.e., to receive a 50% stock interest in FWM—while ensuring that BCGC received no consideration whatsoever; Ms. Tegeler thereafter deliberately gave Trustmark a borrowing base certificate that falsely represented that BCGC had accounts receivable of $389,324.00 as of September 17, 2014, when she knew that her husband, the previous month, had transferred all of BCGC's assets (including accounts receivable) over to FWM; and then, when Trustmark advanced $230,000.00 to BCGC in reliance upon the borrowing base certificate, Ms. Tegeler transferred these funds from BCGC's account over to FWM's account so that these monies could be used to pay FWM's debts—which personally benefitted the Debtors because they had a community property 50% ownership interest in FWM. Meanwhile, Ms. Tegeler ensured that BCGC received no consideration when she transferred the $230,000.00 out of BCGC's operating account to a non-borrower third party, i.e., FWM—which deprived Trustmark of any assets upon which to execute or garnish if BCGC failed to perform under the Loan Documents.  All in all, the actions of the Debtors here are in stark contrast to the actions of the debtor in *In re White* and leave no doubt that their actions were willful and malicious.

In sum, Trustmark has met its burden of proving that the Debtors committed a willful and malicious injury because there is sufficient evidence supporting an objective substantial certainty of harm to Trustmark's security interest in BCGC's assets.

2. <u>Subjective Motive to Cause Harm</u>

In analyzing the subjective motive to cause harm, the Honorable Marvin Isgur has noted that "the Fifth Circuit equated having a subjective motive to harm to acting with the desire to cause injury." *Guerra & Moore, Ltd. v. Cantu (In re Cantu)*, 400 B.R. 104, 108 (Bankr. S.D. Tex. 2008) (citing *In re Miller*, 156 F.3d at 604. "Moreover, § 523(a)(6)'s formulation triggers in the lawyer's mind the category 'intentional torts,' which generally require that the actor intend the *consequences* of an act, not simply the act itself." *Kawaauhau*, 523 U.S. at 58 (emphasis in original). Consent is a valid defense to conversion and a justification for finding a debt to be dischargeable. *See Mack v. Newton*, 737 F.2d 1343, 1355 (5th Cir. 1984); *In re Gagle*, 230 B.R. at 183. There are four reasons that this Court finds the Debtors had a subjective motive to cause harm to Trustmark: (1) the Debtors actively misrepresented their intentions in order to cause Trustmark to loan money; (2) the Debtors failed to obtain Trustmark's written consent to the transfers of the Collateral to FWM; (3) the Debtors failed to make any scheduled payments under the Note; and (4) the Debtors' defense that they relied on Stephens' advice is without merit.

Perhaps the most telling evidence of the subjective motive to harm Trustmark was the scheme that the Debtors carried out to have the $230,000.00 advanced to BCGC under the Note. First, they needed to actually establish a line of credit for BCGC with Trustmark. Hence, they submitted a loan application for BCGC representing that the loan proceeds would be used for BCGC's operations. [Finding of Fact No. 13(d)]. Simultaneously, while they were applying to Trustmark for a loan, they were negotiating with FWM, and when that company's attorney (Dinerstein) raised the need to obtain a waiver from Trustmark, Ms. Tegeler told Stephens that such a request would "raise red flags" [Finding of Fact No. 16(k)]; therefore, the Debtors made no such request from Trustmark, and, instead, persuaded FWM's counsel to delete the condition

precedent requiring the Debtors to obtain a waiver from Trustmark.[74]  [Finding of Fact No. 24].

Rather, the Debtors proceeded to the loan closing without making any disclosures to Trustmark

about FWM so that Trustmark would establish the line of credit facility for BCGC.  [Finding of

Fact No. 23].  The Debtors knew that by misrepresenting how the loan proceeds were to be used

and making no disclosures about FWM, it would cause Trustmark to establish a line of credit

facility for BCGC—which resulted in a loan of $230,000.00 that Trustmark would never be able

to collect.  [Finding of Fact No. 13(d)].  Mr. Tegeler then used the existence of the line of credit

facility to establish the relationship with FWM by executing the Conveyance and the Asset

Purchase Agreement and becoming a 50% owner of FWM.  [Finding of Fact Nos. 26–27].  This

"evil motive"—namely, lying to Trustmark to be financially enriched—underscores that the

Debtors knew the harm Trustmark would suffer from their actions because it is precisely the

harm that occurred.

      The level of their skullduggery is underscored by the fact that, not only did they falsely

represent that the loan proceeds would be used for BCGC's operations when, in fact, they knew

that they were going to be used for FWM's operations, but they actually kept open BCGC's

operating account at Frost Bank after all of BCGC's assets were transferred to FWM; and then,

approximately one month after this transfer of assets, submitted a false borrowing base certificate

to Trustmark in order to convince Trustmark to advance under the Note—which Trustmark did

by wire transferring $230,000.00 into BCGC's operating account.  [Finding of Fact No. 40].  Ms.

Tegeler then drained this account by moving these funds to FWM's account, with no

consideration passing to BCGC.  [Finding of Fact No. 41].  If, as the Debtors have insisted all

along, BCGC had really merged with FWM, then BCGC's operating account would have been

closed on or about August 21, 2014, when all of BCGC's assets were transferred to FWM (i.e.,

---

[74] *See supra* note 31.

when the alleged "merger" occurred).  But, the Debtors did not close this account; rather, they kept it because they knew that they were going to lure Trustmark into advancing monies under the Note and they knew that the only manner in which such an advance would occur would be done through Trustmark wire transferring funds into the account of BCGC—i.e., into the account of Trustmark's borrower.  If BCGC's operating account had been closed on August 21, 2014, the Debtors knew that subsequently, when they would be requesting a drawdown under the Note, Trustmark would not be able to wire the funds into a closed account, which in turn would cause Trustmark to hold off lending the money and, instead, asking questions as to why BCGC's account had been closed.  Given the need for cash infusions into FWM—which, it must be remembered, was now owned 50% by Mr. Tegeler—the Debtors took no chances: they told Trustmark absolutely nothing.[75]

The Debtors assert that they lacked the requisite intent to injure Trustmark because Trustmark knew about the transaction that BCGC and FWM were going to be effectuating—but had not yet effectuated—at the time of the loan closing on August 18, 2014.  Stated differently, the Debtors assert that even though the Loan Documents precluded an asset sale or change in BCGC's financial condition without Trustmark's written consent, the Debtors conveyed BCGC's assets to FWM with Trustmark's knowledge of this impending transaction.  Trustmark contends that it had no knowledge of the BCGC–FWM transaction that was in the works, and that the Debtors failed to obtain prior written consent to convey the Collateral.

---

[75] The only reason that Trustmark learned of the transfer of BCGC's assets to FWM is because the Debtors failed to provide monthly borrowing base certificates (for the months ending September 30, 2014, and October 31, 2014) as required by the Loan Documents, which caused Petrilla to call Ms. Tegeler in November of 2014, at which time she informed Petrilla about FWM's existence.  [Finding of Fact No. 45].  Petrilla requested documentation about FWM, which led to Ms. Tegeler sending to her the Asset Purchase Agreement.  [Finding of Fact No. 46].  In sum, if Petrilla had not affirmatively called to inquire why the Debtors had failed to submit the monthly borrowing base certificates, Trustmark would not have learned about FWM's existence in November of 2014.  At least there is no evidence that the Debtors were going to affirmatively contact Trustmark to alert it of FWM's existence and the transferring of BCGC's assets (including the $230,000.00 of loan proceeds) over to FWM, with no consideration given to BCGC.

In the suit at bar, there is no evidence to support a finding that Trustmark consented, either by its actions or by inaction, to Mr. Tegeler's conveyance of the Collateral and the resulting destruction of its security interest in the Collateral. At trial, Petrilla credibly testified that the Debtors never told her at their initial meeting about any merger, and this Court believes her.[76] Even if Mr. Tegeler did state to her that a merger would occur, no merger actually occurred here. If BCGC actually had effectuated a corporate merger, the surviving corporation—FWM—would have assumed the debts and business obligations of BCGC and BCGC's operating accounts would have been closed. *Coleman v. Bank of N.Y. Melon*, No. 3:12–CV–4783–M–BH, 2014 WL 3827493, at *10 n.11 (N.D. Tex. Aug. 4, 2014); *Enis v. Bank of Am., N.A.,* No. 3:12–CV–0295–D, 2012 WL 4741073, at *1 n.2 (N.D. Tex. Oct. 3, 2012). However, this did not happen. In fact, an asset sale occurred—that is why the governing document is entitled "Asset Purchase Agreement"—which left BCGC as an empty shell corporation. [Finding of Fact No. 27]. Indeed, Mr. Tegeler sold all of the Collateral he owned to FWM free and clear of any and all liens, thereby harming Trustmark's security interest. [*Id.*]. Paragraph 4.18 of the Asset Purchase Agreement exemplifies the destruction of Trustmark's security interest, wherein it provides, in part, "Pursuant to the distribution from BC Gulf Coast to [Mr. Tegeler], [Mr. Tegeler] assumed BC Gulf Coast's *unsecured*, *uncollateralized*, *non-guaranteed* line of credit from [Trustmark], in the aggregate principal amount of $300,000.00 (the "Seller LOC"[77])." [Finding of Fact No. 29] (emphasis added). This characterization of the Note from Trustmark certainly was not true. Trustmark's Loan Documents all unequivocally show that the Note was secured by the Collateral and that, therefore, the assertions in the Asset Purchase Agreement that the Note was unsecured were dead wrong. All in all, the evidence

---

[76] *See* Credibility Section.

[77] The reference to "Seller LOC" is a reference to the line of credit that BCGC established at Trustmark.

reflects that the Debtors failed to obtain valid consent from Trustmark, and they therefore cannot defeat Trustmark's § 523(a)(6) claim with this defense.

Another factor to evaluating the Debtors' state of mind is the abject failure to fulfill their financial obligations—payments of the principal or interest—to Trustmark.  Assuming the Debtors properly merged BCGC with FWM and obtained written consent from Trustmark without the need to update the Loan Documents—which is their stated position in this suit—the Debtors ensured that FWM made no interest payments to Trustmark pursuant to the Note, at least while they were involved in FWM's operations.  The Note, in pertinent part, provides that:

> PAYMENT.  Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on August 12, 2015.  In addition, *Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning September 12, 2014, with all subsequent interest payments to be due on the same day of each month after that.*

[Pl.'s Ex. No. A] (emphasis added).

The Debtors, in their capacities as officers of BCGC, signed the Note on August 18, 2014.  [Finding of Fact No. 22].  Mr. Tegeler, as the sole owner of BCGC, received the loan proceeds of $230,000.00 on September 18, 2014, through the fraudulent acts of his wife—i.e., her submission of the false borrowing base certificate on September 17, 2014.  [Finding of Fact No. 36].  Pursuant to the Note, the Debtors were required to ensure that BCGC made its first interest payment no later than October 12, 2014.  [Pl.'s Ex. No. 1 at 7].  No such payment was made.  In fact, no monthly payments were made until June 2015, and the one payment that was made came from Huebel, not the Debtors; indeed, by this time, the Debtors had resigned from FWM in March 2015.[78]  [Nov. 7, 2017 Tr. 115:15-16].  The only reasonable inference the Court

---

[78] Petrilla testified that Trustmark received a check in the amount of $1,694.33 written by Huebel with FWM, on June 30, 2015, for the payment of BCGC's loan.  [Finding of Fact No. 51].  This is the only payment that Trustmark ever received relating to the Note.  The record is unclear as to why Huebel, as opposed to the Debtors, made this payment.  Perhaps now that the Debtors had departed from FWM, he was hoping that by making such a payment,

can draw from this evidence is that the Debtors never intended to make payments under the Note and that they deliberately and intentionally injured Trustmark without just cause or excuse. This evidence shows that the Debtors intended to harm Trustmark because not only did they set up BCGC as a "straw man" borrower, surreptitiously transfer the Collateral to FWM and transfer the $230,000.00 from BCGC's account to FWM's account, thereby impairing Trustmark's lien by allowing FWM's lenders' liens to attach to the Collateral, but they also failed to ensure that any interest payments were timely made to Trustmark after transferring the Collateral and $230,000.00 to FWM. *Banco Popular, N.A. v. Rodriguez (In re Rodriguez)*, No. 06–31471, 2007 WL 543750, at *7 (Bankr. S.D. Tex. Feb. 15, 2007) ("If the creditor can show that the debtor deliberately and intentionally failed to remit proceeds of collateral to a secured party, as required under a security agreement, the creditor may be able [to] prevail on a claim of non-dischargeability under § 523(a)(6)."); *Karr Plex, Ltd. v. Hollier (In re Hollier)*, 517 B.R. 671, 680 (Bankr. W.D. La. 2014) (finding the debtor's failure to repay the creditor was "substantially certain to cause harm" to the creditor).

In trying to justify the actions that his wife and he took, Mr. Tegeler testified that his wife and he relied upon on the advice of Stephens to sign the Conveyance and the Asset Purchase Agreement. [Oct. 25, 2017 Tr. 16:13–18:14]. Indeed, Mr. Tegeler testified that to avoid tax consequences, on the advice of Stephens, he knowingly conveyed the Collateral to himself before conveying the Collateral to FWM. [Oct. 26, 2017 Tr. 26:17–27:8]. Reliance on the advice of a professional may refute a person's intent to willfully commit an act. *United States v. Pettigrew*, 77 F.3d 1500, 1520 (5th Cir. 1996) (finding that good faith reliance on the advice of a

---

Trustmark would provide a line of credit facility to FWM similar to the one that it had provided to BCGC. However, by June 2015, Huebel had already refused to sign a personal guaranty for the balance owed by BCGC under the Note, and, moreover, Trustmark had already retained counsel to collect the amount owed under the Note [Finding of Fact No. 48, 50]—so there was certainly no chance at this late date that Trustmark was going to provide any financing to FWM.

professional determines whether a person possessed the requisite intent); *United States v. Impastato*, 543 F. Supp. 2d 569, 574 (E.D. La. 2008) ("An honest misunderstanding of one's legal duties negates the willfulness requirement . . . ."). In support of this defense, the Debtors must prove that: (1) the professional is competently qualified; (2) they fully disclosed all the relevant information to the professional; and (3) that good faith reliance on such professional advice was reasonable in light of the circumstances. *See In re Wyly,* 552 B.R. 338, 485 n.772 (Bankr. N.D. Tex. 2016) (citing *Neonatology Assocs., P.A. v. Comm'r of Internal Revenue*, 115 T.C. 43, 99 (T.C. 2000)).

The Court finds that the Debtors have satisfied the first two elements because Stephens is a duly licensed CPA and the Debtors certainly disclosed all of their relevant financial information and plans to him—indeed, he had been doing the tax returns of BCGC and the Debtors' personal tax returns for several years [Finding of Fact Nos. 11(b), (c)]; however, they have failed to satisfy the third element because their reliance was not in good faith. The record reveals that Stephens was trying to simultaneously serve two masters whose interests conflicted. On the one hand, Stephens wanted to remain in Trustmark's good graces because he wanted the bank to continue to use his auditing company, which generated income for him personally;[79] and, one way to remain in the bank's good graces was to refer yet another new borrower to the bank—in this case, BCGC—and help to ensure that the loan to this entity was put on

---

[79] At trial, Stephens denied that he wanted to remain in Trustmark's good graces:

| Plaintiff's Counsel: | Okay. Is there any chance at all that the reason why you've been giving the testimony today about lack of knowledge on these 2014 e-mails that we have looked at, any chance at all that it is because you want to preserve your relationship with Trustmark? |
| --- | --- |
| Stephens: | Zero. |

[Oct. 26, 2017 Tr. 125:2-7]. This Court does not believe his testimony. There is no question that he wanted Trustmark to continue to use his auditing company.

Trustmark's books.  [Finding of Fact No. 11].  On the other hand, Stephens wanted to curry favor with the Debtors, as he wanted to continue to be their personal CPA and also wanted to serve as the CPA for their business.  [*Id.*].  Knowing that disclosure to Trustmark about the Debtors' negotiations with FWM might kill, or at least delay the bank's approval of extending financing to BCGC, Stephens made sure that he said nothing to the bank.  [Finding of Fact No. 16].  Indeed, he was doubtless concerned that if he did disclose the negotiations to the bank, the bank might cease sending any further business to his audit company.  The Debtors knew that Stephens had an existing relationship with Trustmark, and so they knew that the bank trusted him and that his involvement would maximize the chances of obtaining the line of credit from Trustmark quickly.  In sum, Stephens was trying to have his cake and eat it too: he wanted to earn more income by having his audit company perform audits for Trustmark while also generating fees for himself by assisting the Debtors in obtaining a loan for BCGC from Trustmark and negotiating with FWM and, thereafter, by providing accounting services to the Debtors' business (which he knew would be FWM) and to the Debtors personally.

One court has thoroughly explained the lack of good faith in reliance upon the advice of a person who profits considerably from a professional's advice:

> Reliance on a professional who stands to profit considerably from a taxpayer's participation in a transaction on which that professional advises—or who is not an independent professional—may not be reasonable.  This is because, in order to establish reasonable cause or to negate fraudulent intent, a taxpayer must rely on a professional in good faith.
>
> . . .
>
> Some courts have defined a promoter as "an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction."
>
> . . .

The Federal Circuit has noted that "[a]dvice hardly qualifies as disinterested or objective if it comes from parties who actively promote or implement the transactions in question." According to the Fifth Circuit, "taxpayers may not rely on someone with an inherent conflict of interest," *i.e.,* a promoter.

*In re Wyly*, 552 B.R. at 485–86 (footnotes omitted) (first quoting *Stobie Creek Invs LLC v. United States*, 608 F.3d 1366, 1382 (Fed. Cir. 2010); then quoting *Chamberlain v. Comm'r of Internal Revenue*, 66 F.3d 729, 732 (5th Cir. 1995)).   The Court finds that Stephens had an inherent conflict of interest to ensure that not only the Trustmark/BCGC loan transaction closed, but also that the BCGC–FWM asset sale was consummated.   Indeed, Stephens attended the initial meeting between the Debtors and Petrilla to introduce the Debtors to Trustmark; he attended the loan closing on August 18, 2014; and he played a major role in structuring the two transactions (i.e., the Conveyances and the Asset Purchase Agreement) that occurred right after the loan closing in order to accomplish the Debtors' objective of becoming owners and decision-makers at FWM.   [Finding of Fact No. 11(d)].   On the previous drafts of the Asset Purchase Agreement dated August 1, 2014, BCGC was identified as the seller and FWM was identified as the buyer.   [Pl.'s Ex. No. 17 at 1].   In the later drafts of the Asset Purchase Agreement,[80] as well as the final draft, Mr. Tegeler was identified as the seller and FWM was identified as the buyer. [Defs.' Ex. No. 39 at 1; Pl.'s Ex. No. 19 at 1; Pl.'s Ex. No. 10 at 1].   When asked for the reason behind this change, Mr. Tegeler testified that Stephens was responsible for structuring the transaction to further assist him in avoiding tax consequences.   [Oct. 26, 2017 Tr. 26:17–27:8]. Stephens was so entangled in the transaction from the outset that, coupled with his financial

---

[80] The later drafts of the Asset Purchase Agreement were dated August 10, 2014, August 19, 2014, and August 20, 2014.

compensation,[81] it is clear to this Court that any reliance on Stephens' professional advice was not in good faith.

Furthermore, the evidence reveals the Debtors are sophisticated business owners.  Mr. Tegeler testified that he was able to borrow $2.7 million from a friend based on his twenty-five years of business experience.  [Finding of Fact No. 3].  Ms. Tegeler testified that she has been in accounting and auditing for her husband's companies for many years.  [Finding of Fact No. 4]. The Debtors were both corporate officers of BCGC.  [Finding of Fact Nos. 4, 6].  The Debtors were both present at the loan closing and knew—or are charged with knowing—of the importance of preserving Trustmark's collateral position.  The Debtors both signed, in their capacities as officers of BCGC, all of the Loan Documents and were aware of all of the representations and obligations set forth in these documents.  [Finding of Fact No. 22].  Not only did Mr. Tegeler sign the Asset Purchase Agreement expressly acknowledging his sophistication, but he also testified that he is sophisticated and experienced.  [Finding of Fact No. 3].  Moreover, the Debtors were represented by legal counsel (i.e., LeBlanc) at the time of the loan closing and the transfer of BCGC's assets to FWM.  [Finding of Fact No. 10].  The Debtors were both responsible for the transfers of BCGC's assets.  The Debtors knew, or were charged with knowing, that the transfer of the Collateral to Mr. Tegeler and then to FWM, the funneling of the loan proceeds of $230,000.00 from BCGC's account over to FWM's account (with no consideration passing to BCGC), the use of these proceeds to pay FWM's expenses and the

---

[81] Stephens' first invoice to BCGC dated July 29, 2014, was for $21,000.00, and contains the following description of his services: "In connection with meetings, e-mails, correspondence, financials, etc. for negotiation and completion of acquisition. 85 hours@ $300/hr."  [Finding of Fact No. 11(d)].  Stephens' second invoice to BCGC dated September 4, 2014, was for $8,600.00, and contains the following description of his services: "In connection with meetings, calls, correspondence with client and bank, document review, and related matters regarding negotiation and completion of 2nd transaction. 34.5 hours x $250/hr."  [*Id.*].  So, there is no question that Stephens generated a lot of income for his CPA firm by representing the Debtors and BCGC.  The record is unclear as to how much income he generated from providing services to Trustmark, but there is no question that Trustmark employed his company to render services on its behalf.

subsequent failure to make timely payments to Trustmark under the Note, were all breaches of the Loan Documents.  Thus, even without reliance upon Stephens' advice, the Debtors' business acumen, coupled with their active participation, further proves that they possessed the subjective intent to convert the Collateral, which included using the loan proceeds of $230,000.00 for FWM's operations in addition to transferring BCGC's assets in existence as of August 21, 2014 (i.e., the date of the Asset Purchase Agreement) to FWM.  To reiterate, not only did the Debtors orchestrate the conversion of the Collateral through the execution of the Conveyance and the Asset Purchase Agreement on August 20, 2014, and August 21, 2014, but they also converted assets of BCGC (i.e., the $230,000.00) a third time.  [Finding of Fact Nos. 26–27].  After Trustmark deposited the loan proceeds of $230,000.00 into BCGC's account, these proceeds became BCGC's property, and Trustmark had a lien on these proceeds pursuant to the Loan Documents.  [Finding of Fact No. 20, 41].  Ms. Tegeler then converted these proceeds by transferring them over to FWM's account by writing three separate checks; meanwhile, FWM gave no consideration to BCGC in return for the transfer of these monies—which FWM used to pay its own expenses.  [*Id.*].

In sum, this Court finds that the Debtors had subjective motive to cause harm to Trustmark.  They intended to: (1) deprive Trustmark of its valid lien on the Collateral; (2) to deceive Trustmark with a false borrowing base to advance $230,000.00 under the Note; and (3) to deprive Trustmark of its valid lien on these proceeds by transferring them to FWM and then using these proceeds to pay not the obligations of BCGC, but rather the obligations of FWM.

For all the reasons set forth above, this Court finds that Trustmark has met its burden of proving the elements of its § 523(a)(6) claim against the Debtors.  Therefore, the $256,716.54 Debt for which each of them is jointly and severally liable is a nondischargeable obligation.  The

Court now addresses Trustmark's request that it be awarded both pre- and post-judgment interest and that these sums be declared to be nondischargeable obligations of the Debtors.

## K.  Pre- and Post-Judgment Interest

### 1.  Pre-Judgment Interest[82]

At first blush, it would appear that Trustmark is not entitled to pre-judgment interest because unsecured claimants—which is the category into which Trustmark fits [Finding of Fact 52]—are generally not entitled to recover post-petition interest.  11 U.S.C. § 502(b)(2).  Thus, the knee-jerk reaction would be that Trustmark is not entitled to recover any interest under the Note that would otherwise accrue from the Petition Date up until the date that this Court enters judgment in this adversary proceeding.  However, "[i]f the claim is nondischargeable, so also is the interest that continues to accrue on that claim."  *In re Sullivan*, 195 B.R. 649, 653 (Bankr. W.D. Tex. 1996).[83]    Here, this Court has held that the claim held by Trustmark is nondischargeable.  Accordingly, pursuant to the holding in *In re Sullivan*, this Court finds that Trustmark is entitled to pre-judgment interest—i.e., interest that has accrued under the Note from the Petition Date up to the date that this Court enters judgment.  The question now is how to calculate the amount of pre-judgment interest.

Interest under the Note accrues at a per diem rate of $28.75.  The Petition Date was November 7, 2016.  The date that this Court is entering judgment on the docket is June 8, 2018.

---

[82] The Court wants to emphasize that the term "pre-judgment interest" refers to interest that accrues between the date of the filing of the Complaint (i.e., February 9, 2017) initiating this pending adversary proceeding and the date that this Court enters judgment on the docket.  Thus, "pre-judgment interest" does not encompass the interest that accrued under the terms of the Note prior to the Petition Date (which interest totals $14,447.22).

[83] The Court notes that the *In re Sullivan* opinion gives a detailed discussion of case law supporting the conclusion that if a claim is nondischargeable, then interest continues to accrue on that claim after the filing of the debtor's bankruptcy petition.  This Court finds the reasoning set forth therein to be very persuasive and adopts it in the suit at bar.

Thus, interest has accrued for 578 days, which means that the total amount of interest that has accrued is $16,617.50.[84]

When the pre-judgment interest of $16,617.50 is added to the outstanding principal, accrued unpaid interest, and late charges owed under the Note as of the Petition Date—i.e., $256,716.54—the total amount of the nondischargeable debt owed by the Debtors (excluding attorneys' fees and costs) is $273,334.04.

2.   Post-Judgment Interest on the Amount of $273,334.04

28 U.S.C. § 1961(a) sets forth that interest "shall be allowed on any money judgment in a civil case recovered in a district court." This statute also "applies to judgments entered by a bankruptcy court." *Ocasek v. Manville Corp. Asbestos Disease Comp. Fund*, 956 F.2d 152, 154 (7th Cir. 1992). Further, the statute sets forth that the interest will be at the rate of the "weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a) (footnote omitted). For the week of June 4, 2018, to June 10, 2018, the post-judgment interest rate for federal judgments is 2.23% per annum. *Post-Judgment Interest Rates*, United States District & Bankruptcy Court Southern District of Texas, http://www.txs.uscourts.gov/page/post-judgment-interest-rates (last visited June 8, 2018). Accordingly, the Court will grant Trustmark's request for post-judgment interest, and the rate that will be in effect on the date of the entry of the judgment will be 2.23% per annum. *In re Beveridge*, 416 B.R. at 581–82 (awarding post-judgment interest on debt that was declared nondischargeable pursuant to § 523(a)(2)(A)); *Boyington Capital Grp., LLC v. Haler (In re Haler)*, Adv. No. 10-4217, 2016 WL 825668, at *14–15 (Bankr. E.D. Tex. Mar. 2, 2016)

---

[84] See Appendix attached to this opinion discussing this Court's alternative ruling on the calculation on post-petition interest.

(same); *Gronewoller v. Mascio (In re Mascio)*, No. 03-1482 MER, 2014 WL 2621201, at *9 (Bankr. D. Colo. June 12, 2014) (same).

This Court's award of post-judgment interest will accrue during the period from the date the judgment is rendered until the date the judgment is satisfied. *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 331–32 (5th Cir. 1995). Further, the Court concludes that all post-judgment interest is nondischargeable, once again relying upon the language in *Cohen* that the nondischargeable debt includes "other relief." *See Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998); *Fire Prot. Servs., LP v. Ayesh (In re Ayesh)*, 465 B.R. 443, 449–50 (Bankr. S.D. Tex. 2011); *Miller v. Lewis*, 391 B.R. 380, 385 (E.D. Tex. 2008).

**L. Attorneys' Fees, Costs, and Expenses**

    1. <u>Attorneys' Fees</u>

        *a. Applicable Law*

With respect to Trustmark's request for attorneys' fees, the holding in *Cohen* is that a nondischargeable debt in a § 523(a)(2)(A) claim encompasses not only the debt created by the fraud, but also an award of attorneys' fees, among other damages. Stated differently, the word "debt" in § 523(a)(2)(A) includes any form of damage that can be causally linked to the conduct that gives rise to the nondischargeable debt. *Cohen*, 523 U.S. at 220; *Light v. Whittington (In re Whittington)*, 530 B.R. 360, 386–88 (Bankr. W.D. Tex. 2014). Here, the Court concludes that the attorneys' fees incurred by Trustmark for the prosecution of the adversary proceeding are directly linked to the Debtors' conduct that gave rise to the nondischargeable obligation—i.e., the $256,716.54 Debt—owed by the Debtors to Trustmark. *Ritz*, 136 S. Ct. at 1589 (holding that "any debts 'traceable to' the fraudulent conveyance . . . will be nondischargeable under § 523(a)(2)(A)"). The link is this: but for the Debtors' false representations, false pretenses, actual

fraud, and willful and malicious injury to the Collateral on which Trustmark had a lien, there could be no nondischargeable obligation owed by the Debtors to Trustmark.

Of course, under the so-called "American Rule," each party pays its own attorneys' fees arising out of litigation except when specific authority granted by statute or contract states otherwise. "Since the Bankruptcy Code does not address whether creditors can recover attorney's fees in nondischargeability cases, they can only do so if allowed by another statute or by contract." *Schwertner Backhoe Servs., Inc. v. Kirk (In re Kirk)*, 525 B.R. 325, 330 (Bankr. W.D. Tex. 2015) (footnote omitted). Indeed, the Fifth Circuit has held that creditors can recover attorneys' fees only if there is a contractual or statutory right to fees under state law. *See In re Jordan*, 927 F.2d at 226–27; *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1285–86 (5th Cir. 1992).

### b. *Application of the Law to the Suit at Bar*

In the suit at bar, the Court finds that there is a contractual basis for awarding attorneys' fees to Trustmark. First, the Guaranties that each of the Debtors signed promise to pay Trustmark "all legal expenses related thereto permitted by law, [Trustmark's] reasonable attorneys' fees, arising from any and all debts, liabilities, and obligations of every nature or form, now existing or hereafter arising or acquired, that [BCGC] individually or collectively or interchangeably with others, owes or will owe [Trustmark]." [Pl.'s Ex. No. 5 at 23; Pl.'s Ex. No. 6 at 26].

Second, because Trustmark has pierced BCGC's corporate veil to impose liability for the debt owed to Trustmark on the Debtors personally, the Debtors are also liable for the attorneys' fees incurred by Trustmark if any of the Loan Documents between BCGC and Trustmark contain language awarding attorneys' fees. *See Wachovia Secs., LLC v. Jahelka*, 586 F. Supp. 2d 972,

169

1014 (N.D. Ill. 2008) (piercing the defendant's corporate veil to hold the individual defendants liable for the judgment, including the contractually obligated attorneys' fees), *aff'd in part and vacated in part by Wachovia Secs., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743 (7th Cir. 2012); *Menetti v. Chavers*, 974 S.W.2d 168, 171 n.5 (Tex. App.—San Antonio 1998, no pet.) ("If the corporate veil is pierced, the shareholders are considered the equivalent of the corporation . . . . The corporation's liability becomes the shareholder's liability absolutely."). Two of the Loan Documents contain language expressly authorizing the payment of any attorneys' fees and costs incurred by Trustmark in collecting the amounts due under the Note. First, the Note states that "Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees."  [Pl.'s Ex. No. 1 at 2]. Second, the Security Agreement also contains the following language:

> Attorneys' Fees; Expenses.  Grantor agrees to pay upon demand all Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

[Pl.'s Ex. No. 3 at 3].

The Court also finds that there is a statutory basis for awarding fees to Trustmark. Specifically, Trustmark had to successfully invoke § 24.005 of TUFTA to be able to pierce the corporate veil of BCGC under § 21.223(b).  To do this, Trustmark had to allege and prove that several badges of fraud existed under § 24.005(b).  Section 24.008(a) of TUFTA sets forth that "[i]n an action for relief against a transfer . . . under this chapter, a creditor . . . may obtain . . .

any other relief the circumstances may require." And, § 24.013 of TUFTA sets forth that "[i]n any proceeding under this chapter, the court may award costs and reasonable attorney's fees as are equitable and just." Here, the Court finds that the suit at bar constitutes a "proceeding under this chapter" because it necessarily involves TUFTA: Trustmark had to prove up the badges of fraud as set forth in TUFTA in order to prove that Mr. and Ms. Tegeler's orchestration of the transfer of BCGC's assets to FWM constituted "actual fraud." *See In re Ritz*, 832 F.3d at 568–69. Because this suit is a proceeding under TUFTA, this Court is authorized to award "any other relief the circumstances may require." Tex. Bus. & Com. Code § 24.008(a)(3)(C). And here, this Court finds that such circumstances include awarding Trustmark its reasonable attorneys' fees as allowed by § 24.013 of TUFTA. There is ample case law supporting such an award when the plaintiff has proven fraudulent transfers. *See, e.g.*, *Tow v. Speer*, No. H-11-3700, 2015 WL 1058080, at *16 (S.D. Tex. Mar. 10, 2015) (internal citations and quotations omitted) ("TUFTA permits a court to award costs and reasonable attorney's fees as are equitable and just."); *Walker v. Anderson*, 232 S.W.3d 899, 919–20 (Tex. App.—Dallas 2007, no pet.). Indeed, it would be inequitable to require Trustmark to prove actual fraud under TUFTA without compensation for the arguments therein. Thus, the Court concludes that Trustmark is entitled to its reasonable attorneys' fees for prosecuting this adversary proceeding.

Further, this Court has the authority to determine what amount of fees is reasonable. Fed. R. Bankr. Proc. 7054(b)(2); *see also Perkins v. Standard Oil Co. of Ca.*, 399 U.S. 222, 223 (1970) (per curiam) (mandating the district court to determine reasonable attorneys' fees for litigation, including various appeals); *Dague v. City of Burlington*, 976 F.2d 801, 804 (2d Cir. 1991) (holding that "determination of a reasonable attorney's fee . . . should normally be decided by the district court in the first instance"). Indeed, this Court, rather than an appellate court, is

best situated to review and analyze the evidence presented on a request for fees incurred for litigating in this Court. *Asarco, L.L.C. v. Jordan Hyden Womble Culbreth & Holzer, P.C. (In re ASARCO, L.L.C.)*, 751 F.3d 291, 294 (5th Cir. 2014) ("A bankruptcy court has 'broad discretion' to determine reasonable attorneys' fees, as the 'bankruptcy court is more familiar with the actual services performed and has a far better means of knowing what is just and reasonable than an appellate court can have.'") (quoting *Lawler v. Teofan (In re Lawler)*, 807 F.2d 1207, 1211 (5th Cir. 1987)); *Dague*, 976 F.2d at 804. The evidence presented to prove reasonable attorneys' fees may include "voluminous and detailed records of attorney and staff hours spent on various projects, affidavits regarding reasonable billing rates in the relevant communities at various times during the pendency of the suit" as well as "data and arguments concerning whether, under the overall circumstances of the case, a claimed fee is reasonable." *Dague*, 976 F.2d at 804; *see also Citizens Against Rent Control v. City of Berkeley*, 226 Cal. Rptr. 265 (Cal. Ct. App. 1986) (upholding fees for arguments in state court, appeals, and before the Supreme Court when there were detailed summaries of time expended for staff).

This Court has heard received evidence from Trustmark regarding the services that its law firm rendered on behalf of Trustmark, and the Court has also reviewed the fee bills that Trustmark's attorney has introduced into evidence. As discussed immediately below, the Court finds that the amount of reasonable fees and reasonable expenses to which Trustmark is entitled are $91,728.00 and $6,503.84, respectively.

### c. Trustmark is Entitled to Both its Pre-petition Fees and Post-Petition Fees

Trustmark requests attorneys' fees of $91,728.00. The Debtors have stipulated that they do not object to the reasonableness of Trustmark's post-petition fees, which total $65,797.00.

The Debtors do, however, object to Trustmark's pre-petition fees of $25,931.00 (the "Pre-petition Fees").

The Debtors hinge their argument on *Luce v. First Equipment Leasing Corp. (In re Luce)*, 960 F.2d 1277 (5th Cir. 1992). In *In re Luce*, Billye and Jack Luce ("the Luces") were partners in several partnerships. 960 F.2d at 1279. The Luces perpetuated a scheme where their partnerships would lease equipment from equipment lessors, such as First Equipment Leasing Corporation and Westinghouse Credit Corporation ("WCC") (collectively known as the "Equipment Lessors"). *Id.* Equipment suppliers, acting as intermediaries between the Luces and the Equipment Lessors, never delivered the "leased" equipment to the Luces, and instead kicked back the money they were paid by the Equipment Lessors to the partnerships, which the Luces used for personal and financial gain. *Id.* The Luces eventually defaulted on their leases, leaving them indebted to WCC for several hundred thousand dollars. *Id.* at 1280. After they Luces filed for bankruptcy, the Equipment Lessors sued in Texas state court. *Id.* Before the state court determined the merits of the dispute, the Equipment Lessors requested that the bankruptcy court find the debt nondischargeable under 11 U.S.C. § 523(a)(2). *Id.* In finding the debt owed to the Equipment Lessors nondischargeable, among other holdings, the bankruptcy court denied the Equipment Lessors pre-petition attorneys' fees. *Id.* at 1285. The Equipment Lessors appealed, and the Fifth Circuit affirmed. *Id.* at 1285–86.

The Debtors' reliance on *In re Luce*, however, is misplaced for two reasons. First, while under the "American Rule," each party pays its own attorneys' fees arising out of litigation, certain exceptions exist. *In re Kirk*, 525 B.R. at 330. Attorneys' fees will be granted when "specific authority granted by statute or contract—a so-called 'fee shifting' provision—states otherwise." *In re Kirk*, 525 B.R. at 330 (citing *Alyeska Pipeline Serv. Co. v. Wilderness Society*,

421 U.S. 240, 263 (1975); then citing *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994); and then citing *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006)). In the present suit—unlike in *In re Luce*—a specific authority grants all attorneys' fees to the Plaintiff, namely, the Debtors' Guaranties.  The Guaranties explicitly provide that the Debtors are responsible for "all legal expenses related therto permitted by law."  [Pl.'s Ex. No. 5 at 23; Pl.'s Ex. No. 6 at 26].  While *In re Luce* clearly stands for the proposition that there needs to be a state court judgment for the pre-petition fees to be held nondischargeable, it does not wholly discharge the contractual fee-shifting provision of attorneys' fees, as the Debtors suggest. Because the Debtors have a contractual obligation with Trustmark to pay attorneys' fees pursuant to the Guaranties, the "American Rule" does not apply to the Pre-petition Fees in this suit.  Indeed, case law is clear that a party can recover its pre-petition attorneys' fees absent a state court judgment whenever there is a contractual provision providing for recovery of such fees.  *See, e.g.*, *In re Hight*, 393 B.R. 484, 499 (Bankr. S.D. Tex. 2008) (awarding pre-petition attorneys' fees based on language in Deed of Trust, not state court judgment).

Second, since *In re Luce* was decided in 1992, the Supreme Court has specifically addressed the nondischargeability of attorneys' fees in *Cohen v. de la Cruz*, 523 U.S. 213 (1998). In *Cohen*, the Supreme Court held that nondischargeable "debt" in a § 523(a)(2)(A) proceeding included punitive damages and an attorney fee award.  523 U.S. at 223.  The Supreme Court further determined that "debt" includes not only the judgment amount, but all "debt arising from" and "debt on account of" the misconduct giving rise to the judgment.  *Id.* at 220, 223.  In the suit at bar, it is clear that the Pre-petition Fees arose from the Debtors' fraudulent misrepresentations perpetuated prior to the bankruptcy petition and thus should be considered part of the "debt" the Debtors' owe Trustmark.  To the extent that *In re Luce* is inconsistent with

this ruling, *Cohen* governs.  *In re Kirk*, 525 B.R. at 331 n.37 ("[T]he *Luce* court's limitation on the recovery of pre-petition attorney's fees does not survive *Cohen* . . . .").

Based on the contractual fee-shifting provision the Debtors signed, holding them responsible for *all* attorneys' fees, and the Supreme Court's clear holding in *Cohen*, this Court finds that the Pre-petition Fees constitute a nondischargeable debt under § 523(a)(2)(A). Therefore, this Court finds that the total amount of reasonable attorneys' fees to which Trustmark is entitled to recover from the Debtors is $91,728.00, all of which this Court finds to be nondischargeable.

### d. *Trustmark's Request for Attorneys' Fees That Will be Incurred if the Debtors Appeal the Judgment to be Entered by this Court*

In addition to requesting reimbursement for the attorneys' fees and costs that it has already incurred for its collection efforts and the prosecution of this adversary proceeding through trial, Trustmark requests that this Court also award at this time any attorneys' fees that Trustmark will incur in the future in the event that the Debtors appeal the judgment that this Court is entering simultaneously herewith.  Specifically, Trustmark requests an award of attorneys' fees for legal services to be rendered on appeal in the following amounts: (1) $25,000.00 for all services rendered if the Debtors appeal to the United States District Court for the Southern District of Texas; (2) $15,000.00 for all services rendered if the Debtors appeal the District Court's decision to the Fifth Circuit Court of Appeals; and (3) $15,000.00 for all services rendered if the Debtors appeal the Fifth Circuit's decision to the United States Supreme Court. [Adv. Doc. No. 58 at 5–6, ¶ 22].  The Debtors oppose this request.  They argue that applicable federal law does not allow for such relief.

This Court agrees with the Debtors' position.  In *Centerpoint Energy Inc., v. Associated Electric & Gas Insurance Services Ltd.*, Magistrate Judge Mary Milloy, in ruling on the plaintiffs' request for what she called "conditional appellate fees," stated the following:

> However, federal courts have declined to award appellate fees if no appeal has actually been filed.  *Watkins v. Input/Output, Inc.*, 531 F.Supp.2d 777, 786 (S.D. Tex. 2007) (citing *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 433 (5th Cir. 2003) ("It is difficult to imagine how a district court's refusal to award appellate attorney fees before an appeal had even been taken could possibly be declared an error.").  Instead, if a party is entitled to attorneys' fees, the Fifth Circuit will typically remand the appropriate fee determination to the district court once the claim for fees is ripe for adjudication. *Id.* (citing *Williams v. Trustmark Ins. Co.*, 173 Fed. App'x. [sic] 330, 335 (5th Cir. 2006).  Because neither party has appealed the final judgment here, the court declines to award conditional appellate attorneys' fees to [the plaintiffs] at this time.

No. 09-2107, 2011 WL 13134619, at *2 (S.D. Tex. May 27, 2011).

This Court agrees with Judge Milloy's reasoning and adopts her ruling in this adversary proceeding.  Indeed, two cases from the Southern District of Texas support the position that requests for appellate fees defending judgments issued by bankruptcy courts for violations of the automatic stay should be made to the appellate court.  First, in *Mitchell v. BankIllinois*, 316 B.R. 891 (S.D. Tex. 2004), District Judge Lee Rosenthal dealt with an appeal from the bankruptcy court's judgment awarding a Chapter 13 debtor damages for the defendant's violation of the automatic stay.  Judge Rosenthal affirmed the bankruptcy court's order—which awarded the debtor actual damages of $1,972.47 and attorneys' fees for the prosecution of the action in the bankruptcy court in the amount of $6,548.50—and then addressed the issue of whether the debtor was entitled to reimbursement of her attorneys' fees for legal services provided defending the bankruptcy court's order on appeal to the district court.  Judge Rosenthal held that the debtor was entitled to recover these fees from the defendant by stating that:

176

> [The debtor] is also entitled to the attorney fees and costs for defending this appeal. "[Section 362(h)] requires an award of actual damages, including reasonable attorney's fees, caused by the stay violation. Clearly, fees and costs experienced by the injured party in resisting the violator's appeal are part of the damages resulting directly from the stay violation." *In re Walsh*, 219 B.R. 873, 878 (9th Cir. BAP 1998).

*Mitchell*, 316 B.R. at 904.[85]

Judge Rosenthal therefore ordered the debtor to "submit documentation of the fees incurred in defending this appeal within ten days of the date this Memorandum and Order are filed." *Id.* Thus, the district court, not the bankruptcy court, dealt with the issue as to how much attorneys' fees and costs the party who successfully defended the appeal should recover.

A more recent opinion dealing with this same issue came from District Judge Sim Lake in *Burrell v. Auto—Pak—USA, Inc. (In re Burrell)*, Civil Action No. H-12-0450, 2012 WL 3727130 (S.D. Tex. Aug. 27, 2012). Judge Lake affirmed the bankruptcy court's judgment—which awarded the debtor actual damages of $7,181.60, punitive damages of $7,181.60, and attorneys' fees of $54,516.95 for services relating to the representation of the debtor through trial, *id.* at *3—and then he addressed whether the plaintiff (i.e., the debtor) was entitled to reimbursement of her attorneys' fees for legal services provided defending the bankruptcy court's judgment on appeal to the district court. Unlike District Judge Rosenthal, District Judge Lake did not review the rationale for awarding attorneys' fees for services rendered defending the judgement on appeal. Rather, in his concluding paragraph, after affirming the judgment, he ordered the debtor to do the following: "[The debtor] shall file documentation of the fees incurred in defending this appeal within ten (10) days from the entry of this Memorandum Opinion and Order. [The Defendant] may respond within twenty (20) days from the entry of this

---

[85] At the time Judge Rosenthal issued her opinion, § 362(h) was the applicable Code provision. However, when Congress amended the Code in 2005, §362(h) became § 362(k). *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 10–8, 119 Stat. 23.

Memorandum Opinion and Order." *In re Burrell*, 2012 WL 3727130, at *16.  Thus, District Judge Lake made it eminently clear that he—not the bankruptcy court—would adjudicate the issue of how much in fees and costs the plaintiff should recover from the defendant for successfully defending the judgment on appeal.

Given the holdings in the above referenced cases, this Court expressly declines to award Trustmark in the suit at bar any fees for future services that its attorneys may have to render if the Debtors appeal the judgment that this Court is entering simultaneously herewith on the docket.  If Trustmark wants to recover fees for services that their attorneys render defending the judgment on appeal, it will need to request such relief from the appropriate appellate court after its attorneys have actually provided services representing Trustmark on appeal.[86]

### 2.  Costs and Expenses

Trustmark requests reimbursement of expenses totaling $6,503.84.  The Debtors do not object to post-petition expenses of $5,512.12.  They do, however, object to paying Trustmark's pre-petition expenses of $991.72.  [Adv. Doc. 53].  Once again, the Debtors object based upon the holding that the Fifth Circuit issued in *In re Luce*.  However, as this Court has discussed immediately above with respect to pre-petition attorneys' fees, the holding in *In re Luce* does not survive the Supreme Court's decision in *Cohen*.  Accordingly, this Court finds that Trustmark is entitled to recover its pre-petition expenses of $991.72 in addition to recovering its post-petition

---

[86] At the hearing held on May 31, 2018 (which was concerned solely with the issue of how much attorneys' fees and costs Trustmark should recover as part of the nondischargeable judgment to be entered by this Court), Trustmark's counsel inquired as to whether this Court's refusal to award the specific attorneys' fees being requested by Trustmark in the event that the Debtors appeal represented a decision by this Court that Trustmark is barred from recovering any fees for services rendered defending Trustmark's judgment on appeal.  The Court expressly stated on the record that its decision not to award the exact amounts now being requested by Trustmark in no way is to be construed as a ruling from this Court that Trustmark is barred from recovering fees associated with services rendered in the future for defending the judgment on appeal.  Indeed, this Court expressly stated on the record that **if** the Debtors appeal, and **if** Trustmark incurs attorneys' fees successfully defending the judgment on appeal, then Trustmark is in fact entitled to recover its reasonable attorneys' fees for defending the judgment on appeal.  Moreover, this Court stated on the record that such attorneys' fees would also be nondischargeable.  The Court's ruling at this time is therefore a very narrow one: namely, that this Court will not award the specific amounts requested by Trustmark, as they are speculative.

expenses of $5,512.12.  In total, the Court finds that the total amount of reasonable costs and expenses to which Trustmark is entitled to recover from the Debtors is $6,503.84.

       3.  <u>Post-Judgment Interest on the Total Amount of Attorneys' Fees, Costs, and Expenses</u>

Additionally, the Court will also order the Debtors to pay post-judgment interest on the total amount of attorneys' fees and costs awarded to Trustmark.  The Fifth Circuit has held that interest on attorneys' fees begins to accrue on the date of the judgment allowing recovery of attorneys' fees and runs until the date the fees are paid in full.  *See Copper Liquor, Inc. v. Adolph Coors Co.*, 701 F.2d 542, 544–45 (5th Cir. 1983) (en banc), *overruled in part on other grounds by J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 790 F.2d 1193, 1195 (5th Cir. 1986), *aff'd* 482 U.S. 437 (1987).   Further, if the the prevailing party is awarded attorneys' fees and those fees are a part of the judgment, then those fees will bear interest at the same rate as that applied to the judgment on the merits.  *Id.*  The Fifth Circuit allows this interest on attorneys' fees because it "better serve[s] the purpose of awarding these expenses to the prevailing party since it . . . more nearly compensate[s] the victor for the expenses of the litigation."  *Id.* at 544. The post-judgment interest that accrues on the attorneys' fees and costs is also a nondischargeable obligation.  Once again, in making this conclusion, the Court relies upon the language in *Cohen* that the nondischargeable debt imposed upon the Debtor includes "other relief."  *Cohen*, 523 U.S. at 223; *see also In re Ayesh*, 465 B.R. at 449–50 (finding legal fees to be nondischargeable); *Wegmans Food Mkts., Inc. v. Lutgen (In re Lutgen)*, No. 98-CV-0764E(SC), 1999 WL 222605, at *3 (W.D.N.Y. Apr. 5, 1999) (same).  In the suit at bar, the rate that will be in effect on the date of the entry of the judgment will be 2.23% per annum.

## V.   Conclusion

At trial, Mr. Tegeler testified about his disenchantment with certain business practices of Mr. Stutes; indeed, he testified that Mr. Stutes was violating the law.  [Nov. 7, 2017 Tr. 120:23–121:17].   Mr. Tegeler also testified about his concern with Mr. Huebel, suggesting that Mr. Huebel was less than 100% honest with him once he became a co-owner with him of FWM.  [Nov. 7, 2017 Tr. 127:10–132:4].   Given the evidence presented at trial in this adversary proceeding, this Court suggests to Mr. Tegeler and his wife that they need to think more about their own conduct.

Sir Walter Scott's maxim applies to the Debtors: "O, what a tangled web we weave when first we practise to deceive!"[87]   Here, the Debtors deceived Trustmark by making numerous misrepresentations in the loan application, the Loan Documents, and the borrowing base certificate dated September 17, 2014.  By doing so, they achieved their objective of establishing a line of credit for BCGC, which in turn facilitated their objectives of acquiring a 50% interest in FWM and using of loan proceeds drawn down by BCGC to pay the obligations of FWM.  In the end, however, their alliance with FWM turned sour, and resulted in not only their own Chapter 7 bankruptcy, but also the shuttering of FWM's doors and the Chapter 7 filing by Huebel on July 7, 2016.  [Case No. 16-60429, in the United States Bankruptcy Court for the Eastern District of Texas (Tyler), Doc. No. 1].  Having voluntarily chosen to file Chapter 7, the Debtors must now suffer the consequences of having defrauded Trustmark.  Trustmark has successfully proven the necessary elements of its § 523(a)(2)(A) claims against the Debtors, and accordingly, the Court finds that the $256,716.54 Debt, plus pre-judgment interest and attorneys' fees and costs, are nondischargeable obligations as to both of the Debtors, jointly and severally.

---

[87] Sir Walter Scott, *Marmion, Canto vi. Stanza 17*.  The Court notes that the word "practise" is not misspelled in this quotation.

Additionally, Trustmark has successfully proven the necessary elements of its § 523(a)(6) claim against the Debtors, and accordingly the Court finds that the $256,716.54 Debt, plus pre-judgment interest and attorneys' fees and costs, are nondischargeable obligations as to both of the Debtors, jointly and severally, under this particular provision.

In sum, the Debtors, jointly and severally, are liable to Trustmark in the following amounts, all of which constitute nondischargeable obligations:

(1) unpaid principal amount owed under the Note:  $230,000.00;

(2) accrued unpaid interest owed under the Note as of the Petition Date:  $14,447.22;

(3) accrued unpaid late charges owed under the Note as of the Petition Date:  $12,269.32;

(4) pre-judgment interest (from November 7, 2016, i.e., the Petition Date, up to the date set forth below):  $16,617.50;

(5) attorneys' fees of $91,728.00;

(6) costs and expenses totaling $6,503.84; and

(7) post-judgment interest (accruing from the date set forth below up until all of the above referenced amounts are paid in full).

A judgment consistent with these Findings of Fact and Conclusions of Law will be entered on the docket simultaneously herewith.

Signed on this 8th day of June, 2018.

_____
Jeff Bohm
United States Bankruptcy Judge

# Appendix

Assuming that this Court is incorrect and that an unsecured creditor (such as Trustmark) cannot recover its post-petition interest under its contract (here, the Note), the Court, in the alternative, concludes that Trustmark can still recover post-petition interest under a different basis than a contractual one.  The Fifth Circuit has stated as follows:

> The determination of whether pre-judgment interest should be awarded requires a two-step analysis: does the federal act creating the cause of action preclude an award of pre-judgment interest, and if not, does an award of pre-judgment interest further the congressional policies of the federal act.  If pre-judgment interest can be awarded under the two-prong test, whether such interest is awarded in any given case is within the court's discretion.

*Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275, 1288 (5th Cir. 1994) (internal citations omitted).

In the suit at bar, there is no provision of the Code in general, or § 523 in particular, precluding an award of pre-judgment interest.  Moreover, the Fifth Circuit has held that pre-judgment interest may be awarded in cases involving fraudulent transfers because it "furthers the congressional policies of the Bankruptcy Code" and "compensates the estate for the time it was without use of the transferred funds."  *McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1339–40 (5th Cir. 1995).  *See Gentry v. Kovler (In re Kovler)*, 253 B.R. 592, 602–03 (Bankr. S.D.N.Y. 2000) (awarding pre-judgment interest to creditor who was successful in fraudulent conveyance adversary proceeding).  Granted, *In re Texas General* involved a bankruptcy trustee recovering fraudulent transfers for the estate; whereas, in the suit at bar, the plaintiff (i.e., Trustmark) is not a trustee, but rather an individual creditor recovering a judgment solely for itself.  Nevertheless, *Husky International Electronics, Inc. v. Ritz*, 136 S. Ct. 1581, 1589 (2016) was a watershed case that led the Supreme Court to hold that a § 523(a)(2)(A) action can be successful based upon fraudulent transfers; and here, Trustmark has in fact prevailed by showing that the Debtors orchestrated fraudulent transfers.  Moreover, the

Supreme Court has held that § 523(a)(2)(A) should not be construed in favor of "giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud." *Cohen v. de la Cruz*, 523 U.S. 213, 223 (internal citation and quotation omitted). Here, in the suit at bar, to allow the Debtors to escape paying pre-judgment interest would be to "allow the malefic debtor [to] hoist the Bankruptcy Code as protection from the full consequences of fraudulent conduct." *HSSM #7 L.P. v. Bilzerian (In re Bilzerian)*, 100 F.3d 886, 891 (11th Cir. 1996) (internal quotation and citation omitted).

Awarding pre-judgment interest also furthers the congressional purpose that the Code provide a discharge to only honest debtors. *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991); *White v. Brown Shoe Co.*, 30 F.2d 674, 674–75 (5th Cir. 1929); *Gebhardt v. Gartner (In re Gartner)*, 326 B.R. 357, 378 (Bankr. S.D. Tex. 2005). Here, the Debtors, who were not entirely credible witnesses, who made material misrepresentations to Trustmark, both orally [Finding of Fact No. 13(d)], and in writing [Finding of Fact No. 33], and who committed actual fraud, should not be allowed to walk away with only having to pay the unpaid principal amount of $230,000.00—i.e., the amount that Trustmark advanced on September 18, 2014, in reliance upon the materially false borrowing base certificate submitted by Ms. Tegeler [Finding of Fact No. 38, 40]. Indeed, "[t]he purpose of prejudgment interest is to 'make a plaintiff whole' . . . not to reward or punish a party for its litigation conduct." *Tow v. Speer*, No. H-11-3700, 2015 WL 1058080, at *14 (S.D. Tex. Mar. 10, 2015) (quoting *Williams*, 218 F.3d at 488). It would be grossly inequitable for the Debtors to escape without having to pay the time-value of money to Trustmark.

Therefore, for all the reasons set forth above, this Court, exercising its discretion, awards pre-judgment interest to Trustmark. The next question is, at what rate?

Because no federal statute sets the pre-judgment interest rate, the Court must look to state law. *ASARCO LLC v. Am. Mining Corp.*, 404 B.R. 150, 164 (S.D. Tex. 2009) (holding that for "fraudulent-transfer actions . . . courts may look to the laws of the state under which a similar fraudulent-transfer action could have been brought for such guidance"); *see also Murray v. La. State Univ. Found. (In re Zohdi)*, 234 B.R. 371, 385 (Bankr. M.D. La. 1999) (noting that the court should look to state law for the pre-judgment interest rate). Under Texas law, the rate of pre-judgment interest "accrue[s] at the same rate as postjudgment interest . . . ." *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 500 (5th Cir. 2002); *see also Anderson v. Mega Lift Sys., L.L.C. (In re Mega Sys., L.L.C.)*, No. 04-6085, 2007 WL 1643182, at *10–11 (Bankr. E.D. Tex. June 4, 2007). The post-judgment rate is statutorily set at "either 'the prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation' or 'five percent a year if the prime rate as published by the Board of Governors . . . is less than five percent.'" *Arete Partners, L.P. v. Gunnerman*, 643 F.3d 410, 415 (5th Cir. 2011) (quoting Tex. Fin. Code Ann. § 304.003I(1)–(2) (West 2018)). The current prime rate is 4.75%. *The Fed – H.15 – Selected Interest Rates (Daily)*, Board of Governors of the Federal Reserve System, https://www.federalreserve.gov/releases/h15 (last visited June 8, 2018). Section 304.003(c)(2) of the Texas Finance Code states that the post-judgment rate shall be set at 5.0% if the current prime rate is less than 5.0%. Therefore, pursuant to § 304.003(c)(2) of the Texas Finance Code, the Court will award Trustmark pre-judgment interest at a rate of 5% per annum. *See Int'l Turbine Servs., Inc.*, 278 F.3d at 500 (holding that the rate of pre-judgment interest accrues at the same rate as post-judgment interest); *see also In re Mega Sys., L.L.C.*, 2007 WL 1643182, at *10–11 (holding same).

This Court has discretion to award pre-judgment interest from the date that the adversary proceeding is instituted. *Floyd v. Dunson (In re Rodriguez)*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997). Here, this Court chooses to exercise this discretion and will award Trustmark pre-judgment interest from the date that it filed the complaint initiating the pending adversary proceeding. Therefore, here, the Court finds that the pre-judgment interest rate of 5.0% accrues as of February 9, 2017 [Adv. Doc. No. 1, showing that the Complaint was filed on February 9, 2017]. Thus, the amount of this pre-judgment interest is $17,058.81.[1] Further, the Court concludes that all pre-judgment interest is nondischargeable; the Court does so based upon the Supreme Court's language in *Cohen* that the nondischargeable debt includes "other relief." *Cohen*, 523 U.S. at 223; *Fire Safe Prot. Servs., LP v. Ayesh (In re Ayesh)*, 465 B.R. 443, 449–50 (Bankr. S.D. Tex. 2011) (applying *Cohen* to find legal fees, interest, and other costs from the breach of contract to be nondischargeable); *Miller v. Lewis*, 391 B.R. 380, 385 (E.D. Tex. 2008) (applying *Cohen* and find that the entirety of a judgment was an "obvious outgrowth" of the "fraudulent scheme"). The sum of $256,716.54, plus $17,058.81 equals $273,775.35, and this aggregate amount is nondischargeable and will bear post-judgment interest, as discussed in the Memorandum Opinion.

---

[1] The calculation is done for the period of February 9, 2017, through June 8, 2018 (i.e., up to the date that this Memorandum Opinion, plus the judgment associated therewith, are entered on the docket). The calculation is done using 5% simple interest. *Arete Partners, L.P. v. Gunnerman*, 643 F.3d 410, 415 (5th Cir. 2011) (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 532 (Tex. 1998)); *Huggins v. Royalty Clearinghouse, Ltd.*, 121 F. Supp. 3d 646, 660 (W.D. Tex. 2015). This calculation is shown on the following chart:

| Simple Interest Calculation from February 9, 2017 through June 8, 2018 | |
|---|---|
| Amount owed as of the Petition Date | $256,716.54 |
| Interest Rate | 5.0% per annum |
| Term (years) | 1 year, 4 months, 27 days |
| Interest | $17,058.81 |
| | |
| **Prejudgment Interest + Amount Owed as of the Petition Date** | **$273,775.35** |